<u>**FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: MERCEDES-BENZ TELE AID CONTRACT LITIGATION | Civ. No.  07-2720 (DRD)<br><br>MDL No. 1914<br><br>**O P I N I O N** |

*Appearances by:*

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
by: Jonathan D. Selbin, Esq. & Jennifer Gross, Esq.
780 Third Avenue, 48th Floor
New York, NY 10017

CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI, STEWART & OLSTEIN
by: James E. Cecchi, Esq. & Lindsey H. Taylor, Esq.
5 Becker Farm Road
Roseland, NJ 07068

GIRARD GIBBS, LLP
by: Eric H. Gibbs, Esq. & Geoffrey A. Munroe, Esq.
601 California Street, 14th Floor
San Francisco, CA 94108

TRUJILLO, RODRIGUEZ & RICHARDS, LLP
by: Lisa J. Rodriguez, Esq.
8 Kings Highway West
Haddonfield, NJ 08033

*Interim Co-Lead and Liaison Counsel for Plaintiffs*

BRYAN CAVE, LLP
by: Peter W. Herzog III, Esq. & Ketrina G. Bakewell, Esq.
1 Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, MO 63102

GRAHAM CURTIN, PA
Thomas R. Curtin, Esq.
Kathleen M. Fennelly, Esq.
4 Headquarters Plaza
P.O. Box 1991
Morristown, NJ 07962

*Attorneys for Defendant*

**<u>DEBEVOISE, Senior District Judge</u>**

This matter comes before the Court on a motion by Plaintiffs,[1] individuals who purchased

model year 2002-2006 automobiles manufactured and marketed by Defendant Mercedes-Benz

U.S.A., LLC ("Mercedes"), for certification as a class pursuant to Federal Rule of Civil

Procedure 23.  Mercedes, a Delaware corporation with its principal place of business in

Montvale, New Jersey, is responsible for the marketing and service of all Mercedes-Benz

vehicles sold by authorized dealers in the United States.  Because the amount in controversy

exceeds $5,000,000 and at least one of the Plaintiffs resides outside New Jersey, this Court

properly has jurisdiction over the dispute pursuant to the Class Action Fairness Act, 28 U.S.C. §

1332(d).

As the putative representatives of a nationwide class, Plaintiffs assert causes of action for

common law unjust enrichment and violations of the New Jersey Consumer Fraud Act, N.J. Stat.

Ann. §§ 56:8-1 et seq. ("NJCFA").  Those claims are premised on the contention that Mercedes

made statements or omissions of material facts that it knew or should have known were false or

misleading when promoting vehicles purchased by Plaintiffs that were equipped with "Tele

---

[1] The purported class is represented by 15 named Plaintiffs: Leroy Browning, James Giotis, Richard Hankins, Jack D. Kelley, Karen Marcus, Nicholas Lonzisero, Christian Andrew Pellegrini, Mark Russell, Ashish Sen, Colleen Sen, Cord Shiflet, Michael Leslie Shim, Lois A. Stowers, Robert E. Stowers, and Susan Tuteur.  On June 2, 2008, former Plaintiff S.B. Atlass voluntarily dismissed his claim without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1).  Similarly, former Plaintiff Sandra Levin voluntarily dismissed her claim without prejudice on March 12, 2009.

Aid," an emergency response system which links subscribers to road-side assistance operators by using a combination of global positioning and cellular technology. The Tele Aid systems installed in Plaintiffs' vehicles used an analog signal provided by AT&T Wireless Services, Inc. ("AT&T"), as part of a contract between that company and Mercedes.[2] Pursuant to a Federal Communications Commission ("FCC") rule first proposed on May 17, 2001 and adopted on August 8, 2002, AT&T was no longer required to provide analog service after a five-year "sunset period" ending on February 18, 2008.[3] In light of that rule, Plaintiffs allege that Mercedes knew or should have known as early as August 8, 2002 that analog Tele Aid systems would become obsolete in 2008, but continued to the market those systems without disclosing their future obsolescence to buyers of 2002-2004 and some model year 2005 and 2006 vehicles.

In support of their Motion for Class Certification, Plaintiffs submitted the reports of three experts: Dr. Warren J. Keegan, Mr. Edmond J. Thomas, and Dr. Russell L. Lamb. Dr. Keegan, a Professor of Marketing and International Business at Pace University's Lubin School of Business, opined that Mercedes's statements regarding Tele Aid prior to the individual notifications mailed in 2006 and 2007 were insufficient to inform subscribers that analog service would terminate at the end of 2007. Mr. Thomas, an expert in wireless communications and former Chief Engineer of the FCC, contended in his report that the discontinuation of analog service in early 2008 was a regulatory certainty at the time the FCC finalized its rule on August 8, 2002. At their core, the reports submitted by Dr. Keegan and Mr. Thomas implicate issues that will be addressed at trial: (1) whether Mercedes's statements relating to analog Tele Aid

---

[2] Plaintiffs assert no claims against AT&T.

[3] Although the FCC finalized its rule change on August 8, 2002, the amendments to the agency's regulations that resulted from that change did not take effect until six months later, on February 18, 2003. Therefore, the date on which the five-year ended was set as February 18, 2008. For the sake of convenience, the Court will refer throughout its ruling to February 18, 2008 as the date after which communications companies were no longer required to provide analog service.

service were misleading, and (2) whether the company knew or should have known those statements were false.  Since neither report deals with the question currently before the Court – whether Plaintiffs' claims are amenable to class, rather than individual, proof – the testimony of Dr. Keegan and Mr. Thomas need not be considered at this stage.  See In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 309 (3d Cir. 2008) ("Plaintiffs' burden at the class certification stage is not to prove the element[s]" of their particular claim.  "Instead, the task for plaintiffs at class certification is to demonstrate that [those elements are] capable of proof at trial through evidence that is common to the class rather than individual to its members.").

    In contrast, the report submitted by Dr. Lamb dealt with the number of potential class members, an issue that is directly relevant to the pending Motion for Class Certification. Mercedes contends that Dr. Lamb (1) ignored segments of the proposed class, (2) came to conclusions regarding common injury and damages that are unreliable and are not supported by classwide evidence, (3) impermissibly used aggregate damages as the measure of possible recovery, and (4) violated discovery rules by failing to produce material from a related case that he relied upon while formulating his opinions.  On the basis of those allegations, the company moves to exclude Dr. Lamb's testimony pursuant to Federal Rule of Evidence 702.  In support of its motion, Mercedes submitted an expert declaration by Dr. M. Laurentius Marais, which was dedicated solely to attacking the conclusions contained in Dr. Lamb's report.

    For the reasons set forth below, the Court finds that New Jersey law applies to both of Plaintiffs' claims.  Because those claims pose common factual and legal questions and the proposed class satisfies the conditions set forth in Federal Rule of Civil Procedure 23, Plaintiffs' Motion for Class Certification will be granted.  The information contained in Dr. Lamb's expert report pertains only to the pending request for class certification and is unnecessary to the

Court's determination that Plaintiffs' claims are amenable to class treatment.  Therefore, Mercedes's Motion to Exclude Dr. Lamb's report is moot, and the Court need not consider the expert testimony submitted by Dr. Marais in support of that motion.

## I. BACKGROUND

This multi-district litigation is comprised of ten separate actions which were originally filed in six different states.  S.B. Atlass, a former Plaintiff who has voluntarily dismissed his claim, filed a Class Action Complaint with this Court on June 11, 2007.  See Atlass v. Mercedes-Benz U.S.A., LLC, Civ. No. 07-2720 (D.N.J.).  On July 17th of that year Plaintiff Christian Andrew Pellegrini filed a similar case in the United States District Court for the Central District of California.  See Pellegrini v. Mercedes-Benz U.S.A., LLC, Civ. No. 07-4530 (C.D. Cal.).  A third putative class action, filed by Plaintiffs Lois and Robert Stowers in the Superior Court of the State of Washington on October 27, 2007, was removed to the United States District Court for the Western District of Washington on November 11th of that year.  See Stowers, et. al. v. Mercedes-Benz U.S.A., LLC, Civ. No. 07-1797 (W.D. Wash.).  Arguing that the three aforementioned suits involved common questions of fact, Mercedes moved on November 20, 2007 for the cases to be consolidated into a multi-district litigation and transferred to this forum pursuant to 28 U.S.C. § 1407.  The United States Judicial Panel on Multidistrict Litigation ("JPML") granted that motion on February 26, 2008, and transferred the actions for "consolidated or coordinated pretrial proceedings."  Six additional cases – filed in United States District Courts based in California, Illinois, New York, and Missouri – were transferred to this Court after the JPML issued its Order.  See Hankins v. Mercedes-Benz U.S.A., LLC, Civ. No. 07-7543 (C.D. Cal.); Levin v. Mercedes-Benz U.S.A., LLC, Civ. No. 08-0175 (C.D. Cal.); Marcus v. Mercedes-Benz U.S.A., LLC, Civ. No. 07-6892 (N.D. Ill.); Russell v. Mercedes-Benz

U.S.A., LLC, Civ. No. 07-4984 (E.D.N.Y.); Sen, et. al. v. Mercedes-Benz U.S.A., LLC, Civ. No. 07-6519 (N.D. Ill.); Tuteur v. Mercedes-Benz U.S.A., LLC, Civ. No. 08-0223 (E.D. Mo.).  A tenth and final action was filed directly with this Court on February 27, 2009.  See Lonzisero v. Mercedes-Benz, U.S.A., LLC, Civ. No. 09-0899 (D.N.J.).[4]

On April 11, 2008, after the various actions that make up this multi-district litigation were consolidated and transferred, the Court issued a Case Management Order in which it appointed interim class counsel and outlined the pre-trial responsibilities of the parties.  In that Order, the Court instructed Plaintiffs to "file a Consolidated Amended Complaint in this Consolidated Action, which shall supersede the complaints filed in each of the individual Actions."  (Case Management Order of April 11, 2008, ¶ H.)  Plaintiffs complied, and on May 2, 2008 filed a Consolidated Class Action Complaint asserting claims for unjust enrichment and consumer fraud.  See (Consol. Compl. ¶¶ 64-77, 83-93.)[5]  Both of Plaintiffs' claims are premised on their contention that Mercedes knew or should have known that the analog network on which the Tele Aid systems contained in their vehicles depended would cease to function in 2008, but continued to market Tele Aid without disclosing that fact.  See (Id. ¶¶ 2-4.)

**A.  Tele Aid**

Mercedes began including Tele Aid systems in most of its vehicles in 2000.  By April 18, 2002, the company had produced roughly 325,000 vehicles equipped with Tele Aid units, and expected to manufacture another 175,000 each year for the foreseeable future.  (Pls.' Br. Supp.

---

[4] That case will be consolidated pursuant to the Court's April 11, 2008 Case Management Order, which states that "actions subsequently filed in or transferred to this Court that assert putative class claims arising from or relating to the unavailability of 'Tele Aid' telematics services to owners or lessees of Mercedes-Benz vehicles originally equipped with analog-only telematics equipment are hereby consolidated for pre-trial purposes."
[5] The original Consolidated Class Action Complaint included a third claim, breach of implied warranty of merchantability.  Plaintiffs did not move for class certification on that cause of action, choosing instead to voluntarily dismiss their implied warranty claims on March 12, 2009.

Mot. Class Certification, Decl. of Geoffrey Munroe ("Munroe Decl."), Ex. 4 at 1.)  According to

an internal Mercedes memorandum dated November 14, 2006, the company sold approximately

720,000 vehicles equipped with analog-only Tele Aid systems.  (Id., Ex. 18 at 1.)  In

advertisements for Tele Aid, the company touted its ability to provide subscribers with

emergency road-side assistance, remotely unlock doors, and track stolen vehicles.  (Consol.

Compl. ¶ 25.)  A brochure distributed to subscribers stated that "your Tele Aid system gives you

access to service and assistance anywhere.  Anytime."  (Munroe Decl., Ex. 24 at 2.)  In

communications with the FCC, Mercedes claimed that "Tele Aid devices significantly improve

the safety of motorists on America's roadways" by allowing drivers to connect instantly with

roadside assistance operators and automatically notifying authorities of automobile accidents.

(Id., Ex. 1 at 4.)

        Wireless telephone networks operate using either an analog or digital signal.  Although

the technology to produce so-called "dual mode" devices capable of using both analog and

digital phone signals existed at the time, the Tele Aid systems installed in Mercedes's model year

2000-2004 and some 2005 and 2006 automobiles depended exclusively on analog signals.  See

(Id., Ex. 4 at 3) (letter submitted to the FCC by counsel for Mercedes discussing the existence of

dual mode devices and stating that the installation of such devices would add $100 to the

manufacturing cost of each vehicle, a 25 percent increase over the $400 cost of analog-only

devices).  Later vehicles were fitted with Tele Aid equipment that had been re-engineered to

communicate using both analog and digital signals.

        Plaintiffs purchased Mercedes model year 2002-2006 vehicles equipped with analog-only

Tele Aid Systems.  In order to receive Tele Aid service, Plaintiffs were required to sign a

Subscriber Agreement that was separate from their purchase or lease contracts.  Mercedes

offered free Tele Aid service for one year, after which Plaintiffs were required to periodically renew their subscriptions by pre-paying fees corresponding to a given number of years of Tele Aid service.  See (Id., Exs. 19-22); (Def.'s Br. Opp'n Class Certification 3.)  Each of the named Plaintiffs subscribed to Tele Aid until AT&T's discontinuation of analog service.  After that, some Plaintiffs chose to purchase an upgrade to digital equipment offered by Mercedes.  Others did not purchase the upgrade, leaving the Tele Aid systems contained in their vehicles useless.

**B.  FCC Rule**

The fact that Plaintiffs' vehicles were equipped with analog-only Tele Aid systems would not have spawned the current controversy were it not for the promulgation of an FCC rule eliminating the requirement, previously mandated in 47 C.F.R. §§ 22.901 and 22.933, that wireless carriers provide analog-based networks.  The changes to that requirement, which were first proposed on May 17, 2001, were vigorously opposed by Mercedes.  In comments on the proposed rule dated August 1, 2001, Mercedes explained that the planned change would render analog-only Tele Aid systems obsolete.  The company also stated that "[i]t is not feasible to expect automobile users to return to the dealership for Tele Aid hardware modifications as [FCC] standards evolve."  (Id., Ex. 1 at 6-7.)

After its initial letter failed to persuade the FCC, Mercedes continued to object to the proposed rule change.  Attorneys for the company met with FCC Commissioners on two separate occasions during 2002.  In those meetings, Mercedes's lawyers argued that digital cellular service was not widespread enough to provide the necessary coverage for Tele Aid to function, and the proposed rule would therefore endanger their customers' safety by making it impossible to provide crash notification and emergency response services through the use of Tele Aid.  See (Id., Exs. 3, 5.)  The company also submitted a second set of comments on the proposed rule, in

8

which it contended that "automakers and automobile consumers have together invested hundreds of millions of dollars into the analog telematics hardware installed in vehicles currently on the road," and the proposed rule would "prematurely render the hardware obsolete."  (Id., Ex. 4 at 3); see also (Id., Ex. 1 at 6) (stating that the Tele Aid systems were "embedded in [] automobile[s] designed to last up to 20 years.").

Despite Mercedes's protestations, the FCC on August 8, 2002 issued a Report and Order stating that wireless communications companies would no longer be required to provide analog service after a five-year "sunset period."  In doing so, the agency explicitly rejected Mercedes's arguments against the rule, holding that:

> [T]he arguments advanced by telematics providers do not constitute sufficient basis to warrant the indefinite imposition of an outdated technical standard.  Each of the factors identified by telematics providers – e.g., development cycles of vehicles, choice of hardware and technology platforms – are considerations within the control of the individual provider or the original equipment manufacturer with whom it partners.  We are not persuaded that the public interest requires us to accommodate the voluntary business decisions of telematics providers to offer services that require wide-area wireless coverage, and to deploy such services using analog technology.

(Def.'s Br. Opp'n Mot. Class Certification, Decl. of Kathleen N. Fennelly ("Fennelly Decl."), Ex. 7 at 13.)

While the FCC found that an immediate abrogation of the rule requiring wireless communications companies to provide analog service would have disruptive effects on Tele Aid and similar services, it stated that "the sunset period we are establishing … should also mitigate any significant impacts that might affect telematics providers.  During the transition period, we anticipate that telematics providers will be able to … secure service on [wireless] carriers' digital networks."  (Id.)  Based on that pronouncement, the FCC amended the Code of Federal

Regulations to state that wireless communications companies would no longer be required to provide analog service after February 18, 2008.  See 47 C.F.R. § 22.901(b).

The FCC issued a press release summarizing its Report and Order on August 8, 2002, and published the full text of its ruling on September 24, 2002.  The amendments to 47 C.F.R. §§ 22.901 and 22.933 did not take effect, however, until February 18, 2003.  See Public Mobile and Communications Services, 67 Fed. Reg. 77,175 (Dec. 17, 2002).  Thus, telematics providers such as Mercedes were given over five and a half years notice – from the time of the FCC's ruling and press release on August 8, 2002 until the sunset date – of the fact that wireless communications companies would no longer be required to provide analog service after February 18, 2008.

**C.  Sales of Analog-Only Tele Aid Systems After August 8, 2002**

Mercedes continued to manufacture and sell vehicles equipped with analog-only Tele Aid systems after the FCC's August 8, 2002 ruling, but did not inform its customers that wireless carriers would no longer be required to provide the analog service on which their Tele Aid systems depended after February 18, 2008.  In fact, Mercedes did not publicly acknowledge the FCC rule change and the impending obsolescence of analog-only Tele Aid systems until November 2006, when it posted information regarding those developments on its website. (Def.'s Br. Opp'n Class Certification 9.)  Owners of vehicles equipped with analog-only Tele Aid systems were not personally informed until their Tele Aid subscriptions needed to be renewed, meaning that in some cases individual subscribers did not receive notice of the FCC rule change and the imminent cessation of their Tele Aid service until late 2007.  See (Munroe Decl., Ex. 26 at 1) (letter from Mercedes to a Tele Aid subscriber dated September 7, 2007 stating that "in accordance with a recent Federal Communications Commission (FCC) ruling,

10

traditional analog wireless networks that support some Tele Aid systems, including the one used in your vehicle … will no longer be required to be maintained by wireless carriers.").

The disclosures Mercedes sent to Tele Aid subscribers in 2006 and 2007 were part of a "customer ramp-down" plan initiated in cooperation with AT&T.  In meetings between the two companies as early as August 22, 2002 – a mere 14 days after the FCC's initial ruling – AT&T made it clear that they would "shut down" their analog network as soon as the requirement that they provide such service expired.  (Id., Ex. 12 at 3.)  It was not until November 28, 2006, however, that Mercedes stopped selling new vehicles equipped with analog-only Tele Aid systems.  On that date, the companies entered into a contract whereby Mercedes, in addition to halting new vehicle sales, also agreed to stop renewing analog-only Tele Aid subscriber agreements after June 30, 2007 and terminate service to all remaining subscribers on December 31, 2007.  (Id., Ex. 11 at 2); see also (Id., Ex. 14 at 3) (describing Mercedes's plans for a "hard shutdown" of all analog Tele Aid service on December 31, 2007.)  In exchange, AT&T reduced the fees charged for its services by $4.8 million.  (Id., Ex. 14 at 2.)

Faced with the prospect of losing the revenue it previously derived from analog Tele Aid subscriber fees, Mercedes on November 14, 2006 informed its parts managers that it would offer a "Digital Tele Aid Upgrade program" whereby customers whose vehicles contained an analog-only system could choose to purchase new hardware that would be unaffected by the discontinuation of analog service at a price of approximately $1,000 per vehicle.  In doing so, the company characterized the program as "a significant customer pay revenue opportunity," and stated that over 720,000 automobiles containing analog-only Tele Aid systems – including all 2002-2004 and some model year 2005 and 2006 Mercedes vehicles – were eligible for the digital

upgrade.  (Id., Ex. 18.)  Thus, subscribers were faced with a choice: bear the expense of

upgrading to digital equipment or lose the benefits of Tele Aid service at the end of 2007.

## II.  DISCUSSION

In the pending motion, Plaintiffs seek certification of a class of pursuant to Federal Rule

of Civil Procedure 23.  The precise parameters of the proposed class have evolved over the

course of this litigation.  In their original Consolidated Complaint, Plaintiffs requested that the

Court certify a class which would have included individuals or entities who purchased or leased

their vehicles after the FCC first proposed changing its rule requiring wireless communications

companies to provide analog service on May 17, 2001, but before the final adoption of that

change on August 8, 2002.  (Consol. Compl. ¶ 54.)  In a submission filed March 18, 2009,

Plaintiffs narrowed their proposed class definition to exclude those individuals or entities, along

with any who were not active Tele Aid subscribers at the time they were notified that analog

service would be discontinued at the end of 2007.  Thus, the proposed class now includes:

> All persons or entities in the United States who purchased or
> leased a Mercedes-Benz vehicle equipped with an analog-only
> Tele Aid system after August 8, 2002, and
>
> > (1) subscribed to Tele Aid service until being informed that
> > such service would be discontinued at the end of 2007, or
> >
> > (2) purchased an upgrade to digital equipment.[6]

---

[6] Plaintiffs' original proposed class excluded former owners/lessees of Mercedes vehicles who
did not purchase a digital equipment upgrade.  (Compl. ¶ 54.)  In light of Plaintiffs' later request
individuals who did not continue to subscribe to Tele Aid service until it was discontinued in
2007 be excluded from the class, the Court sees no need for a distinction between current and
former owners/lessees.  The relevant consideration is not whether a potential class member
currently owns a Mercedes vehicle, but whether that individual suffered the harm alleged by
Plaintiffs' claims: subscribing to Tele Aid until analog service was discontinued and/or
purchasing a digital upgrade.  Therefore, the Court will omit the distinction between current and
former owners/lessees from its class definition.

In the event that the Court finds that the law of each class member's home state should apply to his or her claim, Plaintiffs argue that nine different classes – one for each state in which a named Plaintiff resides – should be certified.

Plaintiffs contend that this case is particularly well-suited to class treatment because (1) their claims "arise from a single course of conduct that affect[ed] large numbers of consumers," and (2) the costs to each class member of pursuing his or her suit would exceed any potential recovery. (Pls.' Br. Supp. Mot. Class Certification 14-16.) In support of the first point, Plaintiffs note that all of Mercedes conduct relating to Tele Aid was planned and coordinated by a "Telematics team" located in Montvale, New Jersey. (Pls.' Br. Regarding Choice of Law 4.) That team coordinated with AT&T on issues relating to the discontinuation of analog service, determined that customers should be charged approximately $1,000 for an upgrade to digital equipment, and was responsible for informing Tele Aid subscribers of the impending obsolescence of their analog devices. With respect to the second argument, Plaintiffs point out that the pecuniary loss suffered by each class member as a result of Mercedes's alleged misconduct consists only of the Tele Aid activation and subscription fees paid in anticipation of the continued operation of that system and the cost of a digital upgrade, and a refusal to grant class certification would therefore effectively preclude potential class members from pursuing their claims because doing so individually would be economically irrational.

Mercedes asserts two main arguments in opposition to Plaintiffs' Motion for Class Certification. First, the company asserts that the Court should refuse to certify a nationwide class because each Plaintiff's claim is governed by the law of his or her home state, and the differences between those laws would render class treatment inappropriate. Additionally, Mercedes contends that Plaintiffs cannot demonstrate various elements of their claims using

evidence common to all members of the class.  As discussed below, the Court finds that New

Jersey law applies to both of Plaintiffs' claims.  Therefore, Mercedes first argument will be

rejected.  The company's second argument relies on misconceptions regarding the evidence that

will be necessary to prove Plaintiffs' claims – the vast majority of which can be drawn from

Mercedes's own records – and is similarly unavailing.

**A.  Standard of Review**

In order to obtain certification as a class, Plaintiffs must satisfy the two-pronged inquiry

mandated by Federal Rule of Civil Procedure 23 ("Rule 23").  Under that standard, Plaintiffs

must establish that the proposed class meets all four of the requirements outlined in Rule 23(a)

and qualifies under at least one of the three sections of Rule 23(b).  Baby Neal, for and by Kanter

v. Casey, 43 F.3d 48, 55 (3d Cir. 1994).

Rule 23(a) includes four criteria, which are generally referred to as (1) numerosity, (2)

commonality, (3) typicality, and (4) adequacy of representation.  See Fed. R. Civ. P. 23(a).  In

order to satisfy those requirements, Plaintiffs must demonstrate that "(1) the class is so numerous

that joinder of all members is impracticable [(numerosity)]; (2) there are questions of law or fact

common to the class [(commonality)]; (3) the claims or defenses of the representative parties are

typical of the claims or defenses of the class [(typicality)]; and (4) the representative parties will

fairly and adequately protect the interests of the class [(adequacy of representation)]."  Fed. R.

Civ. P. 23(a).

In addition to the four requirements contained in Rule 23(a), Plaintiffs must also

demonstrate that their proposed class falls within one of the three categories enumerated in Rule

23(b).  Baby Neal, 43 F.3d at 55.  In this case, Plaintiffs seek certification under Rule 23(b)(3).

See (Consol. Compl. ¶ 58); (Pls.' Mot. Supp. Class Certification 22-25.)  That section, which

forms the "customary vehicle for damages [class] actions," is designed to "[e]nsure that a proposed class has sufficient unity so that absent class members can fairly be bound by decisions of class representatives." In re Cmty. Bank of N. Va., 418 F.3d 277, 302 (3d Cir. 2005) (internal citations and quotations omitted). In order to do so, it requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "The twin requirements of Rule 23(b) are known as predominance and superiority." In re Hydrogen Peroxide, 552 F.3d at 310. The Rule specifically outlines four factors that are especially "pertinent" to the Court's analysis:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

"In deciding whether to certify a class under [Rule] 23, the district court must make whatever factual and legal inquiries are necessary and must consider all relevant evidence and arguments presented by the parties," including expert testimony. In re Hydrogen Peroxide, 552 F.3d at 309 (citing Newton v. Merril Lynch, Pierce, Fenner & Smith, 259 F.3d 154, 166, 167 (3d Cir. 2001)). Certification is appropriate only "if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met." Id. That analysis "calls for findings by the court, not merely a threshold showing by a party, that each requirement of Rule 23 is met." Id. at 306. "In other words, to certify a class the district court must find that the evidence more likely

than not establishes each fact necessary to meet the requirements of Rule 23." Id. at 320 (citing Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 202 (3d Cir. 2008)).

When determining whether the requirements of Rule 23 are met, "the court may 'consider the substantive elements of the plaintiffs' case in order to envision the form that a trial on those issues would take.'" Id. at 317 (quoting Newton, 259 F.3d at 166). Plaintiffs are not required to conclusively demonstrate the merit of their claims in order to obtain certification as a class, even though doing so will be necessary to ultimately prevail. Rather, they must show that the elements of those claims are "capable of proof at trial through evidence that is common to the class rather than individual to its members." Id. at 311-12. As part of its inquiry into whether the claims asserted by Plaintiffs are amenable to classwide proof, the Court must "resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits – including disputes touching on elements of the cause of action." Id. In doing so, the Court need not afford Plaintiffs' factual allegations any deference. Id., n.18 (rejecting previous statement in Chaing v. Veneman, 385 F.3d 256, 262 (3d Cir. 2004), that "in determining whether a class will be certified, the substantive allegations of the Complaint must be taken as true.").

**A. Choice of Law**

In order to decide whether Plaintiffs' claims are amenable to common proof, and thus to class treatment, the Court must examine each cause of action asserted and identify the law that applies to those claims. See, e.g., Elias v. Ungar's Food Prods., Inc., 252 F.R.D. 233, 246 (D.N.J. 2008); Szczubelek v. Cendant Mortgage Corp., 215 F.R.D. 107, 120-21 (D.N.J. 2003). Although the mere "presence of individual questions ... does not mean that the common questions of law and fact do not predominate," Eisenberg v. Gagnon, 766 F.2d 770, 785 (3d Cir.

1985), "class certification is unsuitable" in cases where "proof of the essential elements of the cause of action requires individual treatment."  In re Hydrogen Peroxide, 552 F.3d at 311.

The Court's choice of law analysis in this proceeding is complicated by the fact that the present multi-district litigation is comprised of ten separate cases originally filed in United States District Courts based in six different states: (1) California, (2) Illinois, (3) Missouri, (4) New Jersey, (5) New York, and (6) Washington.  A federal court exercising jurisdiction pursuant to 28 U.S.C. § 1332 must apply the choice of law rules of the forum state to determine the law that will govern the substantive issues of a case.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  In multi-district litigations, the court to which proceedings were transferred applies the choice of law rules of the states in which the various actions were originally filed.  See Ferens v. John Deere Co., 494 U.S. 516, 532 (1990) ("[T]he decision to transfer venue … should turn on considerations of convenience and the interest of justice rather than on the possible prejudice resulting from a change of law."); Van Dusen v. Barrack, 376 U.S. 612, 638 (1964) ("[W]e should ensure that the 'accident' of federal diversity jurisdiction does not enable a party to utilize a transfer to achieve a result in federal court which could not have been achieved in the courts of the State where the action was filed.").

Plaintiffs contend that the Court should apply New Jersey's choice of law rules, rather than those of the various states in which the actions that make up this litigation were originally filed, because "[f]ollowing transfer … to this Court, each plaintiff joined in filing a Consolidated Class Action Complaint … individually invoking this Court's original jurisdiction and properly establishing venue here."  (Pls.' Br. Supp. Mot. Class Certification 2); see also (Consol. Compl. ¶ 46) ("New Jersey's substantive laws apply to the proposed Nationwide Class … because all Plaintiffs properly bring this Complaint in this District.")  That Complaint was filed pursuant to a

Case Management Order dated April 11, 2008, in which the Court stated that the Amended Complaint would "supersede the complaints filed in each of the individual Actions."

The use of a superseding complaint as the operative pleading for determining the proper choice of law rules in a multi-district litigation is not without precedent.  See 15 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3866, at 612 n.23.1 (3d ed. 1998 & Supp.2004).  Doing so is only appropriate, however, when the parties have agreed to such an arrangement.  Compare In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig., 155 F. Supp.2d 1069, 1078 (D.C. Ind. 2001) ("[T]he parties agree that this Court should be treated as the forum court because Plaintiffs filed their Master Complaint in this Court. Indiana's choice of law rules therefore are applicable.") with In re Conagra Peanut Butter Prods. Liab. Litig., 251 F.R.D. 689, 693 (N.D. Ga. 2008) (applying choice of law rules of various transferor courts due to the fact that defendant objected to use of master complaint as operative pleading for the purposes of determining substantive law).  In the absence of such consent, the majority of courts treat consolidated complaints filed in multi-district litigations as a procedural device rather than a substantive pleading with the power to alter the choice of law rules applicable to the plaintiffs' claims.  See, e.g., In re Vioxx Prods. Liab. Litig., 239 F.R.D. 450, 454 (E.D. La. 2006) ("[A] master complaint is only an administrative device used to aid efficiency and economy and, thus, should not be given the status of an ordinary complaint.") (quoting In re Propulsid Prods. Liab. Litig., 208 F.R.D. 133, 140-41 (E.D. La. 2002)); In re Rezulin Prods. Liab. Litig., 390 F. Supp.2d 319, 330 n.62 (S.D.N.Y. 2005) ("Just as transfers pursuant to [28 U.S.C. §§] 1404 and 1407 do not affect the applicable choice of law rules, so too the next step in the streamlining process – namely consolidation into one proceeding of two or more actions initially filed in different states – does not affect them."); In re Guidant Corp.

Implantable Defibrillators Prods. Liab. Litig., 489 F. Supp.2d 932, 936 (D.C. Minn. 2007) ("The transfer under [28 U.S.C.] § 1407, even after the filing of an amended complaint, is only a change in courtrooms.  Consolidation of a master complaint is merely a procedural device designed to promote judicial economy, and, as such, it does not affect the rights of the parties in separate suits.").

As mentioned above, the Amended Complaint in this action was filed pursuant to the Court's Case Management Order of April 11, 2008.  Mercedes never consented to the use of the Amended Complaint as a substantive pleading that would alter the choice of law rules.  In keeping with the majority of the precedents regarding the use of amended complaints in multi-district litigations, the Court will therefore apply the choice of law rules of the states from which the various cases that make up this multi-district litigation were transferred when deciding what substantive law governs Plaintiffs' claims.

While the Court must complete a separate choice of law analysis for each of the ten proceedings that make up this multi-district litigation, doing so requires the use of only two sets of choice of law rules.  In determining which state's law applies to claims involving individuals from different forums, two of the states in which the actions that make up this litigation were originally filed – California and New York – use a "government interest" test.  As a threshold issue, that test requires the Court to determine whether a conflict exists between the laws of the interested states.  If no conflict exists, the Court will apply the law of its forum state – in this case, New Jersey.  Kearney v. Salomon Smith Barney, Inc., 137 P.3d 914, 922 (Cal. 2006) ("First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different."); Kahara Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 313 F.3d 70, 85

(2d Cir. 2002) ("[I]f a conflict is identified, New York choice of law rules require the application

of an interests analysis.") (internal quotations omitted).  In the event of a conflict, however, the

Court must determine the interest of each state, in light of the policies underlying its laws, in

having those laws applied to the issues presented by the case.  After making that determination,

the Court will apply the law of the state with the greatest interest in governing the particular

issue to each of Plaintiffs' causes of action.  <u>Kearney</u>, 137 P.3d at 922 ("[I]f the court finds that

there is a true conflict, it carefully evaluates and compares the nature and strength of the interest

of each jurisdiction in the application of its own law to determine which state's interest would be

more impaired if its policy were subordinated to the policy of the other state.") (internal

quotations omitted); <u>Istum, Inc. v. Chem. Bank</u>, 581 N.E.2d 1042, 1044 (N.Y. 1991) ("[W]e first

look to the purposes of the statutes in conflict and identify the policies which the States seek to

promote through application of their laws.  Then, based upon the facts of the case which relate to

the statutes' purpose, we determine which State has the greater interest in having its law

applied.").

    The other four states from which the actions that make up this litigation were transferred

– Illinois, Missouri, New Jersey, and Washington – follow the "most significant relationship"

test laid out in the Restatement (Second) of Conflict of Laws ("Restatement") when determining

which state's law applies to claims involving individuals from different forums.  As with the

"government interest" analysis utilized by California and New York, the Court's first step under

the Restatement test is to determine whether a conflict exists between the laws of the various

states.  If no conflict exists, the Court will apply the law of New Jersey, its forum state.

<u>Townsend v. Sears, Roebuck and Co.</u>, 879 N.E.2d 893, 898 (Ill. 2007) ("A choice-of-law

determination is required only when a difference in law will make a difference in the outcome.");

Farmers Exch. Bank v. Metro Contracting Servs., Inc., 107 S.W.3d 381, 391 (Mo. Ct. App. 2003) ("[W]e initially must determine whether the [conflict] presented in this case is one of substance or procedure in that if it is a matter of procedure … the law of the forum state … would apply."); P.V. v. Camp Jaycee, 962 A.2d 453, 460 (N.J. 2008) ("Procedurally, the first step is to determine whether an actual conflict exists.  That is done by examining the substance of the potentially applicable laws to determine whether there is a distinction between them.") (internal quotations omitted); Rice v. Dow Chem. Co., 875 P.2d 1213, 1216 (Wash. 1994) ("To engage in a choice of law determination, there must first be an actual conflict between the laws or interests of Washington and the laws or interests of another state.  Where there is no conflict between the laws or interests of two states, the presumptive local law is applied.") (internal citations omitted).  If the various state laws are materially different, however, the Court must weigh the considerations contained in the Restatement and determine which state has the "most significant relationship" to each cause of action asserted in the suit.  In doing so, the Court must consider two sets of factors: (1) the general considerations articulated in § 6, and (2) those specific to each claim.  Townsend, 879 N.E.2d at 900 ("[T]he Second Restatement's methodology has three principal features: (1) the policies of section 6; (2) the concept of the 'most significant relationship'; and (3) the list of particularized connecting factors."); Bauer v. Farmers Ins. Co., 270 S.W.3d 491, 493 (Mo. Ct. App. 2008) (The Restatement test "requires the balancing of several factors to determine which state has the most significant relationship to the action."); P.V., 962 A.2d at 462 (applying Restatement factors to "determine whether New Jersey ha[d] a more significant relationship with the occurrence and the parties" than the state in which the underlying tort took place.); Rice, 875 P.2d at 1217 (stating that "Washington has adopted the 'most significant relationship test'" and applying the Restatement factors).

It is widely-acknowledged that the "governmental-interest test is substantially similar to the most-significant-relationship test adopted by the … Restatement." P.V., 962 A.2d at 460; Clawans v. United States, 75 F. Supp.2d 368 (D.N.J. 1999).  The "pure governmental interest analysis" utilized by California and New York "is distinct from the Second Restatement approach," however, inasmuch as the "strength of the countervailing governmental interests" is dispositive under the former test.  Id.  In other words, "under the 'interests analysis' approach, the law of the jurisdiction having the greatest interest in the litigation will be applied and the only facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict."  Istum, 581 N.E.2d at 1044 (internal quotations omitted).  In contrast, the "most significant relationship" test contained in the Restatement requires the Court to consider a number of factors in addition to the policies underlying the various states' laws.  See Restatement (Second) of Conflict of Laws § 6 (1971).

### i.      Unjust Enrichment

Under both the "government interest" and "most significant relationship" tests, the Court's first step is to determine whether the laws of the various states in which Plaintiffs originally brought their claims are in conflict.  If no conflict exists, the Court will apply the law of New Jersey, its forum state.  See, e.g., Kearney, 137 P.3d at 922; P.V., 962 A.2d at 460.  Both sides acknowledge that the proposed class will likely be comprised of individuals from all 50 states and the District of Columbia.  The Court "must apply an individualized choice of law analysis to each plaintiff's claims."  Georgine v. Amchem Prods., Inc., 83 F.3d 610, 627 (3d Cir. 1996) (citing Philips Petroleum Co. v. Shutts, 472 U.S. 797, 823 (1985)).  Therefore, the Court may apply New Jersey law pursuant to the first step of the "government interest" and "most

significant relationship" tests only if it determines that there is no material conflict between the

unjust enrichment laws of any two or more states.

While there are minor variations in the elements of unjust enrichment under the laws of

the various states, those differences are not material and do not create an actual conflict.

Agostino v. Quest Diagnostics, Inc., --- F.R.D. ----, 2009 WL 348898 at *22 (D.N.J. 2009). As

was recently explained by the United States District Court for the Eastern District of

Pennsylvania:

> Although there are numerous permutations of the elements of the
> [unjust enrichment] cause of action in the various states, there are
> few real differences. In all states, the focus of an unjust
> enrichment claim is whether the defendant was <u>unjustly</u> enriched.
> At the core of each state's law are two fundamental elements – the
> defendant received a benefit from the plaintiff and it would be
> inequitable for the defendant to retain that benefit without
> compensating the plaintiff. The focus of the inquiry is the same in
> each state. Application of another variation of the cause of action
> than that subscribed to by a state will not frustrate or infringe upon
> that state's interests. In other words, regardless of which state's
> unjust enrichment elements are applied, the result is the same.
> Thus, there is no real conflict surrounding the elements of the
> cause of action.

Powers v. Lycoming Engines, 245 F.R.D. 226, 231 (E.D. Pa. 2007) (emphasis in original), <u>rev'd
on other grounds</u>, 2009 WL 826842 (3d Cir. 2009).

Since there is no material conflict relating the elements of unjust enrichment between the

different jurisdictions from which class members will be drawn, the Court will apply New Jersey

law to those claims.

Even if there were a conflict, the choice of law rules applicable in the states from which

the cases that make up this multi-district litigation were transferred – the "government interest"

test in California and New York, and the "most significant relationship" test in Illinois, Missouri,

New Jersey, and Washington – would support the application of New Jersey law to Plaintiffs'

unjust enrichment claim.  Under the former test, the Court must determine which of the states from which class members will be drawn has the greatest interest in having its law applied. Kearney, 137 P.3d at 922.  The latter requires the Court to weigh the factors contained in the Restatement and determine which state has the "most significant relationship" to Plaintiffs' unjust enrichment claim.  Townsend, 879 N.E.2d at 900.

<i>(a)  "Government Interest" Test – California and New York</i>

It has long been recognized that unjust enrichment is an equitable cause of action meant to provide restitution to a party who has conferred a benefit on another under circumstances where the retention of that benefit would be inequitable, not punish those who were wrongfully enriched.  Restatement (First) of Restitution § 1 (1937); see also Stone v. White, 301 U.S. 532, 535-36 (U.S. 1927) (characterizing modern action for unjust enrichment as successor to common law action of indebitatus assumpsit, and stating that the action's "use to recover upon rights equitable in nature to avoid unjust enrichment by the defendant at the expense of the plaintiff, and its control in every case by equitable principles … have long been recognized in this Court.") (internal citations omitted); Tull v. United States, 481 U.S. 412, 422 (U.S. 1987) (stating that, at common law, "[r]emedies intended to punish culpable individuals, as opposed to those intended simply to extract compensation or restore the status quo, were issued by courts of law, not courts of equity.")  Therefore, each state from which class members will be drawn has an equal stake in this litigation; namely, the interest in assuring that their citizens are compensated. Consequently, the only means of distinguishing between the various state interests at play is by applying the law of the forum where the alleged wrongdoing took place.  See Cooney v. Osgood Mach., Inc., 612 N.E.2d 277, 282-83 (N.Y. 1993) ("Assuming that the interest of each State in enforcement of its law is roughly equal … the situs of the tort is appropriate as a 'tie breaker'

24

because that is the only State with which both parties have purposefully associated themselves in a significant way.").

New Jersey is clearly the site of the alleged wrongdoing in this case.  Mercedes is headquartered in that state, and all decisions related to the marketing of Tele Aid were made and implemented by a "Telematics team" located in Montvale, New Jersey.  (Pls.' Br. Regarding Choice of Law 4.)  That team was purportedly responsible for (1) coordinating the discontinuation of Tele Aid service with AT&T, the wireless carrier that provided the analog signal necessary to operate the system, (2) choosing to charge Tele Aid subscribers approximately $1,000 for an upgrade that would allow their systems to operate using a digital signal, and (3) deciding how and when Tele Aid subscribers should be informed of the impending obsolescence of their analog-only equipment.  (Id. at 4-5.)

Two additional factors weigh in favor of the application of New Jersey law to Plaintiffs' unjust enrichment claim.  First, Mercedes is headquartered in New Jersey.  Therefore, New Jersey is the only state that has an interest not only in compensating its citizens, but also in regulating a resident corporation.  See Blount v. Peerless Chems. (P.R.), Inc., 315 F.2d 695, 697 (2d Cir. 1963) (A "state has an interest in subjecting to its judicial process a corporation whose activities in that state expose its residents to a risk of physical harm or economic loss; the state's interest in regulating such objectionable conduct within its borders is apparent even though the plaintiff may be a nonresident.").  Furthermore, the benefits provided by Plaintiffs which they allege unjustly enriched the company – their payments for Tele Aid subscriptions prior to the suspension of analog service and the $1,000 upgrade fee paid by individuals who converted to digital technology – were accepted by Mercedes in New Jersey.  The revenue received by the company was subject to New Jersey taxes, thus giving that state an economic stake in the

outcome of this litigation beyond those of others, whose policies are implicated only with respect to their interest in assuring that their residents receive restitution for any benefits conferred on Mercedes by their citizens as a result of the company's alleged wrongful activities.  See Pasquantino v. United States, 544 U.S. 349, 357 (2005) (characterizing "entitlement to tax revenue" as "a straightforward 'economic' interest").  In light of the foregoing, it is clear that the interactions between Mercedes and potential class members relating to Tele Aid were centered in New Jersey, and that New Jersey has a greater interest than any other jurisdiction in having its law applied to Plaintiffs' unjust enrichment claim.  Therefore, New Jersey law would apply pursuant to the government interest test utilized by California and New York if the unjust enrichment laws of the various states from which class members will be drawn were in conflict.

    (b) *"Most Significant Relationship" Test – Illinois, Missouri, New Jersey, and Washington*

       New Jersey law would also apply pursuant to the "most significant relationship" test articulated in the Restatement in the event of a conflict between the states' unjust enrichment laws.  That test, which is used by Illinois, Missouri, New Jersey, and Washington, requires the Court to analyze the Plaintiffs' unjust enrichment cause of action in light of both the claim-specific factors contained in Restatement § 221 and the general considerations enumerated in section 6 of that document.  Townsend, 879 N.E.2d at 900.  Upon application of those factors, it is clear that New Jersey has a more significant relationship to Plaintiffs' unjust enrichment claim than any other jurisdiction.

       Under the "most significant relationship" test, choice of law analysis for unjust enrichment claims is governed by Restatement § 221.  See Restatement (Second) of Conflict of Laws § 221, Comment (a).  That section states:

> (1) In actions for restitution, the rights and liabilities of the parties
> with respect to the particular issue are determined by the local law

of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

> (a) the place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship,
>
> (b) the place where the benefit or enrichment was received,
>
> (c) the place where the act conferring the benefit or enrichment was done,
>
> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
>
> (e) the place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

On balance, the claim-specific factors contained in Restatement § 221 support the application of New Jersey law to Plaintiffs' unjust enrichment claim.  As mentioned above, Plaintiffs allege that all Mercedes's actions related to Tele Aid – including its promotion and marketing, coordination between Mercedes and AT&T relating to the discontinuation of analog service, and the determination that customers would be charged roughly $1,000 to upgrade to digital equipment – were made by a "Telematics team" based in Montvale, New Jersey.  (Pls.' Br. Regarding Choice of Law 4.)  Thus, the relationship between the parties, at least insofar as it related to the Tele Aid systems at issue in this litigation, was centered in New Jersey.  Furthermore, the benefits at issue in Plaintiffs' unjust enrichment claim – subscription payments for Tele Aid prior to the suspension of analog service and the $1,000 upgrade fee paid by

individuals who converted to digital equipment – were received in New Jersey by virtue of the fact that Mercedes is headquartered in that state.  Therefore, the first two factors enumerated by Restatement § 221 strongly support the application of New Jersey law.

In contrast, the third factor articulated by section 221 of the Restatement, "the place where the act conferring the benefit or enrichment was done," weighs in favor of applying the law of each Plaintiffs' home state.  Each potential class member presumably submitted payment for his or her Tele Aid subscription or upgrade to digital equipment by mailing or electronically submitting a check or credit card information from his or her state of residence.  The weight to be accorded to the third factor is minimal in this case, however, because it is unrelated to the conduct at issue and the ongoing relationship between the parties.  The actions which gives rise to Plaintiffs' unjust enrichment claims, Mercedes's alleged misrepresentations with respect to Tele Aid, occurred solely in New Jersey.  The fact that individual Plaintiffs may have remitted payment from their home states as the result of those misrepresentations is purely fortuitous.  For example, a plaintiff residing in New Jersey but working in New York may have sent payment for his or her Tele Aid service or digital upgrade from the latter state.  In such a situation, it would be absurd to rule that New York law should be applied to the plaintiff's claim simply because the benefit at issue was sent from that state.  Similarly, it would be absurd to apply the laws of all 50 states and the District of Columbia to the claims of potential class members from those jurisdictions simply because Mercedes's alleged wrongdoing – which emanated from New Jersey – was so widespread as to affect individuals throughout the United States.  Therefore, the Court finds that the third factor articulated by Restatement § 221 is outweighed by the fact that the relationship between the parties was centered in New Jersey and the benefits of the allegedly unjust enrichment were received in that state.  See Restatement (Second) of Conflict of Laws §

221, Comment (d) ("The place where a relationship between the parties was centered … is the contact that, as to most issues, is given the greatest weight in determining the state of the applicable law.")

The fourth claim-specific factor contained in Restatement § 221 lends further support for the application of New Jersey law to Plaintiffs' unjust enrichment cause of action.  Under that portion of the test, the Court must consider the "the domicil, residence, nationality, place of incorporation and place of business of the parties" when determining which jurisdiction's law should apply.  Restatement (Second) of Conflict of Laws § 221(2)(c).  As discussed above, it is likely that members of the proposed class will reside in all 50 states and the District of Columbia. Therefore, no state has a greater relationship to the litigation than any other by virtue of its ties to potential class members.  Since Mercedes is headquartered in New Jersey and the conduct at issue took place in that state, however, New Jersey is connected to both sides of the dispute. Accordingly, its twin interests in assuring that its citizens are compensated for any wrongdoing and in regulating a resident corporation support the application of New Jersey law.  See Palmer v. Beverly Enter., 823 F.2d 1105, 1108 (7th Cir. 1987) (recognizing a state's interest in regulating its corporations while applying "most significant relationship" test).

The fifth consideration enumerated in Restatement § 221 – the "place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment" – weighs neither for nor against the application of New Jersey law to Plaintiffs' unjust enrichment claims.  The proposed class encompasses individuals residing throughout the country.  The "physical thing[s]" at issue in their unjust enrichment claims – the Tele Aid systems contained in their automobiles – were scattered across all 50 states and did not have any substantial connection to any one jurisdiction.

To summarize, (1) the first and second considerations enumerated in section 221 of the Restatement strongly support the application of New Jersey law, (2) the third factor – which supports the application of law of each Plaintiffs' home state – is of minimal value because it is unrelated to the conduct at issue and the ongoing relationship between the parties, (3) the fourth prong supports the application of New Jersey law, and (4) the fifth factor is neutral.  Therefore, the Court finds that the balance of the factors contained in Restatement § 221 weighs in favor of the application of New Jersey law to Plaintiffs' unjust enrichment claims.

The Court's inquiry under the "most significant relationship" test does not end, however, with the claim-specific factors contained in section 221.  Rather, those factors must be weighed against the ones contained in Restatement § 6.  P.V., 962 A.2d at 463.  That section requires the Court to consider a number of general principles in determining the applicable law, including:

> (a) the needs of the interstate and international systems,
>
> (b) the relevant policies of the forum,
>
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>
> (d) the protection of justified expectations,
>
> (e) the basic policies underlying the particular field of law,
>
> (f) certainty, predictability and uniformity of result, and
>
> (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6(2) (1971).

Those considerations are not exhaustive, are not listed in any order of priority, and do not provide precise rules mandating the application of a given jurisdiction's law in any particular situation.  Id. at Comment (c); Townsend, 879 N.E.2d at 900-01.  To the contrary, the

Restatement's "most significant relationship" requires a flexible, case-by-case analysis of each claim in order to determine which jurisdiction's law should be applied.  Restatement (Second) of Conflict of Laws § 6, Comment (c); see also Townsend, 879 N.E.2d at 901 ("[Section] 6 offers a kind of 'laundry list' [of factors] that enables the court to consider all of them when appropriate.").

In this case, consideration of the principles outlined in section 6 of the Restatement does not alter the Court's judgment pursuant to Restatement § 221 that New Jersey has the "most significant relationship" to the Plaintiffs' unjust enrichment claims.  To the contrary, a balancing of the factors articulated in Restatement § 6 lends further support for the application of New Jersey law.  As discussed above, each state in which potential class members reside has an interest in assuring that those individuals receive compensation for any benefit conferred on Mercedes as a result of its alleged wrongful behavior.  See Restatement (First) of Restitution § 1. Because those interests are aligned, the use of New Jersey law to adjudicate Plaintiffs' unjust enrichment claim will not lead to friction between the various states and will have no adverse effect on the interstate and international systems.  Having already ruled that New Jersey has the greatest interest in applying its law to Plaintiffs' unjust enrichment claim, the Court finds that the second and third considerations articulated by Restatement § 6 – "the relevant policies of the forum" and "the relevant policies of other interested states and relative interests of those states in the determination of the particular issue" – weigh in favor of the application of New Jersey law. With respect to the fourth factor, the "justified expectations" of the parties will be best served by applying the law of New Jersey.  Given the fact that it is headquartered in that state, Mercedes cannot reasonably argue that it will suffer any hardship or surprise due to the use of New Jersey law in a suit in which it is the defendant.  In light of the relatively small amount of damages

claimed by each class member, however, the Plaintiffs would likely find it impossible to achieve recovery if the Court applied the law of each individual's home state to his or her claim and refused to certify a class based on differences between the unjust enrichment cause of action in the various jurisdictions.  Such a scenario would have the undesirable result of leaving potential class members with no practical means of vindicating their expectations regarding the continued functionality of their Tele Aid systems.  See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617 (1997) ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.  A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.") (internal quotations omitted).  For similar reasons, the fifth consideration – "the basic policies underlying the particular field of law" – also weighs in favor of applying New Jersey law.  The compensatory function of Plaintiffs' unjust enrichment cause of action would be frustrated if the law of each class member's home state was applied and a class was not certified.  Finally, the sixth and seventh factors enumerated in section 6 of the Restatement – "certainty, predictability and uniformity of result" and "ease in the determination and application of the law to be applied" – support the Court's holding that Plaintiffs' unjust enrichment claims should be adjudicated using New Jersey law.  The potential class members reside throughout the United States. Assuming that the laws of the various Plaintiffs' home states relating to unjust enrichment conflict, it is likely that different class members – who have suffered the same harm based on the same alleged wrongdoing – will have their rights adjudicated inconsistently if the Court applies the law of each class individual's home state to his or her claims.  Such a formulation would also have the detrimental effect of requiring the trial jury to engage in a time-consuming and

bewildering analysis of the miniscule differences between the elements of unjust enrichment in each forum.  Therefore, the Court will apply New Jersey law to Plaintiffs' unjust enrichment claim.

   *ii.*  ***Consumer Fraud***

   Plaintiffs' second claim, that Mercedes committed consumer fraud by failing to disclose the impending obsolescence of Tele Aid and continuing to market Tele Aid systems when it knew or should have known that the analog service on which they depended would be discontinued at the end of 2007, implicates conflicting state laws.  "Courts have recognized that significant conflicts exist between the NJCFA and the consumer protection statutes of other states."  Agostino, 2009 WL 348898 at * 20 (citing Elias v. Ungar's Food Prods., Inc., 252 F.R.D. 233, 247 (D.N.J. 2008)); see also Fink v. Ricoh Corp., 839 A.2d 942, 974-82 (finding that "[a] review of the consumer fraud statutes of the various states, and the cases decided thereunder demonstrates the existence of numerous actual conflicts on various issues between provisions of the NJCFA and those of the statutes enacted by other states," and discussing those differences at length).  In fact, Plaintiffs concede that such conflicts exist.  (Pls.' Br. Regarding Choice of Law 3.)  Therefore, the Court must apply the choice of law rules of the states from which the various actions that make up this multi-district litigation were transferred in order to determine which state's substantive law should apply to class members' consumer fraud claims.  Ferens, 494 U.S. at 532.  Two of those states, California and New York, utilize the "government interest" test for making such determinations.  See Kearney, 137 P.3d at 922; Kahara, 313 F.3d at 85.  The other four, Illinois, Missouri, New Jersey, and Washington, use the Restatement's "most significant relationship" test.  See Townsend, 879 N.E.2d at 900; Bauer, 270 S.W.3d at 493; P.V., 962 A.2d

at 462; Rice, 875 P.2d at 1217.  Both tests support the application of New Jersey law to

Plaintiffs' consumer fraud claims.

(a)  "Government Interest" Test – California and New York

There is no monolithic policy interest underlying the consumer fraud laws of the various

states from which class members will be drawn.  To the contrary, the wide variations between

the NJCFA and other states' consumer fraud statutes are evidence of the disparate policies those

laws are meant to effectuate.  See Fink, 839 A.2d at 974-82 (discussing differences between state

consumer fraud laws).  As stated by the Appellate Division of the New Jersey Superior Court:

> New Jersey allows and often encourages private class actions for
> consumer fraud while several other states prohibit private class
> action consumer fraud suits.  Our law finds actionable fraud in
> connection with the sale of goods or services for commercial or
> business uses, whereas some states "confine their consumer fraud
> statute remedies to items purchased primarily for personal, family
> or household purposes."   Some states require proof that the
> defendant willfully or knowingly made false representations "with
> specific intent to deceive," while New Jersey does not require such
> a showing.  Furthermore, variations exist in the award of damages,
> especially the decision or ability of a court to award punitive or
> treble damages.

Int'l Union of Operating Eng'rs  Local #68 Welfare Fund v. Merck & Co., 894 A.2d 1136, 1146-
47 (N.J. Super. Ct. App. Div. 2006) (quoting Fink, 839 A.2d at 975, 978) rev'd on other grounds,
929 A.2d 1076 (N.J. 2007).

Nowhere are the differences between the NJCFA and other states' consumer fraud

statutes more apparent than in the damages available under those laws.  "Under the NJCFA an

award must be made of threefold the actual damages suffered by the victim of any practice

declared unlawful … plus an award of reasonable attorney's fees and costs of suit to the

successful plaintiff."  Fink, 839 A.2d at 979.  The award of treble damages, fees, and costs

mandated by the NJCFA are a form of punitive damages, Id. at 980, and are meant to deter

wrongful activity on the part of businesses operating in New Jersey.  Cox v. Sears Roebuck &

Co., 647 A.2d 454, 463-64 (N.J. 1994).  Thus, the NJCFA is designed to serve two purposes: compensating victims of consumer fraud and regulating companies within New Jersey.  Id.

In light of the dual purpose of the NJCFA, it is clear that New Jersey has a greater interest in having its law applied to the Plaintiffs' consumer fraud claim than any other jurisdiction.  While each of the various jurisdictions from which class members will be drawn have an equal interest in compensating their citizens, only New Jersey has the additional interest of regulating a corporation which is headquartered – and allegedly committed the acts in question – within its borders.  See (Pls.' Br. Regarding Choice of Law 4) (alleging that all of Mercedes's acts relating to Tele Aid were conceived, planned, and implemented by a "Telematics team" located in Montvale, New Jersey).  The intended deterrent effect of the NJCFA would be compromised if Mercedes were allowed to escape liability for the treble damages, attorneys' fees, and litigation costs mandated by New Jersey law simply because its alleged misconduct defrauded citizens of states whose laws do not provide for similar punitive damages.[7]  On the other hand, the New Jersey legislature's decision to limit recovery in consumer fraud actions against businesses within that state to treble damages would be compromised if class members residing in jurisdictions which allow unlimited punitive damages were allowed to bring claims under the law of their home states.[8]  See Fink, 893 A.2d at 980

---

[7] A number of states, including Maine, Oklahoma, and West Virginia, limit recovery or do not allow for punitive damages in consumer fraud actions.  See, e.g., Me. Rev. Stat. Ann. tit. 5, § 213 (limiting recovery to "actual damages," fees, and costs); Okla. Stat. tit. 15, § 761.1 (limiting fee awards to $10,000 and civil penalties for consumer fraud to $2,000 per violation); W. Va. Code Ann. 46A-6-106(a) (limiting recovery to "actual damages or two hundred dollars, whichever is greater").  Others, such as Alabama, Kansas, Mississippi, and South Carolina, prohibit private class action consumer fraud suits, and thus would effectively bar recovery by forcing class members to bring individual suits, the costs of which would dwarf their potential benefits.  See, e.g., Ala. Code § 8-19-10(f); Kan. Stat. Ann. § 50-634(b); Miss. Code Ann. § 75-24-15(4); S.C. Code Ann. § 39-5-140(a).

[8] Several states, such as Connecticut, Delaware, Kentucky, and Oregon, place no limits on the punitive damages available in consumer fraud actions.  See, e.g., Conn. Gen. Stat. § 42-110g(a);

("[T]he only form of punitive damages expressly allowed by the NJCFA are treble damages.").

Accordingly, the Court finds that New Jersey's interest in regulating Mercedes, a corporation

located within its borders, requires the application of New Jersey law to Plaintiffs' consumer

fraud claims under the "government interest" choice of law test utilized by California and New

York.  See Kearney, 137 P.3d at 922 (The "government interest" test requires the Court to apply

the law of the state whose "interest would be mo[st] impaired if its policy were subordinated to

the policy of the other state[s].").

    (b)  *"Most Significant Relationship" Test – Illinois, Missouri, New Jersey and Washington*

        The "most significant relationship" test utilized by Illinois, Missouri, New Jersey, and

Washington also requires the application of New Jersey law to Plaintiffs' consumer fraud claim.

Having already ruled that there are material conflicts between the laws of the various states from

which class members will be drawn, that test requires the Court to weigh both the claim-specific

and general factors contained in the Restatement in order to determine which state has the

greatest ties to Plaintiffs' consumer fraud claim.  Townsend, 879 N.E.2d at 900.

        Section 148 of the Restatement governs choice of law analysis for consumer fraud

claims.  Restatement (Second) of Conflict of Laws § 148, Comment (a); Agostino, 2009 WL

348898 at * 20.  That section states:

> (1) When the plaintiff has suffered pecuniary harm on account of
> his reliance on the defendant's false representations and when the
> plaintiff's action in reliance took place in the state where the false
> representations were made and received, the local law of this state
> determines the rights and liabilities of the parties unless, with
> respect to the particular issue, some other state has a more
> significant relationship under the principles stated in § 6 to the

---

Stephenson v. Capano Dev., Inc., 462 A.2d 1069, 1076-77 (Del. 1983) ("If the fraud is gross,
oppressive, or aggravated, or where it involves breach of trust or confidence, the plaintiff may
recover punitive damages whether he sues in tort or under the consumer fraud statute."); Ky.
Rev. Stat. Ann. § 367.220(a); Or. Rev. Stat. § 646.638(1).

occurrence and the parties, in which event the local law of the other state will be applied.

(2) When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

> (b) the place where the plaintiff received the representations,

> (c) the place where the defendant made the representations,

> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties,

> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

> (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflict of Laws § 148.

Thus, the Restatement distinguishes between, on the one hand, fraud claims in which the defendant's alleged misrepresentations and plaintiffs' reliance on those statements took place in the same state, and on the other, those in which the misrepresentations and reliance occurred in different jurisdictions. In the former situation, the state in which both the misrepresentations and reliance occurred is presumed to have the "most significant relationship" with the litigation. Id. § 148(1); Agostino, 2009 WL 348898 at * 20. In the latter scenario, however, the Court must weigh the factors enumerated in section 148(2) in order to determine which state has the greatest

ties to the plaintiffs' fraud claim.  See, e.g., Levin v. Dalva Bros., Inc., 459 F.3d 68, 74-75 (1st

Cir. 2006) (using Restatement § 148(2) to find that New York law applied fraud claim involving

misrepresentations regarding the value of antiques by New York corporation even though the

goods were purchased through a local dealer in Massachusetts and the plaintiffs resided in that

state); Palmer, 823 F.2d at 1112 (applying Restatement § 148(2) to fraud claim brought by

plaintiff residing in Illinois against California corporation based on alleged misrepresentations

made in meetings in California, Illinois, and Mississippi, and reliance – in the form of acceptance

of an offer of employment – that took place in Illinois); Inacom Corp. v. Sears, Roebuck & Co.,

254 F.3d 683, 688 (8th Cir. 2001) (applying Restatement § 148(2) to fraud claim involving

merger negotiations between corporations which took place in both Illinois and Nebraska).

     Relying on Agostino, a case this Court decided after the parties submitted their briefs

regarding choice of law but prior to oral arguments, Mercedes contends that, in consumer fraud

cases, "[s]ection 148 of the Second Restatement creates a presumption that the law of the state

where the misrepresentation or omission is received and relied on applies unless some other state

has a more significant relationship to the occurrence and the parties under the principles states in

section 6 of the Restatement."  (Def.'s Notice of Supplemental Authority, March 10, 2009.)  That

assertion relies on an interpretation of the Restatement that is at odds with the plain meaning of

section 148, which calls for such a presumption only in cases where "when the plaintiff's action

in reliance took place in the state where the false representations were made and received."

Restatement (Second) of Conflict of Laws § 148(1) (emphasis added).  While the Court in

Agostino did apply a presumption in favor of the application of the law of each plaintiff's home

state, it did so based on its implied ruling that the alleged misrepresentations underlying the

claim in that case were both made and received in the plaintiffs' home states, and therefore

Restatement § 148(1) – not the second subsection of that rule – applied to the plaintiffs' consumer fraud claim.  An examination of the opinion shows evidence of that ruling: the Court began its choice of law analysis relating to the plaintiffs' consumer fraud claim by quoting Restatement § 148(1), and later explicitly acknowledged that it was proceeding "under the rule of Subsection (1)."  Agostino, 2009 WL 348898 at * 20.

 Although the facts relevant to the consumer fraud choice of law analysis in Agostino are largely analogous to those at issue in this proceeding, the application of a presumption in favor of the law of each plaintiffs' home state in that case does not require such a presumption here.  Rather, after close inspection of text Restatement § 148, the Court believes that it erred by applying the first subsection of that provision in Agostino.  The alleged misrepresentations which formed the basis for the plaintiffs' consumer fraud claim in that case were made as part of a billing scheme utilized by Quest Diagnostics, Inc. ("Quest"), a corporation headquartered in New Jersey.  Like Mercedes, Quest operated throughout the United States, and the plaintiffs in Agostino sought certification of a nationwide class.  Id. at * 1-3.  Yet despite its holdings that (1) "the purportedly illegal billing practices … emanated from New Jersey" and (2) the plaintiffs relied on the alleged misrepresentations "in their home states," the Court applied Restatement § 148(1) in determining which states had the "most significant relationship" with the plaintiffs' consumer fraud claim.  Id. at * 21.  In doing so, the Court ignored section 148(2), which applies in cases where the "plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made."  Restatement (Second) of Conflict of Laws § 148(2).

 Turning to Plaintiffs' consumer fraud claim against Mercedes in this case, it is clear that the company's purported misconduct and any reliance on the part of Plaintiffs' occurred, at least

partially, in different states.[9]  The alleged misrepresentations which form the basis of Plaintiffs'

claim took place in New Jersey.  Plaintiffs contend that all of Mercedes's actions relating to Tele

Aid were planned and implemented by a "Telematics team" based in Montvale, New Jersey.

(Pls.' Br. Regarding Choice of Law 4.)  That team oversaw the marketing and promotion of Tele

Aid, coordinated with AT&T in anticipation of the discontinuation of analog service, and was

responsible for deciding that Tele Aid subscribers would be charged approximately $1,000 to

upgrade to digital equipment.  (Id.)  As acknowledged by Mercedes, however, each Plaintiff

received and relied on the alleged misrepresentations – by subscribing to Tele Aid or purchasing

an upgrade – in his or her home state.  (Def.'s Br. Regarding Choice of Law 13.)  Therefore,

Restatement § 148(2) forms the starting point for the Court's choice of law analysis under the

"most significant relationship" test.

 Since Plaintiffs presumably received and relied on Mercedes's alleged misrepresentations

in their home states, three of the six factors enumerated by Restatement § 148(2) –  (1) "the

place, or places, where the plaintiffs acted in reliance upon defendant's representations," (2) "the

place where the plaintiff received the representations," (3) and "the place where the plaintiff is to

render performance under a contract which he has been induced to enter by the false

representations of the defendant" – weigh in favor of applying the law of each of the various

---

[9] As discussed below, Plaintiffs need not demonstrate reliance in order to prevail on their claims under the NJCFA.  See N.J. Stat. Ann. § 56:8-2 (allowing recovery "whether or not any person has in fact been misled, deceived or damaged" by the defendant's misrepresentation or omission); Int'l Union of Operating Eng'rs  Local #68, 929 A.2d at 1087 ("Our CFA does not require proof that a consumer has actually relied on a prohibited act in order to recover.").  Other states, however, require proof of reliance in consumer fraud cases.  See Fink, 839 A.2d at 979. Therefore, for the purposes of determining which state's substantive law should apply pursuant to the Restatement's "most significant relationship" test, the Court will treat Plaintiffs' actions in subscribing to Tele Aid until being informed that their service would be discontinued and/or purchasing a digital upgrade as having been taken in reliance on Mercedes alleged misrepresentations.  In doing so, the Court expresses no opinion on whether Mercedes statements or omissions were fraudulent or whether Plaintiffs actually did rely on those statements or omissions.

jurisdictions from which class members will be drawn.  Restatement (Second) of Conflict of
Laws § 148(2)(a),(b),(f).  Given the fact that Plaintiffs probably operated their automobiles and
the Tele Aid systems those vehicles contained in the states in which they resided, an additional
factor, "the place where a tangible thing which is the subject of the transaction between the
parties was situated at the time," also weighs in favor of applying the law of each class member's
home jurisdiction.  Id. § 148(2)(e).

     The other two considerations articulated in Restatement § 148(2), however, support the
application of New Jersey law.  Given the fact that all of the conduct underlying Plaintiffs'
consumer fraud claim took place in that state, consideration of "the place where the defendant
made the representations," strongly supports applying the NJCFA to Plaintiffs' claims.  See Id. §
148(2)(c).  Class members will be drawn from all 50 states and the District of Columbia.  Thus,
each jurisdiction has equal ties to the Plaintiffs, and consideration of "the domicil, residence,
nationality, place of incorporation and place of business of the parties," weighs in favor of the
application of the law of New Jersey – the only state with an additional interest in regulating a
corporation headquartered within its borders.  See Id. § 148(2)(d).

     The fact that four of the six considerations articulated by Restatement § 148(2) weigh in
favor of applying the law of each class member's home state does not necessarily mean that New
Jersey should not apply to Plaintiffs' consumer fraud claim.  It is well-established that the "most
significant relationship" test is not a mechanical process in which the Court simply tallies up the
factors enumerated in the Restatement and applies the law of the jurisdiction supported by the
majority of them.  See, e.g., Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 467 (3d Cir.
2006) (discounting certain factors due to their "minor importance to the issue."); David B. Lilly
Co., Inc. v. Fisher, 18 F.3d 1112, 1119 (3d Cir. 1994) ("The factors enumerated in [the

Restatement] should be evaluated on a qualitative rather than a quantitative basis.").  To the contrary, the relative importance of each of the considerations articulated by Restatement § 148(2) varies depending on the circumstances underlying the claim asserted.  <u>See</u> Restatement (Second) of Conflict of Laws § 148, Comments (f)-(j) (discussing importance of factors under various scenarios).

The third of Restatement § 148(2)'s six factors – "the place where the defendant made the representations" – is of similar import in consumer fraud cases where the plaintiff suffered only pecuniary harm as in tort cases involving injuries to persons or tangible things.  <u>Id.</u> § 148, Comment (h).  In elucidating that similarity, the Comments to section 148(2) incorporate those from Restatement § 146.  <u>Id.</u>  The Comments to the latter section state that, in tort cases in which the conduct at issue and the injury for which the plaintiff seeks relief occurred in different states:

> [A]n important factor in determining which is the state of most significant relationship is the purpose sought to be achieved by the rule of tort law involved.  If this purpose is to punish the tortfeasor and thus to deter others from following his example, there is better reason to say that the state where the conduct occurred is the state of dominant interest and that its local law should control than if the tort rule is designed primarily to compensate the victim for his injuries.

Restatement (Second) of Conflict of Laws § 146, Comment (e).

The importance of considering the policies underlying the various states' laws is also emphasized by the Comments to section 148(2), which instruct courts to take into account "the choice-of-law principles stated in [Restatement] § 6 with emphasis upon the purpose sought to be achieved by the relevant tort rules of the potentially interested states, the particular issue and the tort involved" when balancing the choice of law factors applicable to fraud claims.  <u>Id.</u> § 148, Comment (e).

In light of those provisions, the Court finds that the third consideration articulated by Restatement § 148(2) – "the place where the defendant made the representations" – outweighs those that support applying the law of each class member's home state.  As mentioned above, the NJCFA seeks to deter wrongful activity on the part of corporations operating in New Jersey by imposing automatic treble damages on consumer fraud claims.  Cox, 647 A.2d at 463-64.  That deterrent effect would be compromised if Mercedes were allowed to avail itself of the law of states which limit recovery in consumer fraud actions to compensatory damages simply because its alleged wrongful activity, which took place within New Jersey, had nationwide effects.[10]  On the other hand, New Jersey's interest in limiting the liability of a corporation headquartered within its borders – an interest which is implicit in the fact that "the only form of punitive damages expressly allowed by the NJCAF are treble damages," Fink, 839 A.2d at 980 – would be compromised if the company were subjected to the law of states that do not limit punitive recovery in consumer fraud cases.[11]  Therefore, the Court finds that New Jersey is "the state of dominant interest and that its local law should control."  See Restatement (Second) of Conflict of Laws § 146, Comment (e).

Even if the claim-specific factors articulated in Restatement § 148(2) did weigh in favor of applying the law of each class member's home state, that finding would not conclude the Court's choice of law analysis.  Rather, the claim-specific considerations contained in Restatement § 148(2) must be balanced against those enumerated in section 6.  P.V., 962 A.2d at 463.  The factors in the latter section militate in favor of applying New Jersey law, and outweigh the portions of Restatement § 148(2) that support applying the law of each class member's home jurisdiction.

---

[10] For a list of states that limit damages in consumer fraud actions, see supra note 3.

[11] For a list of such states, see supra note 4.

The considerations articulated in Restatement § 6(a), (b), and (c) overlap in this case. The first, "the needs of the interstate and international systems," requires that the Court take into account "the needs and policies of other states and of the community of states" when determining which jurisdiction's law should apply to Plaintiffs' consumer fraud claim. Restatement (Second) of Conflict of Laws § 6, Comment (d).  The second and third, respectively, require the Court to consider "the relevant policies of the forum" and "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue."  Id. § 6(b),(c).  Having already ruled that conflicts exist between the various states' consumer fraud statutes and that New Jersey has a greater interest than any other jurisdiction in having its law applied, the Court finds that applying the NJCFA to Plaintiffs' consumer fraud claims will not result in an unacceptable conflict between states.  As mentioned above, each of the states from which class members will be drawn has an interest in assuring that its citizens will be compensated for any harm they may have suffered.  Only New Jersey, however, possesses the additional interest in regulating a corporation headquartered within its borders – the interest implicated by the availability, or lack thereof, of punitive damages.  See Exxon Shipping Co. v. Baker, 128 S. Ct. 2605, 2621 (2008) ("[T]he consensus today is that punitives are aimed not at compensation but principally at retribution and deterring harmful conduct.").  Therefore, the interests of jurisdictions whose consumer fraud statutes differ with respect to punitive damages will not be implicated by the application of the NJCFA to Plaintiffs' claim, and that application will not give rise to any conflict between the various states.

As was the case with Plaintiffs' unjust enrichment claim, the fourth factor enumerated by Restatement § 6, "the protection of justified expectations," weighs in favor of applying New Jersey law.  The alleged misrepresentations which form the basis of Plaintiffs' consumer fraud

claim were made by the company's "Telematics team," which allegedly oversaw the promotion

and marketing of Tele Aid, coordinated with AT&T relating to the discontinuation of analog

service, and decided that customers would be charged $1,000 to upgrade to digital equipment.

(Pls.' Br. Regarding Choice of Law 4.)  Given the fact that the "Telematics team" was based in

New Jersey, Mercedes cannot reasonably argue that its justified expectations would be violated

by the application of that state's law.  In contrast, however, the actions taken by Plaintiffs in

reliance on Mercedes alleged misrepresentations – the payment of Tele Aid subscription fees or

the $1,000 upgrade charge – occurred throughout the United States, and may or may not have

taken place in each Plaintiffs' home state.  As discussed above, it is entirely possible that a given

class member may have submitted payment to Mercedes from a location, such as an office or

vacation-spot, outside his or her home state.  In the absence of any evidence to the contrary, the

Court finds that the ongoing relationship between Mercedes and the Tele Aid subscribers from

which class members will be drawn was centered at the place where the alleged misconduct

underlying Plaintiffs' consumer fraud claim took place: the headquarters of the "Telematics

team" in Montvale, New Jersey.  Therefore, the "justified expectations" of both sides will be best

upheld by the application of New Jersey law.

Similarly, the fifth consideration outlined by Restatement § 6, "the basic policies

underlying the particular field of law," supports the application of New Jersey law to Plaintiffs'

consumer fraud claim.  Although the consumer fraud statutes of the various states from which

class members will be drawn vary in many respects, every jurisdiction seeks to assure that

plaintiffs can recover compensatory damages for any pecuniary loss suffered as the result of

foreseeable reliance on a defendant's misrepresentations.  See Fink, 839 A.2d at 979-82;

Restatement (Second) of Torts § 531 (1977).  That shared policy would be frustrated if the Court

applied the law of each Plaintiffs' home state to his or her claims and refused on that basis to

certify a class.  Given the relatively paltry amount of damages suffered by each potential class

member – the Tele Aid subscription fees paid in anticipation of that system's continuing

functionality and the upgrade charge for those individuals who purchased digital equipment – the

requirement that potential class members individually pursue their claims would effectively bar

suits by creating a situation where the costs to each Plaintiff of pursuing his or her proceeding

would dwarf any potential recovery.  See Windsor, 521 U.S. at 617.  Therefore, the Court finds

that the "the basic policies underlying the particular field of" consumer fraud will be best served

by the application of New Jersey law and the certification of a class.

      The final two factors articulated by Restatement § 6, "certainty, predictability and

uniformity of result" and "ease in the determination and application of the law to be applied,"

also weigh in favor of the applying the NJCFA.  As discussed above, the consumer fraud statutes

of the various jurisdictions in which potential class members reside vary significantly.  See Fink,

839 A.2d at 974-82 (discussing variations).  Were the Court to apply the law of each Plaintiffs'

home state to his or her claim, there is a danger that different class members – all of whom

suffered the same harm based on the same alleged wrongdoing – would have their claims

decided inconsistently.  Additionally, the application of the law of each Plaintiffs' home

jurisdiction would hopelessly complicate the trial process by requiring the jury to consider the

multitudinous differences between the elements necessary to prove consumer fraud in each

jurisdiction and the damages that can be awarded to successful claimants.

## C.  Rule 23(a) Analysis

      Having ruled as a preliminary matter that New Jersey law applies to Plaintiffs' unjust

enrichment and consumer fraud claims, the Court must determine whether class treatment of

those claims is appropriate.  In order to obtain certification, Plaintiffs must demonstrate that their proposed class satisfies all four of the requirements enumerated in Federal Rule of Civil Procedure 23(a) and falls into at least one of the three categories contained in Rule 23(b).  Baby Neal, 43 F.3d at 55 (3d Cir. 1994).  Turning first to the four criteria contained in Rule 23(a) – numerosity, commonality, typicality, and adequacy of representation – the Court finds that Plaintiffs' proposed class meets those conditions.

### i.    Numerosity

In order to meet the first requirement of Rule 23(a), "numerosity," Plaintiffs must demonstrate that "the [proposed] class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "To meet the impracticability standard, a party need not prove that joinder of every class member is impossible; instead, proof of 'difficulty or inconvenience of joining all members of the class' suffices."  Weisfeld v. Sun Chem. Corp., 210 F.R.D. 136, 140 (D.N.J. 2002) (quoting Harris v. Palm Springs Alpine Estates, Inc., 329 F.2d 909, 913-14 (9th Cir. 1964)).  "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."  Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001).

Even disregarding the testimony submitted by Plaintiffs' expert, Dr. Lamb, the proposed class meets Rule 23(a)(1)'s numerosity requirement.  Mercedes's own records show that potential class members likely number in the hundreds of thousands.  As part of its "customer ramp-down" plan, the company estimated on November 20, 2006 that 107,703 customers would continue to subscribe to analog Tele Aid services until June 2007, the last month in which owners of vehicles equipped with analog-only Tele Aid systems were able to renew their

subscriptions.  (Munroe Decl., Ex. 11 at 5.)  In a later document, Mercedes representatives noted

that "[n]ot enough Tele Aid customers have voluntarily discontinued their service to meet [the

'customer ramp-down'] schedule" and pointed out that, while the company expected 141,815

individuals to continue to subscribe to analog Tele Aid service in April 2007, a total of 182,565

did so.  (Munroe Decl., Ex. 12 at 2.)  In light of the apparent disparities between Mercedes's

November 20, 2006 projections and the actual number of subscribers in April 2007, it is likely

that significantly more than 100,000 potential class members continued to subscribe to analog

Tele Aid service until being informed that such service would terminate at the end of 2007.  The

joinder of such a large number of individuals would be "impracticable," to say the least.

Therefore, the Court finds that the proposed class satisfies Rule 23(a)(1)'s numerosity

requirement.[12]

### ii.    Commonality

The second of the four criteria for class certification mandated by Rule 23(a),

"commonality," requires Plaintiffs to demonstrate that "there are questions of law or fact

common to the class."  Fed. R. Civ. P. 23(a)(2).  "Commonality does not require an identity of

claims or facts among class members; instead '[t]he commonality requirement will be satisfied if

the named plaintiffs share at least one question of fact or law with the grievances of the

prospective class.'"  Johnston v. HBO Film Mgmt. Inc., 265 F.3d 178, 184 (3d Cir. 2001)

(quoting In re Prudential Ins. Co. of Am. Sales Practice Litig., 148 F.3d 283, 310 (3d Cir. 1998)).

Because the requirement may be satisfied by a single common issue, it is easily met.  Baby Neal,

43 F.3d at 56.

---

[12] Mercedes effectively concedes that Rule 23(a)(1)'s numerosity requirement is met by stating
repeatedly that the proposed class includes "tens of thousands" of individuals.  (Def.'s Reply Br.
Supp. Mot. Exclude Russell L. Lamb 6, 9, 10, 11.)

As discussed below in the Court's analysis relating to Rule 23(b)(3)'s "predominance" requirement, the vast majority of the factual and legal questions that will be addressed at trial are common to all members of the proposed class.  Both of Plaintiffs' claims are premised on the contention that Mercedes knew or should have known after the FCC's rule change became final on August 8, 2002 that analog Tele Aid service would no longer be available after February 18, 2008, but failed to disclose that fact to its customers.  Those allegations relate only to Mercedes's– rather than individual class members' – knowledge and actions, and are therefore amenable to common proof.  Accordingly, since the named Plaintiffs share at least one question of law or fact with the prospective class, Rule 23(b)(2)'s commonality requirement is satisfied.  See Johnston, 265 F.3d at 184.

### iii.    Typicality

Rule 23(a)'s third criterion for class certification, "typicality," requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "The concepts of commonality and typicality are broadly defined and tend to merge.  Both criteria seek to assure that the action can be practically and efficiently maintained and that the interests of the absentees will be fairly and adequately represented."  Baby Neal, 43 F.3d at 56.  The two requirements, however, are distinct.  Id.

"The typicality inquiry is intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented."  Baby Neal, 43 F.3d at 57.  "The typicality criterion is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees by requiring that the common claims are comparably central to the claims of the

named plaintiffs as to the claims of the absentees." Id. "Typicality entails an inquiry whether 'the named plaintiff's individual circumstances are markedly different or … the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based.'" Id. at 57-58 (quoting Hassine v. Jeffes, 846 F.2d 169, 177 (3d Cir. 1988)). "Commentators have noted that cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." Id. at 58. "[F]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." Id. (quoting Hoxworth v. Blinder, Robinson & Co., 980 F.2d 912, 923 (3d Cir. 1992)).

The typicality requirement is clearly satisfied in this case. The named Plaintiffs are individuals who purchased model year 2002-2006 vehicles equipped with analog-only Tele Aid systems. All class members, including the named Plaintiffs, were affected by Mercedes's alleged concealment of analog Tele Aid's impending obsolescence in the same way, and all suffered the same harm. Therefore, the Court finds that the named Plaintiffs' claims satisfy Rule 23(a)(3)'s typicality requirement.

### iv.    *Adequacy of Representation*

"Adequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class.'" New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 313 (3d Cir. 2007) (quoting Wetzel v. Liberty Mut. Ins. Co., 508 F.2d 239, 247 (3d Cir. 1975)). With respect to the first requirement, the Court finds that

Plaintiffs' attorneys, who have up to this point been serving as interim class counsel,[13] are sufficiently qualified and experienced to conduct the litigation.  Plaintiffs' lawyers have ably handled the proceedings thus far, and Mercedes has not objected to their qualifications. Therefore, the Court finds the first portion of Rule 23(a)(4)'s adequacy criteria satisfied, and will appoint Plaintiffs' current attorneys as counsel for the class.

As the Supreme Court has noted, the second prong of adequacy of representation – that the plaintiff not have interests antagonistic to those of the proposed class – "tend[s] to merge with the commonality and typicality criteria" because all three examine "whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  Windsor, 521 U.S. at 626 n.2 (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157 n.13 (1982)).  There is no apparent conflict between the interests of the named Plaintiffs and the rest of the class, and Mercedes has not alleged that such a conflict exists.  To the contrary, as discussed above with respect to Rule 23(a)'s typicality requirement, the named Plaintiffs suffered the same harm as the other members of the proposed class, and have the same interest in quickly and efficiently redressing that harm. Therefore, the Court finds that the named Plaintiffs satisfy the second portion of Rule 23(a)'s adequacy of representation requirements.

## D.  Rule 23(b)(3) Analysis

In addition to meeting the four criteria of Rule 23(a), Plaintiffs must also demonstrate that their proposed class action falls within one of the three categories enumerated in Rule 23(b). Baby Neal, 43 F.3d at 55.  Plaintiffs contend that their claims meet the twin prerequisites for

---

[13] Jonathan Selbin of Lieff, Cabraser, Heimann & Bernstein, LLP and Eric Gibbs of Girard Gibbs, LLP were appointed interim co-lead class counsel pursuant to the Court's Case Management Order of April 11, 2008, while Lisa J. Rodriguez of Trujillo, Rodriguez & Richards, LLP was appointed interim plaintiffs' liaison counsel.

class certification contained in Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Those requirements are commonly known as "predominance" and "superiority." In re Hydrogen Peroxide, 552 F.3d at 310. After considering the questions that will be addressed at trial, the Court is satisfied that common issues predominate and class treatment will be the most efficient means of adjudicating Plaintiffs' claims. Therefore, the requirements of Rule 23(b)(3) are met, and class certification is appropriate.

*(a) Predominance*

The predominance requirement "tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." Windsor, 521 U.S. at 623. That standard is "far more demanding than the commonality requirement of Rule 23(a)." In re Hydrogen Peroxide, 552 F.3d at 311 (quotations omitted). "Because the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual, a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate." Id. "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." Newton, 259 F.3d at 172.

In this case, an examination of the elements Plaintiffs' two causes of action – unjust enrichment and consumer fraud – reveals that virtually all of the legal and factual issues which will be adjudicated at trial are common to the class. In order to demonstrate unjust enrichment, Plaintiffs must show that (1) they conferred a benefit on Mercedes, and (2) retention of that

benefit without payment would be unjust.  VRG Corp. v. GKN Realty Corp., 641 A.2d 519, 526

(N.J. 1994); Restatement (First) of Restitution § 1 (1937).  Under New Jersey law, "[t]he unjust

enrichment doctrine requires that [P]laintiff[s] show that [they] expected remuneration from

[Mercedes] at the time [they] performed or conferred a benefit on [the company] and that the

failure of remuneration enriched [Mercedes] beyond its contractual rights."  VRG Corp., 641

A.2d at 526.  In other words, Plaintiffs must show that they got something less than they paid for,

and Mercedes should be required as a matter of equity to make them whole.

      Plaintiffs have essentially proven the first element of their unjust enrichment claim, that

they conferred a benefit on Mercedes, by limiting their proposed class to owners of vehicles

equipped with analog-only Tele Aid systems that continued to subscribe until being told that

analog service would be discontinued at the end of 2007 or purchased an upgrade to digital

equipment.  Consequently, the only question for trial will be whether it would be inequitable to

allow Mercedes to retain the subscription fees and/or digital upgrade payments remitted by

Plaintiffs.  The resolution of that question will require Plaintiffs to address three issues that are

amenable to class, rather than individual, proof: (1) whether Mercedes knew or should have

known after August 8, 2002 that analog service would not be available after February 18, 2008,

(2) whether the company's statements regarding the continued viability of analog Tele Aid were

misleading in light of that knowledge, and (3) whether Plaintiffs had any legally-cognizable

expectation that Tele Aid service would be available throughout the life of their vehicles.  Since

the first two issues deal only with Mercedes's behavior and the third is a question of contractual

interpretation that is common to all members of the putative class, the Court finds Rule

23(b)(3)'s predominance requirement satisfied with respect to Plaintiffs' unjust enrichment

claim.

Similarly, Plaintiffs' consumer fraud claim is predominated by issues of law and fact that are common to the proposed class. In order to prevail on that claim, Plaintiffs must demonstrate that (1) unlawful conduct on the part of Mercedes, (2) an ascertainable loss on the part of the Plaintiffs, and (3) a causal relationship between the unlawful conduct and the ascertainable loss. N.J. Stat. Ann. § 56:8-19; Bosland v. Warnock Dodge, Inc., 964 A.2d 741, 749 (N.J. 2009). The first prong requires Plaintiffs to prove that Mercedes knew or should have known after August 8, 2002 that analog service would be discontinued on or before February 18, 2008, but either affirmatively misrepresented or omitted that fact when marketing analog-only Tele Aid systems. See N.J. Stat. Ann. § 56:8-2 (declaring unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact … in connection with the sale or advertisement of any merchandise or real estate."); Int'l Union of Operating Eng'rs Local #68, 929 A.2d at 1086 ("Consumer fraud violations are divided broadly into three categories: affirmative acts, knowing omissions, and regulatory violations.") (internal quotations omitted). Accordingly, the issues for trial relating to the first element of Plaintiffs' consumer fraud claim turn on the knowledge and actions of the company rather than those of the individual class members, and are therefore common to the class.

The second element, ascertainable loss, does not require Plaintiffs to prove that they relied on Mercedes's alleged misrepresentations. Id. at 1087. To the contrary, Plaintiffs need only show that they "paid for a product and got something less than what had been promised." Elias, 252 F.R.D. at 249 (internal quotations omitted); see also Thiedemann v. Mercedes-Benz U.S.A., LLC, 872 A.2d 783, 792-93 (N.J. 2005) (defining "ascertainable loss" as "either an out-of-pocket loss or a demonstration of loss in value" that is "quantifiable and measurable."). By

limiting their proposed class to vehicle owners who subscribed to analog Tele Aid service until

being told that service would be discontinued at the end of 2007 or purchased a digital upgrade,

Plaintiffs have effectively established ascertainable loss.  Mercedes acknowledged in its

submissions to the FCC that Plaintiffs' Tele Aid systems were "embedded in [] automobile[s]

designed to last up to 20 years."  (Munroe Decl. Ex. 1 at 6.)  Each member of the proposed class

demonstrated his or her intention to utilize the system by continuing to subscribe until being

informed that analog service would be discontinued at the end of 2007, and some Plaintiffs went

so far as to purchase a digital upgrade in order to assure that they could continue to use Tele Aid.

Thus, each class member got something less than he or she was promised: a vehicle that was

meant to last up to 20 years, but contained a Tele Aid system that would become useless at the

end of 2007.

The amount of Plaintiffs' "ascertainable loss," which will serve as the basis for

quantifying damages at trial, is easily calculated using common proof.  Simply put, the sum of

each class member's loss is the amount necessary to fulfill his or her expectation of a functioning

Tele Aid system.  For those class members who did not purchase a digital upgrade, the

ascertainable loss will be the cost of such an upgrade plus compensation for the time period

between the end of 2007 and any eventual judgment, during which service was unavailable.

With respect to Plaintiffs who purchased an upgrade to digital equipment, the amount paid for

that modification represents the total ascertainable loss.  After each class member's total

ascertainable loss is calculated, damages of three times that sum will be awarded pursuant to the

NJCFA's treble damages requirement.  See N.J. Stat. Ann. § 56:8-19 ("In any action under this

section the court shall … award threefold the damages sustained by any person in interest.").

Causation, the final element of Plaintiffs' consumer fraud claim, can also be established using common proof.  At common law, the causal link between a defendant's fraudulent conduct and a plaintiff's loss was demonstrated by showing that the plaintiff relied on the defendant's misrepresentations or omissions.  <u>Varacallo v. Mass. Mut. Life Ins. Co.</u>, 752 A.2d 807, 817 (N.J. Super. Ct. App. Div. 2000).  As discussed above, however, the NJCFA does not require Plaintiffs to demonstrate that they relied on Mercedes misstatements.  N.J. Stat. Ann. § 56:8-2 (allowing recovery "whether or not any person has in fact been misled, deceived or damaged" by the defendant's misrepresentation or omission); <u>Int'l Union of Operating Eng'rs  Local #68</u>, 929 A.2d at 1087 ("Our CFA does not require proof that a consumer has actually relied on a prohibited act in order to recover.").  Instead, "the [NJCFA] requires only a causal nexus between the 'method, act, or practice declared unlawful' and the consumer's 'ascertainable loss.'"  <u>Varacallo</u>, 752 A.2d at 817 (citing N.J. Stat. Ann. § 56:8-19).

The distinction between the proof of reliance required at common law and the less-rigorous "causal nexus" standard applicable to NJCFA claims is best explained by examining the precise nature of the "ascertainable loss" at issue in this case.  Plaintiffs do not allege that, but for the alleged misrepresentations, they would not have purchased their vehicles.  Nor do they contend that analog Tele Aid service would have been available after 2007 if not for Mercedes's alleged misconduct; AT&T stopped providing analog service because the FCC rule change removed the requirement that it do so, not because of any statement made by Mercedes.  Plaintiffs simply claim that they did not get what they paid for – that because of Mercedes's alleged wrongdoing, they did not know that the Tele Aid systems in their automobiles would become useless long before the vehicles aged to such a degree that they were no longer drivable.  Therefore, Plaintiffs will not need to prove at trial that each individual class member relied on

56

Mercedes statements relating to Tele Aid when purchasing their vehicles.  To the contrary, Plaintiffs can establish the necessary "causal nexus" between their ascertainable loss and the alleged misrepresentations simply by proving with respect to the class as a whole that, had Mercedes disclosed the existence of the FCC rule change and the fact that analog service would no longer be available after 2007, that disclosure would have effectively warned potential purchasers of vehicles equipped with analog-only Tele Aid systems that those systems would soon be rendered obsolete.

Even if Plaintiffs were required at trial to show evidence of reliance similar to that required in common law fraud claims, that requirement would not render class certification inappropriate.  It is well-established that plaintiffs asserting fraud claims "involving primarily failure to disclose" material information need not demonstrate "positive proof of reliance" in order to recover.  Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153 (1972). "All that is necessary is that the facts withheld be material in the sense that a reasonable [purchaser] might have considered them important in the making of [his or her] decision.  This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact."  Id. at 153-54; see also Varacallo, 752 A.2d at 817 ("The presumption or inference of reliance and causation, where omissions of material fact are common to the class, has been extended in the context of both common law and statutory fraud.").  Thus, if Plaintiffs demonstrate at trial that Mercedes failed to disclose the impending obsolescence of analog Tele Aid, that omission will be presumed to have caused Plaintiffs' loss and there will be no need for individualized evidence regarding causation.  Therefore, common questions of law and fact predominate, and class certification is appropriate.  See Varacallo, 752 A.2d at 818 ("Where [an] omission of fact is common to the entire class, class certification is favored.").

*(b)  Superiority*

The second prerequisite to class certification contained in Rule 23(b)(3), "superiority,"

requires the Court "to balance, in terms of fairness and efficiency, the merits of a class action

against those of 'alternative available methods' of adjudication."  <u>Georgine</u>, 83 F.3d at 632.  In

doing so, the Court is guided by four "pertinent" factors:

> (A) the class members' interests in individually controlling the
> prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the
> controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation
> of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Upon consideration of those factors, the Court finds that a class action will be the most

efficient method for adjudicating Plaintiffs' claims.  Individual class members have little to no

interest in controlling the prosecution of separate actions.  To the contrary, the requirement that

potential class members individually pursue their claims would effectively bar recovery by

creating a situation in which the cost to each Plaintiff of litigating his or her claim would exceed

any potential recovery.  <u>See</u> <u>Windsor</u>, 521 U.S. at 617 ("The policy at the very core of the class

action mechanism is to overcome the problem that small recoveries do not provide the incentive

for any individual to bring a solo action prosecuting his or her rights.  A class action solves this

problem by aggregating the relatively paltry potential recoveries into something worth

someone's (usually an attorney's) labor.").  Pursuant to the JPML's Order dated on February 26,

2008 and this Court's Case Management Order of April 11, 2008, all currently-pending cases

relating to the discontinuation of analog Tele Aid service have been consolidated, thus assuring

that no related litigation in any other forum has proceeded to an advanced stage.  Given that consolidation, along with the fact that the proceedings in this Court have advanced through several rounds of motions and over a year of discovery, the concentration of Plaintiffs' claims in this forum will greatly streamline the adjudication of those claims.  Finally, the certification of a class would not give rise to any difficulties that would make the remainder of this litigation unmanageable.

## III.  CONCLUSION

For all the foregoing reasons, Plaintiffs' Motion for Class Certification is granted.  The class shall be defined as follows:

> All persons or entities in the United States who purchased or leased a Mercedes-Benz vehicle equipped with an analog-only Tele Aid system after August 8, 2002, and
>
>> (1) subscribed to Tele Aid service until being informed that such service would be discontinued at the end of 2007, or
>>
>> (2) purchased an upgrade to digital equipment.

Mercedes's Motion to Exclude the Expert Testimony of Dr. Russell L. Lamb is dismissed as moot.

The Court will enter an Order implementing this opinion.


  s/ Dickinson R. Debevoise
DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated: April 24, 2009