**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: MERCEDES-BENZ TELE AID CONTRACT LITIGATION | Civ. No.  07-2720 (DRD) |
| | MDL No. 1914 |
| | **O P I N I O N** |

*Appearances by:*

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
by: Jonathan D. Selbin, Esq. & Jennifer Gross, Esq.
780 Third Avenue, 48th Floor
New York, NY 10017

CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI, STEWART & OLSTEIN
by: James E. Cecchi, Esq. & Lindsey H. Taylor, Esq.
5 Becker Farm Road
Roseland, NJ 07068

GIRARD GIBBS, LLP
by: Eric H. Gibbs, Esq. & Geoffrey A. Munroe, Esq.
601 California Street, 14th Floor
San Francisco, CA 94108

TRUJILLO, RODRIGUEZ & RICHARDS, LLP
by: Lisa J. Rodriguez, Esq.
8 Kings Highway West
Haddonfield, NJ 08033

   *Interim Co-Lead and Liaison Counsel for Plaintiffs*

BRYAN CAVE, LLP
by: Peter W. Herzog III, Esq. & Ketrina G. Bakewell, Esq.
1 Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, MO 63102

GRAHAM CURTIN, PA
Thomas R. Curtin, Esq.
Kathleen M. Fennelly, Esq.
4 Headquarters Plaza
P.O. Box 1991
Morristown, NJ 07962

    *Attorneys for Defendant*

## DEBEVOISE, Senior District Judge

This matter comes before the Court on two motions submitted by Defendant, Mercedes-Benz U.S.A., LLC ("Mercedes"). In the first, Mercedes argues that a recent decision by the Court of Appeals for the Third Circuit requires decertification of the class of plaintiffs[1] created by the Court's April 24, 2009 Opinion and Order. In the event the Court refuses to decertify the class, Mercedes contends in its second motion that the class definition should be narrowed to exclude any individual whose "Tele Aid" service – an emergency response system which links subscribers to road-side assistance operators by using a combination of global positioning and cellular technology – was terminated prior to December 31, 2007.

For the reasons set forth below, the Court will deny Mercedes's Motion for Decertification. The class definition will be clarified in two ways: (1) the date after which a plaintiff must have purchased or leased the vehicle in question will be changed from August 8, 2002 to August 22, 2002, and (2) persons or entities that purchased or leased a pre-owned vehicle after Decemeber 2006 will be excluded from the class. Moreover, the Court will certify an interlocutory appeal of two issues: (1) whether a district court may entertain a motion for

---

[1] The class is represented by 15 named Plaintiffs: Leroy Browning, James Giotis, Richard Hankins, Jack D. Kelley, Karen Marcus, Nicholas Lonzisero, Christian Andrew Pellegrini, Mark Russell, Ashish Sen, Colleen Sen, Cord Shiflet, Michael Leslie Shim, Lois A. Stowers, Robert E. Stowers, and Susan Tuteur. On June 2, 2008, former Plaintiff S.B. Atlass voluntarily dismissed his claim without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1). Similarly, former Plaintiff Sandra Levin voluntarily dismissed her claim without prejudice on March 12, 2009.

reconsideration of an order certifying a class after a request for interlocutory appeal of that order

pursuant to Federal Rule of Civil Procedure 23(f) has been denied, and (2) whether the Court

was correct in its April 24, 2009 ruling that Restatement 148(2) governs the choice of law

analysis under the "most significant relationship" test in consumer fraud actions in which the

misrepresentations or omissions at issue were made and received in different states.

## I.  BACKGROUND

The circumstances underlying this litigation are laid out in detail in the Court's April 24,

2009 Opinion.  See In re Mercedes-Benz Tele Aid Contract Litig., 257 F.R.D. 46 (D.N.J. 2009).

For the sake of brevity, the Court incorporates by reference the "background" section of that

decision, and will refrain from revisiting the majority of the facts contained therein.

### A.  FCC Rule Change and Discontinuation of Analog Service

Plaintiffs purchased Mercedes model year 2002-2006 vehicles equipped with analog-only

Tele Aid Systems and subscribed to that service until being informed that it would be

discontinued at the end of 2007.[2]  In order to receive Tele Aid service, Plaintiffs were required to

sign a Subscriber Agreement that was separate from their purchase or lease contracts.  Mercedes

offered free Tele Aid service for one year, after which Plaintiffs were required to periodically

renew their subscriptions by pre-paying fees corresponding to a given number of years of Tele

Aid service.  See (Pls.' Br. Supp. Mot. Class Certification, Decl. of Geoffrey Munroe ("Munroe

Decl."), Exs. 19-22).

The Tele Aid systems installed in Plaintiffs' vehicles used an analog signal provided by

AT&T Wireless Services, Inc. ("AT&T"), as part of a contract between that company and

---

[2] Wireless telephone networks operate using either an analog or digital signal.  Although the
technology to produce so-called "dual mode" devices capable of using both analog and digital
phone signals existed at the time they were manufactured, the Tele Aid systems installed in
Mercedes's model year 2000-2004 and some 2005 and 2006 automobiles depended exclusively
on analog signals.

Mercedes.  Prior to August 8, 2002, federal regulations required wireless carriers to provide both analog and digital signals over their networks.  However, on August 8, 2002, the Federal Communications Commission ("FCC") adopted a rule that abandoned that requirement by stating that carriers would no longer be required to provide analog service after a five-year "sunset period" ending on February 18, 2008.[3]  That rule change was vigorously opposed by Mercedes, which filed several objections during the rulemaking process and whose representatives met with FCC officials on at least two occasions prior to the agency's final adoption of the new regulation.

Mercedes continued to manufacture and sell vehicles equipped with analog-only Tele Aid systems after the FCC's August 8, 2002 ruling, but did not inform its customers that wireless carriers would no longer be required to provide the analog service on which their Tele Aid systems depended after February 18, 2008.  In fact, Mercedes admits that it did not publicly acknowledge the FCC rule change and the impending obsolescence of analog-only Tele Aid systems until 2006, when it posted information regarding those developments on its website. Compare (Def.'s Br. Supp. Mot. Decertify 22) (setting the date of that disclosure as "June 2006") with (Def.'s Br. Opp'n Class Certification 9) (stating that the information was posted in "November 2006.")  Owners of vehicles equipped with analog-only Tele Aid systems were not personally informed until their Tele Aid subscriptions needed to be renewed, meaning that in some cases individual subscribers did not receive notice of the FCC rule change and the imminent cessation of their Tele Aid service until late 2007.  See (Munroe Decl., Ex. 26 at 1) (letter from Mercedes to a Tele Aid subscriber dated September 7, 2007 stating that "in

---

[3] Although the FCC finalized its rule change on August 8, 2002, the amendments to the agency's regulations that resulted from that change did not take effect until six months later, on February 18, 2003.  Therefore, the date on which the five-year ended was set as February 18, 2008.  For the sake of convenience, the Court will refer throughout its ruling to February 18, 2008 as the date after which communications companies were no longer required to provide analog service.

accordance with a recent Federal Communications Commission (FCC) ruling, traditional analog

wireless networks that support some Tele Aid systems, including the one used in your vehicle …

will no longer be required to be maintained by wireless carriers.")

　　　　The disclosures Mercedes sent to Tele Aid subscribers in 2006 and 2007 were part of a

"customer ramp-down" plan initiated in cooperation with AT&T.  In meetings between the two

companies as early as August 22, 2002 – a mere 14 days after the FCC's ruling – AT&T made it

clear that it would "shut down" its analog network as soon as the requirement that it provide such

service expired.  (Id., Ex. 12 at 3.)  It was not until November 28, 2006, however, that Mercedes

stopped selling new vehicles equipped with analog-only Tele Aid systems.  On that date, the

companies entered into a contract whereby Mercedes, in addition to halting new vehicle sales,

also agreed to stop renewing analog-only Tele Aid Subscriber Agreements after June 30, 2007

and terminate service to all remaining subscribers on December 31, 2007.  (Id., Ex. 11 at 2); see

also (Id., Ex. 14 at 3) (describing Mercedes's plans for a "hard shutdown" of all analog Tele Aid

service on December 31, 2007.)  In exchange, AT&T reduced the fees charged for its services by

$4.8 million.  (Id., Ex. 14 at 2.)

　　　　In order to mitigate its impending loss of the revenue from analog Tele Aid subscriber

fees, Mercedes on November 14, 2006 informed its parts managers that it would offer a "Digital

Tele Aid Upgrade program" whereby customers whose vehicles contained an analog-only

system could choose to purchase new hardware that would be unaffected by the discontinuation

of analog service at a price of approximately $1,000 per vehicle.  The company characterized the

program as "a significant customer pay revenue opportunity," and stated that over 720,000

automobiles containing analog-only Tele Aid systems – including all 2002-2004 and some model

year 2005 and 2006 Mercedes vehicles – were eligible for the digital upgrade.  (Id., Ex. 18.)

Thus, subscribers were faced with a choice:  bear the expense of upgrading to digital equipment or lose the benefits of Tele Aid service at the end of 2007.

**B. Plaintiffs' Claims**

This multi-district litigation is comprised of ten separate actions, which were originally filed in six different states.  After those actions were consolidated and transferred to this Court pursuant to 28 U.S.C. § 1407, the named Plaintiffs were instructed to "file a Consolidated Amended Complaint in this Consolidated Action, which shall supersede the complaints filed in each of the individual Actions."  (Case Management Order of April 11, 2008, ¶ H.)  Plaintiffs complied, and on May 2, 2008 filed a Consolidated Class Action Complaint asserting claims for unjust enrichment and consumer fraud.[4]   See (Consol. Compl. ¶¶ 64-77, 83-93.)

In light of the FCC's August 8, 2002 rule change and the aforementioned communications in which AT&T informed Mercedes that it would discontinue analog service as soon as it was allowed to do so, Plaintiffs alleged in their Consolidated Complaint that Mercedes knew or should have known as early as August 8, 2002 that analog Tele Aid systems would become obsolete in 2008, but continued to the market those systems without disclosing their future obsolescence to buyers of 2002-2004 and some model year 2005 and 2006 vehicles. Based on that allegation, Plaintiffs asserted causes of action for consumer fraud and unjust enrichment as the representatives of a purported nationwide class made up of individuals who purchased Mercedes vehicles equipped with analog-only Tele Aid systems between August 8, 2002 and the company's acknowledgment of the FCC ruling and impending obsolescence of analog Tele Aid, which was made in letters sent to subscribers in 2006 and 2007.

---

[4] The original Consolidated Class Action Complaint included a third claim, breach of implied warranty of merchantability.  Plaintiffs did not move for class certification on that cause of action, choosing instead to voluntarily dismiss their implied warranty claims on March 12, 2009.

### C. Motion for Class Certification

The parties on October 1, 2008 submitted a proposed Stipulation and Order setting forth a plan for the briefing of the Motion for Class Certification that the Plaintiffs planned to file shortly thereafter. That Stipulation and Order, which the Court entered on October 3, 2008, stated that the parties would file separate briefs relating to the issues of (1) which state's substantive law should apply to Plaintiffs' claims and (2) whether the proposed class met the requirements of Federal Rule of Civil Procedure 23.

In their briefs regarding class certification and choice of law, Plaintiffs contended that this case is particularly well-suited to class treatment because (1) their claims "arise from a single course of conduct that affect[ed] large numbers of consumers" and (2) the costs to each class member of pursuing his or her suit would exceed any potential recovery. (Pls.' Br. Supp. Mot. Class Certification 14-16.) In support of the first point, Plaintiffs noted that all of Mercedes's conduct relating to Tele Aid was planned and coordinated by a "Telematics team" located in Montvale, New Jersey. (Pls.' Br. Regarding Choice of Law 4.) That team coordinated with AT&T on issues relating to the discontinuation of analog service, determined that customers should be charged approximately $1,000 for an upgrade to digital equipment, and was responsible for informing Tele Aid subscribers of the impending obsolescence of their analog devices. With respect to the second argument, Plaintiffs pointed out that the pecuniary loss suffered by each class member as a result of Mercedes's alleged misconduct consists only of the Tele Aid activation and subscription fees paid in anticipation of the continued operation of that system and the cost of a digital upgrade, and a refusal to grant class certification would therefore effectively preclude potential class members from pursuing their claims because doing so individually would be economically irrational.

Mercedes asserted two main arguments in opposition to Plaintiffs' request for class certification. First, the company contended that the Court should refuse to certify a nationwide class because each Plaintiff's claim is governed by the law of his or her home state, and the differences between those laws would render class treatment inappropriate. Additionally, Mercedes argued that Plaintiffs cannot demonstrate various elements of their claims using evidence common to all members of the class.

In addition to its arguments relating to class certification and choice of law, Mercedes on December 8, 2008 submitted a Motion to Exclude the Testimony of Dr. Russell L. Lamb, one of the experts on which Plaintiffs relied in their Motion for Class Certification. Dr. Lamb's testimony dealt with the number of potential class members. Mercedes contended that Dr. Lamb (1) ignored segments of the proposed class, (2) came to conclusions regarding common injury and damages that are unreliable and are not supported by classwide evidence, (3) impermissibly used aggregate damages as the measure of possible recovery, and (4) violated discovery rules by failing to produce material from a related case that he relied upon while formulating his opinions. On the basis of those allegations, the company argued that Dr. Lamb's testimony must be excluded pursuant to Federal Rule of Evidence 702. In support of its motion, Mercedes submitted an expert declaration by Dr. M. Laurentius Marais, which was dedicated solely to attacking the conclusions contained in Dr. Lamb's report.

**D.  April 24, 2009 Opinion**

In a ruling dated April 24, 2009, the Court granted Plaintiffs' motion and certified a class consisting of:

> All persons or entities in the United States who purchased or
> leased a Mercedes-Benz vehicle equipped with an analog-only
> Tele Aid system after August 8, 2002, and

(1) subscribed to Tele Aid service until being informed that such service would be discontinued at the end of 2007, or

(2) purchased an upgrade to digital equipment.

See Mercedes, 257 F.R.D. at 75.

In reaching that decision, the Court held that New Jersey law applied to Plaintiffs' unjust enrichment and consumer fraud claims.

As a preliminary matter, the Court found in its April 24, 2009 Opinion that Mercedes's Motion to Exclude the testimony of Plaintiffs' expert, Dr. Lamb, should be denied as moot. Dr. Lamb's testimony pertained only to the question of whether the proposed class was numerous enough to satisfy the requirements of Federal Rule of Civil Procedure 23(a)(1), and argued that a class should be certified because reasonable consumers would have relied on the alleged misrepresentations made by Mercedes in marketing Tele Aid in choosing to purchase a vehicle made by the company. Given the Court's ruling that New Jersey law applied to Plaintiffs' consumer fraud claims and the fact that the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. §§ 56:8-1 et seq., does not require a showing of individualized reliance – along with the fact that Mercedes's own records demonstrated that the proposed class included hundreds of thousands of individuals – Dr. Lamb's testimony was not relevant to the question of whether a class should be certified. Since the expert testimony of Dr. Marais submitted by Mercedes was dedicated solely to attacking Dr. Lamb's conclusions, the Court found that it need not be considered. Mercedes, 257 F.R.D. at 49.

### i.    Choice of Law

The Court's April 24, 2009 Opinion included a lengthy choice of law analysis in which it determined that New Jersey law applies to both of Plaintiffs' claims. As part of that analysis, the Court completed a test in which it applied the choice of law rules applicable in each of the six

states – California, Illinois, Missouri, New Jersey, New York, and Washington – in which one of the named Plaintiffs originally filed his or her suit to both the unjust enrichment and consumer fraud claims at issue in this litigation.  See Id. at 55-69.  Two of those states – New York and California – utilize a "government interest" test.  As stated by the Court in its prior Opinion:

> As a threshold issue, that test requires the Court to determine whether a conflict exists between the laws of the interested states.  If no conflict exists, the Court will apply the law of its forum state – in this case, New Jersey.  In the event of a conflict, however, the Court must determine the interest of each state, in light of the policies underlying its laws, in having those laws applied to the issues presented by the case.  After making that determination, the Court will apply the law of the state with the greatest interest in governing the particular issue to each of Plaintiffs' causes of action.

Id. at 56-57 (citations omitted).

The other four states in which the suits that make up this multi-district litigation were originally filed – Illinois, Missouri, New Jersey, and Washington – follow the "most significant relationship" test laid out in the Restatement (Second) of Conflict of Laws ("Restatement") when determining which state's substantive law applies.  The Court in its earlier ruling summarized the inquiry under that test, stating:

> As with the "government interest" analysis utilized by California and New York, the Court's first step under the Restatement test is to determine whether a conflict exists between the laws of the various states.  If no conflict exists, the Court will apply the law of New Jersey, its forum state.  If the various state laws are materially different, however, the Court must weigh the considerations contained in the Restatement and determine which state has the "most significant relationship" to each cause of action asserted in the suit.  In doing so, the Court must consider two sets of factors: (1) the general considerations articulated in § 6, and (2) those specific to each claim.

Id. at 57 (citations omitted).

*(a)  Unjust Enrichment*

After setting forth the two choice of law tests used by the states in which the actions that make up this litigation were originally filed, the Court proceeded to apply those tests to each of

the causes of action asserted by the Plaintiffs.  With respect to the Plaintiffs' unjust enrichment

claim, the Court found that "[w]hile there are minor variations in the elements of unjust

enrichment under the laws of the various states, those differences are not material and do not

create an actual conflict." Id. (citing Agostino v. Quest Diagnostics, Inc., 256 F.R.D. 437, 463-

64 (D.N.J. 2009); Powers v. Lycoming Engines, 245 F.R.D. 226, 231 (E.D. Pa. 2007)).  Based

on that finding, the Court held that New Jersey law applies to Plaintiffs' unjust enrichment claim.

Even if there were a conflict between the unjust enrichment laws of the various states in

which the suits that make up this action were filed, the Court found that New Jersey law would

apply.  In doing so, it first examined the Plaintiffs' unjust enrichment claims under the

"government interest" test used by New York and California.  The Court held that each state

from which potential Plaintiffs will be drawn has an equal interest in compensating its citizens,

thus meaning that "the only means of distinguishing between the various state interests at play is

by applying the law of the forum where the alleged wrongdoing took place." Id. at 58-59.  Since

Mercedes is headquartered in New Jersey and all of the company's actions relating to Tele Aid

were coordinated from that state, the Court held that it had the greatest interest in having its law

applied.  Id. at 59 (citing Cooney v. Osgood Mach., Inc., 612 N.E.2d 277, 282-83 (N.Y. 1993)

("Assuming that the interest of each State in enforcement of its law is roughly equal … the situs

of the tort is appropriate as a 'tie breaker' because that is the only State with which both parties

have purposefully associated themselves in a significant way.")).

In addition to the fact that it was the site of the alleged wrongdoing, the Court found that

New Jersey possessed two interests in having its law applied that were not at stake for any other

state, stating:

> First, Mercedes is headquartered in New Jersey.  Therefore, New Jersey is the
> only state that has an interest not only in compensating its citizens, but also in

regulating a resident corporation.  Furthermore, the benefits provided by Plaintiffs which they allege unjustly enriched the company – their payments for Tele Aid subscriptions prior to the suspension of analog service and the $1,000 upgrade fee paid by individuals who converted to digital technology – were accepted by Mercedes in New Jersey.  The revenue received by the company was subject to New Jersey taxes, thus giving that state an economic stake in the outcome of this litigation beyond those of others, whose policies are implicated only with respect to their interest in assuring that their residents receive restitution for any benefits conferred on Mercedes by their citizens as a result of the company's alleged wrongful activities.  In light of the foregoing, it is clear that the interactions between Mercedes and potential class members relating to Tele Aid were centered in New Jersey, and that New Jersey has a greater interest than any other jurisdiction in having its law applied to Plaintiffs' unjust enrichment claim. Therefore, New Jersey law would apply pursuant to the government interest test utilized by California and New York if the unjust enrichment laws of the various states from which class members will be drawn were in conflict.

Id. at 59 (citations omitted).

Similarly, the Court found that New Jersey law would apply to Plaintiffs' unjust enrichment claim under the "most significant relationship" test, which is used by Illinois, Missouri, New Jersey, and Washington.  In doing so, it first examined Plaintiffs' claim in light of the factors set out in § 221 of the Restatement.  That section states:

(1) In actions for restitution, the rights and liabilities of the parties with respect to the particular issue are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship,

(b) the place where the benefit or enrichment was received,

(c) the place where the act conferring the benefit or enrichment was done,

(d) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

> (e) the place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment.

> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflict of Laws § 221 (1971).

The Court found that the first, second, and fourth of the five factors enumerated in § 221 weighed in favor of applying New Jersey law, while the third consideration favored using the law of each Plaintiff's home state.  The fifth consideration was neutral due to the fact that "physical thing[s]" at issue in Plaintiffs' unjust enrichment claim – the Tele Aid systems contained in their automobiles – were scattered across all 50 states and did not have any substantial connection to any one jurisdiction.  Mercedes, 237 F.R.D. at 61.

In addressing the first two factors, the Court stated that:

> Plaintiffs allege that all Mercedes's actions related to Tele Aid – including its promotion and marketing, coordination between Mercedes and AT&T relating to the discontinuation of analog service, and the determination that customers would be charged roughly $1,000 to upgrade to digital equipment – were made by a "Telematics team" based in Montvale, New Jersey.  Thus, the relationship between the parties, at least insofar as it related to the Tele Aid systems at issue in this litigation, was centered in New Jersey.  Furthermore, the benefits at issue in Plaintiffs' unjust enrichment claim – subscription payments for Tele Aid prior to the suspension of analog service and the $1,000 upgrade fee paid by individuals who converted to digital equipment – were received in New Jersey by virtue of the fact that Mercedes is headquartered in that state.

Id. at 60 (citations omitted).

The third factor – "the place where the act conferring the benefit or enrichment was done" – weighed in favor of applying the law of each Plaintiff's home state.  The Court ruled, however, that "[t]he weight to be accorded to the third factor is minimal in this case, however, because it is unrelated to the conduct at issue and the ongoing relationship between the parties."

Id.  In making that ruling, the Court noted that:

> The fact that individual Plaintiffs may have remitted payment from their home states as the result of [Mercedes's alleged] misrepresentations is purely fortuitous. For example, a plaintiff residing in New Jersey but working in New York may have sent payment for his or her Tele Aid service or digital upgrade from the latter state.  In such a situation, it would be absurd to rule that New York law should be applied to the plaintiff's claim simply because the benefit at issue was sent from that state.  Similarly, it would be absurd to apply the laws of all 50 states and the District of Columbia to the claims of potential class members from those jurisdictions simply because Mercedes's alleged wrongdoing – which emanated from New Jersey – was so widespread as to affect individuals throughout the United States.

Id. at 60-61 (citing Restatement (Second) of Conflict of Laws § 221, Comment (d) ("The place where a relationship between the parties was centered … is the contact that, as to most issues, is given the greatest weight in determining the state of the applicable law.")).

The Court also found that the fourth factor – "the domicil, residence, nationality, place of incorporation and place of business of the parties" – weighed in favor of applying New Jersey law to the Plaintiffs' unjust enrichment claim.  In doing so, it noted that:

> [I]t is likely that members of the proposed class will reside in all 50 states and the District of Columbia.  Therefore, no state has a greater relationship to the litigation than any other by virtue of its ties to potential class members.  Since Mercedes is headquartered in New Jersey and the conduct at issue took place in that state, however, New Jersey is connected to both sides of the dispute.  Accordingly, its twin interests in assuring that its citizens are compensated for any wrongdoing and in regulating a resident corporation support the application of New Jersey law.

Id. at 61.

In addition to the five factors outlined in § 221, the Court considered the corresponding concerns outlined in Restatement § 6.  That section sets forth a number of general considerations relevant to which state has the "most significant relationship" to the litigation, including:

> (a) the needs of the interstate and international systems,

> (b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6(2).

The Court found that those factors lent further support for the application of New Jersey law to Plaintiffs' unjust enrichment claim. With respect to the first, it noted that each state in which potential class members reside would have an equal interest in assuring that those individuals were compensated for any wrongdoing on the part of Mercedes, and the use of New Jersey law would therefore not lead to friction between the states. Mercedes, 257 F.R.D. at 62. In light of the Court's earlier ruling that that New Jersey had the greatest governmental interest in having its law applied, the Court found that the second and third factors – "the relevant policies of the forum" and "the relevant policies of other interested states and relative interests of those states in the determination of the particular issue" – also supported the application of that state's law. Id. Turning to the fourth and fifth considerations, the Court found that the "justified expectations" and "basic policies underlying the particular field of law" of the parties would be best served by applying New Jersey law, stating that:

> Given the fact that it is headquartered in that state, Mercedes cannot reasonably argue that it will suffer any hardship or surprise due to the use of New Jersey law in a suit in which it is the defendant. In light of the relatively small amount of damages claimed by each class member, however, the Plaintiffs would likely find it impossible to achieve recovery if the Court applied the law of each individual's home state to his or her claim and refused to certify a class based on differences between the unjust enrichment cause of action in the various jurisdictions. Such a scenario would have the undesirable result of leaving potential class members with no practical means of vindicating their expectations regarding the continued

> functionality of their Tele Aid systems.   For similar reasons, the fifth
> consideration – "the basic policies underlying the particular field of law" – also
> weighs in favor of applying New Jersey law.   The compensatory function of
> Plaintiffs' unjust enrichment cause of action would be frustrated if the law of each
> class member's home state was applied and a class was not certified.

Id.  (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617 (1997) ("The policy at the very

core of the class action mechanism is to overcome the problem that small recoveries do not

provide the incentive for any individual to bring a solo action prosecuting his or her rights.  A

class action solves this problem by aggregating the relatively paltry potential recoveries into

something worth someone's (usually an attorney's) labor.") (internal quotations omitted)).

    Finally, the Court found that the sixth and seventh factors enumerated in Restatement § 6

– "certainty, predictability and uniformity of result" and "ease in the determination and

application of the law to be applied" – supported the application of New Jersey law to Plaintiffs'

unjust enrichment claims.  In doing so, it stated that:

> The potential class members reside throughout the United States.  Assuming that
> the laws of the various Plaintiffs' home states relating to unjust enrichment
> conflict, it is likely that different class members – who have suffered the same
> harm based on the same alleged wrongdoing – will have their rights adjudicated
> inconsistently if the Court applies the law of each class individual's home state to
> his or her claims.  Such a formulation would also have the detrimental effect of
> requiring the trial jury to engage in a time-consuming and bewildering analysis of
> the miniscule differences between the elements of unjust enrichment in each
> forum.

Id. at 62-63.

*(b)  Consumer Fraud*

    After determining that New Jersey law applies to the Plaintiffs' unjust enrichment claim,

the Court undertook a similar inquiry with respect to the consumer fraud cause of action.  In

doing so, it found as a preliminary matter that there are material conflicts between the various

states' consumer fraud laws.  Id. at 63 (citing Fink v. Ricoh Corp., 839 A.2d 942, 974-82 (N.J.

Super. L. Div. 2003) (finding that "[a] review of the consumer fraud statutes of the various states, and the cases decided thereunder demonstrates the existence of numerous actual conflicts on various issues between provisions of the NJCFA and those of the statutes enacted by other states," and discussing those differences at length)).  The Court then examined the facts underlying Plaintiffs' consumer fraud claim to determine which state's law governs under both the "government interest" and "most significant relationship" tests.

In attempting to determine the government interests possessed by each state from which class members might be drawn, the Court noted that – unlike in the unjust enrichment claim, where each state's law is aimed mainly at providing restitution to a party who has conferred a benefit on another under circumstances where the retention of that benefit would be inequitable – "[t]here is no monolithic policy interest underlying the consumer fraud laws of the various states."  Id.  The consumer fraud statutes of some states appear to focus on compensation by limiting plaintiffs' recovery to compensatory damages.  See Id. at 64 n.7.  Others include measures such as punitive or mandatory treble damages that are aimed at deterring fraud.  See Id. at 64 n.8.  The Court noted that New Jersey falls in the latter category, stating:

> "Under the NJCFA an award must be made of threefold the actual damages suffered by the victim of any practice declared unlawful … plus an award of reasonable attorney's fees and costs of suit to the successful plaintiff."  Fink, 839 A.2d at 979.  The award of treble damages, fees, and costs mandated by the NJCFA are a form of punitive damages, Id. at 980, and are meant to deter wrongful activity on the part of businesses operating in New Jersey.  Cox v. Sears Roebuck & Co., 647 A.2d 454, 463-64 (N.J. 1994).  Thus, the NJCFA is designed to serve two purposes: compensating victims of consumer fraud and regulating companies within New Jersey.  Id.

Id. at 64.

Based on the dual purpose of the NJCFA, the Court found that New Jersey had a greater interest than any other state in having its consumer fraud statute applied to Plaintiffs' claims.  In

doing so, it noted that the application of New Jersey law would provide for compensatory damages, and thus would not infringe the interests of states' whose consumer fraud acts are directed mainly toward providing restitution.  The use of the law of each Plaintiff's home state, however, would compromise New Jersey's interest in deterring fraudulent behavior by a resident corporation by assuring that punitive damages would not be available for at least some Plaintiffs.

Id.  The Court clearly outlined its reasoning to that effect, stating that:

> While each of the various jurisdictions from which class members will be drawn have an equal interest in compensating their citizens, only New Jersey has the additional interest of regulating a corporation which is headquartered – and allegedly committed the acts in question – within its borders.  The intended deterrent effect of the NJCFA would be compromised if Mercedes were allowed to escape liability for the treble damages, attorneys' fees, and litigation costs mandated by New Jersey law simply because its alleged misconduct defrauded citizens of states whose laws do not provide for similar punitive damages.  On the other hand, the New Jersey legislature's decision to limit recovery in consumer fraud actions against businesses within that state to treble damages would be compromised if class members residing in jurisdictions which allow unlimited punitive damages were allowed to bring claims under the law of their home states.

Id. (citations omitted).

Similarly, the Court found that the "most significant relationship" test used by Illinois, Missouri, New Jersey and Washington requires that the NJCFA be applied to the Plaintiffs' consumer fraud claim.  In doing so, it first noted that choice of law in consumer fraud actions is governed by Restatement § 148, which states:

> (1) When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.
>
> (2) When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular

case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

> (b) the place where the plaintiff received the representations,

> (c) the place where the defendant made the representations,

> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties,

> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

> (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflict of Laws § 148.

Based on that section, the Court explained that:

> [T]he Restatement distinguishes between, on the one hand, fraud claims in which the defendant's alleged misrepresentations and plaintiffs' reliance on those statements took place in the same state, and on the other, those in which the misrepresentations and reliance occurred in different jurisdictions.  In the former situation, the state in which both the misrepresentations and reliance occurred is presumed to have the "most significant relationship" with the litigation.  In the latter scenario, however, the Court must weigh the factors enumerated in section 148(2) in order to determine which state has the greatest ties to the plaintiffs' fraud claim.

Mercedes, 257 F.R.D. at 65 (citations omitted).

In making that conclusion, the Court specifically noted and rejected a case from this district decided by the Honorable Stanley R. Chesler, Agostino v. Quest Diagnostics, Inc., 246 F.R.D. at 462, holding that the Restatement "recognizes that the state in which a prospective plaintiff acted in reliance on a defendant's fraud is presumed to have the predominant relationship to the parties and the issues in the litigation."  Relying on that ruling, Mercedes had

argued that "[s]ection 148 of the Second Restatement creates a presumption that the law of the state where the misrepresentation or omission is received and relied on applies unless some other state has a more significant relationship to the occurrence and the parties under the principles states in section 6 of the Restatement."  (Def.'s Notice of Supplemental Authority, March 10, 2009.)  The Court categorically rejected that assertion, stating that it "relie[d] on an interpretation of the Restatement that is at odds with the plain meaning of section 148, which calls for such a presumption only in cases where 'the plaintiff's action in reliance took place in the state where the false representations were made <u>and</u> received.'"  <u>Mercedes</u>, 257 F.R.D. at 65-66 (quoting Restatement (Second) of Conflict of Laws § 148(1)) (emphasis in original).  It then ruled that, to the extent <u>Agostino</u> applied such a presumption to statements that were made in a state other than the one in which they were received and relied upon, the decision in that case was erroneous, stating:

> Although the facts relevant to the consumer fraud choice of law analysis in <u>Agostino</u> are largely analogous to those at issue in this proceeding, the application of a presumption in favor of the law of each plaintiffs' home state in that case does not require such a presumption here.  Rather, after close inspection of text Restatement § 148, the Court believes that it erred by applying the first subsection of that provision in <u>Agostino</u>.  The alleged misrepresentations which formed the basis for the plaintiffs' consumer fraud claim in that case were made as part of a billing scheme utilized by Quest Diagnostics, Inc. ("Quest"), a corporation headquartered in New Jersey.  Like Mercedes, Quest operated throughout the United States, and the plaintiffs in <u>Agostino</u> sought certification of a nationwide class.  Yet despite its holdings that (1) "the purportedly illegal billing practices … emanated from New Jersey" and (2) the plaintiffs relied on the alleged misrepresentations "in their home states," the Court applied Restatement § 148(1) in determining which state[] had the "most significant relationship" with the plaintiffs' consumer fraud claim.  In doing so, the Court ignored section 148(2), which applies in cases where the "plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made."

<u>Id.</u> at 66.

20

After rejecting the presumption in favor of applying the law of each Plaintiff's home state used in Agostino, the Court proceeded to apply the factors enumerated in Restatement § 148(2). It found that since Plaintiffs presumably received and relied on Mercedes's alleged misrepresentations and operated the vehicles containing their Tele Aid systems in their home states, four of the six factors – (1) "the place, or places, where the plaintiffs acted in reliance upon defendant's representations," (2) "the place where the plaintiff received the representations," (3) "the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant," and (4) "the place where a tangible thing which is the subject of the transaction between the parties was situated at the time" – weighed in favor of applying the law of each of the jurisdictions from which class members would be drawn.  Id. at 66-67.  The other two factors supported the application of New Jersey law:

> Given the fact that all of the conduct underlying Plaintiffs' consumer fraud claim took place in that state, consideration of "the place where the defendant made the representations," strongly supports applying the NJCFA to Plaintiffs' claims. Class members will be drawn from all 50 states and the District of Columbia. Thus, each jurisdiction has equal ties to the Plaintiffs, and consideration of "the domicil, residence, nationality, place of incorporation and place of business of the parties," weighs in favor of the application of the law of New Jersey – the only state with an additional interest in regulating a corporation headquartered within its borders.

Id. at 67.

Although four of the six considerations enumerated by Restatement § 148(2) weighed in favor of the applying the law of each Plaintiff's home state, the Court held that New Jersey had the "most significant relationship" to the consumer fraud claim.  In doing so, it noted that:

> [T]he "most significant relationship" test is not a mechanical process in which the Court simply tallies up the factors enumerated in the Restatement and applies the law of the jurisdiction supported by the majority of them.  See, e.g., Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 467 (3d Cir. 2006) (discounting certain

factors due to their "minor importance to the issue."); <u>David B. Lilly Co., Inc. v. Fisher,</u> 18 F.3d 1112, 1119 (3d Cir. 1994) ("The factors enumerated in [the Restatement] should be evaluated on a qualitative rather than a quantitative basis."). To the contrary, the relative importance of each of the considerations articulated by Restatement § 148(2) varies depending on the circumstances underlying the claim asserted. <u>See</u> Restatement (Second) of Conflict of Laws § 148, Comments (f)-(j) (discussing importance of factors under various scenarios).

<u>Id.</u>

In assigning relative importance to the various considerations contained in Restatement § 148(2), the Court found that the third factor – "the place where the defendant made the representations" – weighed more heavily than the others. <u>Id.</u> at 67-68. That finding was based on the fact that the comments to § 148, which deals with torts causing purely pecuniary harm, incorporate those of § 146, which deals with torts causing "injury to persons or tangible things." Restatement (Second) of Conflict of Laws § 148, Comment (h). The comments to § 146 state that, in tort cases in which the conduct at issue and the injury for which the plaintiff seeks relief occurred in different states:

> [A]n important factor in determining which is the state of most significant relationship is the purpose sought to be achieved by the rule of tort law involved. If this purpose is to punish the tortfeasor and thus to deter others from following his example, there is better reason to say that the state where the conduct occurred is the state of dominant interest and that its local law should control than if the tort rule is designed primarily to compensate the victim for his injuries.

Restatement (Second) of Conflict of Laws § 146, Comment (e).

Moreover, the comments to Restatement § 148 specifically instruct courts to take into account "the choice-of-law principles stated in [Restatement] § 6 with emphasis upon the <u>purpose sought to be achieved by the relevant tort rules of the potentially interested states</u>, the particular issue and the tort involved" when balancing the choice of law factors applicable to fraud claims. <u>Id.</u> § 148, Comment (e) (emphasis added).

Based on those admonitions, the Court found that the third factor – "the place where the defendant made the representations" – outweighed those that supported applying the law of each Plaintiff's home state in light of the deterrent purpose of the NJCFA and the fact that the relevant conduct on the part of Mercedes occurred in New Jersey.  In doing so, it stated that:

> [T]he NJCFA seeks to deter wrongful activity on the part of corporations operating in New Jersey by imposing automatic treble damages on consumer fraud claims.  That deterrent effect would be compromised if Mercedes were allowed to avail itself of the law of states which limit recovery in consumer fraud actions to compensatory damages simply because its alleged wrongful activity, which took place within New Jersey, had nationwide effects.  On the other hand, New Jersey's interest in limiting the liability of a corporation headquartered within its borders – an interest which is implicit in the fact that the only form of punitive damages expressly allowed by the NJCAF are treble damages – would be compromised if the company were subjected to the law of states that do not limit punitive recovery in consumer fraud cases.  Therefore, the Court finds that New Jersey is the state of dominant interest and that its local law should control.

Mercedes, 257 F.R.D. at 68 (internal citations and quotations omitted).

Turning to the factors enumerated in Restatement § 6, the Court found that those considerations "militate in favor of applying New Jersey law, and outweigh the portions of Restatement § 148(2) that support applying the law of each class member's home jurisdiction." Id.  Thus, even if the Court had mechanically applied the § 148(2) factors and assigned undue significance to the fact that four of the six considerations outlined in that section favored the law of each Plaintiff's home state, the overarching concerns articulated in Restatement § 6 would have required the application of the NJCFA.

In considering the first three factors contained in Restatement § 6 – (1) "the needs of the interstate and international systems," (2) "the relevant policies of the forum," and (3) "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue" – the Court stated:

Having already ruled that conflicts exist between the various states' consumer fraud statutes and that New Jersey has a greater interest than any other jurisdiction in having its law applied, the Court finds that applying the NJCFA to Plaintiffs' consumer fraud claims will not result in an unacceptable conflict between states. … [E]ach of the states from which class members will be drawn has an interest in assuring that its citizens will be compensated for any harm they may have suffered.   Only New Jersey, however, possesses the additional interest in regulating a corporation headquartered within its borders – the interest implicated by the availability, or lack thereof, of punitive damages.  Therefore, the interests of jurisdictions whose consumer fraud statutes differ with respect to punitive damages will not be implicated by the application of the NJCFA to Plaintiffs' claim, and that application will not give rise to any conflict between the various states.

Id. (internal citations omitted).

The Court also found that the fourth factor articulated in Restatement § 6 – "the protection of justified expectations" – favored applying the NJCFA, stating:

The alleged misrepresentations which form the basis of Plaintiffs' consumer fraud claim were made by the company's "Telematics team," which allegedly oversaw the promotion and marketing of Tele Aid, coordinated with AT&T relating to the discontinuation of analog service, and decided that customers would be charged $1,000 to upgrade to digital equipment.  Given the fact that the "Telematics team" was based in New Jersey, Mercedes cannot reasonably argue that its justified expectations would be violated by the application of that state's law.  In contrast, however, the actions taken by Plaintiffs in reliance on Mercedes's alleged misrepresentations – the payment of Tele Aid subscription fees or the $1,000 upgrade charge – occurred throughout the United States, and may or may not have taken place in each Plaintiff's home state. … [I]t is entirely possible that a given class member may have submitted payment to Mercedes from a location, such as an office or vacation-spot, outside his or her home state.  In the absence of any evidence to the contrary, the Court finds that the ongoing relationship between Mercedes and the Tele Aid subscribers from which class members will be drawn was centered at the place where the alleged misconduct underlying Plaintiffs' consumer fraud claim took place:  the headquarters of the "Telematics team" in Montvale, New Jersey.  Therefore, the "justified expectations" of both sides will be best upheld by the application of New Jersey law.

Id. at 68-69 (internal citations omitted).

Similarly, the Court ruled that the fifth consideration contained in Restatement § 6 – "the basic policies underlying the particular field of law" – supported the use of the NJCFA to adjudicate Plaintiffs' consumer fraud claims.  In doing so, it noted that:

> Although the consumer fraud statutes of the various states from which class members will be drawn vary in many respects, every jurisdiction seeks to assure that plaintiffs can recover compensatory damages for any pecuniary loss suffered as the result of foreseeable reliance on a defendant's misrepresentations.  That shared policy would be frustrated if the Court applied the law of each Plaintiff's home state to his or her claims and refused on that basis to certify a class.  Given the relatively paltry amount of damages suffered by each potential class member – the Tele Aid subscription fees paid in anticipation of that system's continuing functionality and the upgrade charge for those individuals who purchased digital equipment – the requirement that potential class members individually pursue their claims would effectively bar suits by creating a situation where the costs to each Plaintiff of pursuing his or her proceeding would dwarf any potential recovery.  Therefore, the Court finds that "the basic policies underlying the particular field of" consumer fraud will be best served by the application of New Jersey law and the certification of a class.

Id. at 69 (citing Windsor, 521 U.S. at 617).

Finally, the Court held that the sixth and seventh factors enumerated by Restatement § 6 – "certainty, predictability and uniformity of result" and "ease in the determination and application of the law to be applied" – weighed in favor of applying the NJCFA, stating:

> [T]he consumer fraud statutes of the various jurisdictions in which potential class members reside vary significantly.  Were the Court to apply the law of each Plaintiffs' home state to his or her claim, there is a danger that different class members – all of whom suffered the same harm based on the same alleged wrongdoing – would have their claims decided inconsistently.  Additionally, the application of the law of each Plaintiff's home jurisdiction would hopelessly complicate the trial process by requiring the jury to consider the multitudinous differences between the elements necessary to prove consumer fraud in each jurisdiction and the damages that can be awarded to successful claimants.

Id. (citing Fink, 839 A.2d at 974-82 (discussing the variations between state consumer fraud statutes)).

Thus, the Court's choice of law analysis relating to Plaintiffs' consumer fraud claim contained three rulings: (1) Restatement § 148(2) governs the choice of law inquiry, and the presumption in favor of the law of each Plaintiff's home state called for by § 148(1) and applied in Agostino was therefore inapposite, (2) the portions of Restatement § 148(2) that weigh in favor of applying the law of each Plaintiff's home state are outweighed by the considerations that favor New Jersey law, and (3) even if the factors contained in Restatement § 148(2) did support applying the law of each jurisdiction from which potential class members might be drawn, the fact that the considerations outlined in § 6 unanimously support the use of New Jersey law would require the Court to apply the NJCFA to Plaintiffs' consumer fraud claim.

## ii.    *Rule 23 Analysis*

Having ruled as a preliminary matter that New Jersey law applies to Plaintiffs' unjust enrichment and consumer fraud claims, the Court turned to the question of whether the class outlined by the Plaintiffs met the criteria of Federal Rule of Civil Procedure 23.  Under that rule, a party seeking certification must establish that the proposed class meets all four of the requirements outlined in Rule 23(a) and qualifies under at least one of the three sections of Rule 23(b).  Baby Neal, for and by Kanter v. Casey, 43 F.3d 48, 55 (3d Cir. 1994).

### (a) Rule 23(a) Requirements

The Court found that the first of Rule 23(a)'s four requirements – that the class be "so numerous that joinder of all members is impracticable" – was satisfied by Mercedes's own records relating to the discontinuation of analog-only Tele Aid service.  In doing so, it stated that:

> As part of its "customer ramp-down" plan, the company estimated on November 20, 2006 that 107,703 customers would continue to subscribe to analog Tele Aid services until June 2007, the last month in which owners of vehicles equipped with analog-only Tele Aid systems were able to renew their subscriptions.

26

> (Munroe Decl., Ex. 11 at 5.)  In a later document, Mercedes representatives noted that "[n]ot enough Tele Aid customers have voluntarily discontinued their service to meet [the 'customer ramp-down'] schedule" and pointed out that, while the company expected 141,815 individuals to continue to subscribe to analog Tele Aid service in April 2007, a total of 182,565 did so.  (Munroe Decl., Ex. 12 at 2.) … The joinder of such a large number of individuals would be "impracticable," to say the least.

Mercedes, 257 F.R.D. at 70.

Additionally, the Court noted that Mercedes had "effectively concede[d] that Rule 23(a)(1)'s numerosity requirement is met by stating repeatedly that the proposed class includes 'tens of thousands' of individuals."  Id. at 70 n.12 (citing (Def.'s Reply Br. Supp. Mot. Exclude Russell L. Lamb 6, 9, 10, 11.))

Based on its conclusion that numerosity was established by Mercedes's records, the Court ruled that it need not consider the report submitted on behalf of Plaintiffs by Dr. Lamb.  As discussed above, Mercedes had moved to exclude Dr. Lamb's testimony – which was dedicated solely to demonstrating that a sufficient number of individuals would fall within the proposed class to satisfy Rule 23(a) – and had submitted its own expert report, Dr. Marais in support of that motion.  Given the fact that the Court did not consider Dr. Lamb's testimony, Dr. Marais's report attacking that testimony was ruled irrelevant, and Mercedes's Motion to Exclude was denied as moot.  Id. at 49.

The Court ruled that the second of Rule 23(a)'s four requirements – that there be "questions of law or fact common to the class " – was satisfied because "the vast majority of the factual and legal questions that will be addressed at trial are common to all members of the proposed class."  Id. at 70.  Specifically, it noted that:

> Both of Plaintiffs' claims are premised on the contention that Mercedes knew or should have known after the FCC's rule change became final on August 8, 2002 that analog Tele Aid service would no longer be available after February 18, 2008, but failed to disclose that fact to its customers.  Those allegations relate

only to Mercedes's – rather than individual class members' – knowledge and actions, and are therefore amenable to common proof.

Id.

For similar reasons, the Court held that Rule 23(a)'s third criterion was satisfied. That requirement, commonly referred to as "typicality," states that "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). It is "intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees." Baby Neal, 43 F.3d at 57. The Court found that the claims advanced by the named Plaintiffs posed no conflict with those that might be pursued by other class members. In doing so, it noted that "[t]he named Plaintiffs are individuals who purchased model year 2002-2006 vehicles equipped with analog-only Tele Aid systems. All class members, including the named Plaintiffs, were affected by Mercedes's alleged concealment of analog Tele Aid's impending obsolescence in the same way, and all suffered the same harm." Mercedes, 257 F.R.D. at 71.

Finally, the Court held that the named Plaintiffs met Rule 23(a)(4)'s requirement that they "fairly and adequately protect the interests of the class." That requirement includes "two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class.'" New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 313 (3d Cir. 2007) (internal quotations omitted). Having already found in its typicality inquiry that the named Plaintiffs did not possess interests conflicting with the other class members, the Court stated that "Plaintiffs' attorneys, who have up to this point been serving as interim class counsel … have ably handled the proceedings thus far, and Mercedes has not objected to their qualifications." Mercedes, 257 F.R.D. at 71.

*(b) Rule 23(b) Analysis*

After ruling that the Plaintiffs had met the four criteria enumerated in Rule 23(a), the Court examined the proposed class to determine whether it fell within one of the three categories contained in Rule 23(b).  Plaintiffs contended that the class satisfied Rule 23(b)(3)'s requirement that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Those prerequisites to certification are commonly referred to as "predominance" and "superiority."  In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 310 (3d Cir. 2008).

(1) Predominance

The predominance requirement "tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation."  Windsor, 521 U.S. at 623.  That standard is "far more demanding than the commonality requirement of Rule 23(a)."  In re Hydrogen Peroxide, 552 F.3d at 311 (quotations omitted).  "Because the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual, a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate."  Id.  "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable."  Newton v. Merril Lynch, Pierce, Fenner & Smith, 259 F.3d 154, 172 (3d Cir. 2001).

The Court found that the predominance requirement was satisfied in this case because "an examination of the elements Plaintiffs' two causes of action – unjust enrichment and consumer fraud – reveals that virtually all of the legal and factual issues which will be

adjudicated at trial are common to the class." Mercedes, 257 F.R.D. at 72.  With respect to the

unjust enrichment claim, the Court noted that the Plaintiffs must prove two elements: that (1)

they conferred a benefit on Mercedes, and (2) retention of that benefit without payment would be

unjust.  Id. (citing VRG Corp. v. GKN Realty Corp., 641 A.2d 519, 526 (N.J. 1994); Restatement

(First) of Restitution § 1 (1937)).  It then stated that:

> Plaintiffs have essentially proven the first element of their unjust enrichment
> claim, that they conferred a benefit on Mercedes, by limiting their proposed class
> to owners of vehicles equipped with analog-only Tele Aid systems that continued
> to subscribe until being told that analog service would be discontinued at the end
> of 2007 or purchased an upgrade to digital equipment.  Consequently, the only
> question for trial will be whether it would be inequitable to allow Mercedes to
> retain the subscription fees and/or digital upgrade payments remitted by Plaintiffs.
> The resolution of that question will require Plaintiffs to address three issues that
> are amenable to class, rather than individual, proof: (1) whether Mercedes knew
> or should have known after August 8, 2002 that analog service would not be
> available after February 18, 2008, (2) whether the company's statements
> regarding the continued viability of analog Tele Aid were misleading in light of
> that knowledge, and (3) whether Plaintiffs had any legally-cognizable expectation
> that Tele Aid service would be available throughout the life of their vehicles.
> Since the first two issues deal only with Mercedes's behavior and the third is a
> question of contractual interpretation that is common to all members of the
> putative class, the Court finds Rule 23(b)(3)'s predominance requirement satisfied
> with respect to Plaintiffs' unjust enrichment claim.

Id. at 72-73.

Turning to the consumer fraud cause of action, the Court acknowledged that "[i]n order

to prevail on that claim, Plaintiffs must demonstrate [] (1) unlawful conduct on the part of

Mercedes, (2) an ascertainable loss on the part of the Plaintiffs, and (3) a causal relationship

between the unlawful conduct and the ascertainable loss."  Id. (citing N.J. Stat. Ann. § 56:8-19;

Bosland v. Warnock Dodge, Inc., 964 A.2d 741, 749 (N.J. 2009)).  After an examination of

Plaintiffs' claim, the Court ruled that each of those elements could be demonstrated using

common proof.

With respect to the first element – an unlawful misrepresentation or omission on the part of Mercedes – the Court stated that:

> Plaintiffs [must] prove that Mercedes knew or should have known after August 8, 2002 that analog service would be discontinued on or before February 18, 2008, but either affirmatively misrepresented or omitted that fact when marketing analog-only Tele Aid systems.  Accordingly, the issues for trial relating to the first element of Plaintiffs' consumer fraud claim turn on the knowledge and actions of the company rather than those of the individual class members, and are therefore common to the class.

Mercedes, 257 F.R.D. at 73 (citing N.J. Stat. Ann. § 56:8-2 (declaring unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact … in connection with the sale or advertisement of any merchandise or real estate."); Int'l Union of Operating Eng'rs Local #68 Welfare Fund v. Merck & Co., 929 A.2d 1076, 1086 (N.J. 2007) ("Consumer fraud violations are divided broadly into three categories: affirmative acts, knowing omissions, and regulatory violations.") (internal quotations omitted)).

Similarly, the Court found that the second element – ascertainable loss – could be proven using evidence common to all members of the class.  The Court noted that:

> [A]scertainable loss[] does not require Plaintiffs to prove that they relied on Mercedes's alleged misrepresentations.  [Int'l Union of Operating Eng'rs, 929 A.2d] at 1087.  To the contrary, Plaintiffs need only show that they "paid for a product and got something less than what had been promised." Elias [v. Ungar's Food Prods., Inc.], 252 F.R.D. [233,] 249 [(D.N.J. 2008)] (internal quotations omitted); see also Thiedemann v. Mercedes-Benz U.S.A., LLC, 872 A.2d 783, 792-93 (N.J. 2005) (defining "ascertainable loss" as "either an out-of-pocket loss or a demonstration of loss in value" that is "quantifiable and measurable.").

Id.

In light of that definition of "ascertainable loss," the Court ruled:

> By limiting their proposed class to vehicle owners who subscribed to analog Tele Aid service until being told that service would be discontinued at the end of 2007 or purchased a digital upgrade, Plaintiffs have effectively established ascertainable loss.  Mercedes acknowledged in its submissions to the FCC that Plaintiffs' Tele Aid systems were "embedded in [] automobile[s] designed to last up to 20 years."  (Munroe Decl. Ex. 1 at 6.)  Each member of the proposed class demonstrated his or her intention to utilize the system by continuing to subscribe until being informed that analog service would be discontinued at the end of 2007, and some Plaintiffs went so far as to purchase a digital upgrade in order to assure that they could continue to use Tele Aid.  Thus, each class member got something less than he or she was promised:  a vehicle that was meant to last up to 20 years, but contained a Tele Aid system that would become useless at the end of 2007.

Id.

Moreover, the Court found that the unique facts at issue in this case resulted in a situation where the "ascertainable loss" suffered by each plaintiff could be easily calculated using common proof:

> Simply put, the sum of each class member's loss is the amount necessary to fulfill his or her expectation of a functioning Tele Aid system.  For those class members who did not purchase a digital upgrade, the ascertainable loss will be the cost of such an upgrade plus compensation for the time period between the end of 2007 and any eventual judgment, during which service was unavailable.  With respect to Plaintiffs who purchased an upgrade to digital equipment, the amount paid for that modification represents the total ascertainable loss.   After each class member's total ascertainable loss is calculated, damages of three times that sum will be awarded pursuant to the NJCFA's treble damages requirement.

Id. at 73-74 (citing N.J. Stat. Ann. § 56:8-19 ("In any action under this section the court shall … award threefold the damages sustained by any person in interest.")).

Finally, the Court found that causation – the third element of Plaintiffs' consumer fraud claim – could be demonstrated using common proof.  In doing so, it first noted that a plaintiff suing under the NJCFA need not demonstrate reliance on the alleged misrepresentations or omissions at issue.  Id. at 74 (citing N.J. Stat. Ann. § 56:8-2; Varacallo v. Mass. Mut. Life Ins. Co., 752 A.2d 807, 817 (N.J. Super. Ct. App. Div. 2000) ("[T]he [NJCFA] requires only a causal nexus between the 'method, act, or practice declared unlawful' and the consumer's 'ascertainable

loss.'"").  After acknowledging the difference in the standard for proving causation applicable to traditional common law fraud (reliance) and the "causal nexus" standard used by the NJCFA, the Court held that Plaintiffs would not be required to present evidence of the individual behavior or knowledge of each class member in order to recover at trial, stating:

> The distinction between the proof of reliance required at common law and the less-rigorous "causal nexus" standard applicable to NJCFA claims is best explained by examining the precise nature of the "ascertainable loss" at issue in this case.  Plaintiffs do not allege that, but for the alleged misrepresentations, they would not have purchased their vehicles.  Nor do they contend that analog Tele Aid service would have been available after 2007 if not for Mercedes's alleged misconduct; AT&T stopped providing analog service because the FCC rule change removed the requirement that it do so, not because of any statement made by Mercedes.  Plaintiffs simply claim that they did not get what they paid for – that because of Mercedes's alleged wrongdoing, they did not know that the Tele Aid systems in their automobiles would become useless long before the vehicles aged to such a degree that they were no longer drivable.  Therefore, Plaintiffs will not need to prove at trial that each individual class member relied on Mercedes statements relating to Tele Aid when purchasing their vehicles.  To the contrary, Plaintiffs can establish the necessary "causal nexus" between their ascertainable loss and the alleged misrepresentations simply by proving with respect to the class as a whole that, had Mercedes disclosed the existence of the FCC rule change and the fact that analog service would no longer be available after 2007, that disclosure would have effectively warned potential purchasers of vehicles equipped with analog-only Tele Aid systems that those systems would soon be rendered obsolete.

Id.

In fact, the Court found that – under rulings by both the Supreme Court of the United States and the Supreme Court of New Jersey – issues common to the class would predominate even if the Plaintiffs were required to prove reliance, stating:

> It is well-established that plaintiffs asserting fraud claims "involving primarily failure to disclose" material information need not demonstrate "positive proof of reliance" in order to recover.  Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153 (1972).  "All that is necessary is that the facts withheld be material in the sense that a reasonable [purchaser] might have considered them important in the making of [his or her] decision.  This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact."  Id. at 153-54; see also Varacallo, 752 A.2d at 817 ("The presumption or

33

> inference of reliance and causation, where omissions of material fact are common to the class, has been extended in the context of both common law and statutory fraud."). Thus, if Plaintiffs demonstrate at trial that Mercedes failed to disclose the impending obsolescence of analog Tele Aid, that omission will be presumed to have caused Plaintiffs' loss and there will be no need for individualized evidence regarding causation. Therefore, common questions of law and fact predominate, and class certification is appropriate. See Varacallo, 752 A.2d at 818 ("Where [an] omission of fact is common to the entire class, class certification is favored.").

Id. at 74-75.

### (2) Superiority

The second of Rule 23(b)(3)'s criteria, "superiority," requires the Court "to balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication." Georgine v. Amchem Prods., Inc., 83 F.3d 610, 632 (3d Cir. 1996). That analysis is guided by the four "pertinent" factors enumerated in Rule 23(b)(3):

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

On consideration of those factors, the Court found that a class action would be the most fair and efficient means of litigating the Plaintiffs' claims, stating:

> Individual class members have little to no interest in controlling the prosecution of separate actions. To the contrary, the requirement that potential class members individually pursue their claims would effectively bar recovery by creating a situation in which the cost to each Plaintiff of litigating his or her claim would exceed any potential recovery. Pursuant to the JPML's Order dated February 26, 2008 and this Court's Case Management Order of April 11, 2008, all currently-pending cases relating to the discontinuation of analog Tele Aid service have been consolidated, thus assuring that no related litigation in any other forum has proceeded to an advanced stage. Given that consolidation, along with the fact that

the proceedings in this Court have advanced through several rounds of motions and over a year of discovery, the concentration of Plaintiffs' claims in this forum will greatly streamline the adjudication of those claims.  Finally, the certification of a class would not give rise to any difficulties that would make the remainder of this litigation unmanageable.

Mercedes, 257 F.R.D. at 75.

## E.  Subsequent Developments

Following this Court's April 24, 2009 Opinion and Order certifying the aforementioned class, Mercedes petitioned the Court of Appeals for the Third Circuit for leave to file an interlocutory appeal of that ruling pursuant to Federal Rule of Civil Procedure 23(f).  On June 4, 2009, a panel made up of the Honorable Marjorie O. Rendell and Thomas M. Hardiman, Circuit Judges, and the Honorable Robert E. Cowen, Senior Circuit Judge, summarily denied the company's request.

On July 1, 2009, the parties filed a joint status letter in which they noted a dispute relating to whether Mercedes was required to provide certain information that Plaintiffs contended was necessary to send notice of the action to potential class members as required by Federal Rule of Civil Procedure 23(c)(2)(B).  Plaintiffs had requested that Mercedes provide a list of individuals who subscribed to analog Tele Aid Service until being sent a letter in 2006 or 2007 informing them that such service would be discontinued at the beginning of 2008. Mercedes asserted that such a list would include at least four categories of individuals that it did not believe were included in the class defined by the Court's April 24, 2009 ruling: (1) those who sold their vehicles prior to receiving the notice letter, (2) those who sold their vehicle after receiving the notice but prior to the discontinuation of service, (3) those who chose voluntarily not to renew their Tele Aid service for reasons unrelated to its impending obsolescence, and (4) those who retained their vehicle until analog Tele Aid service was discontinued but have since

sold or otherwise disposed of the car.  (Joint Status Letter of June 1, 2009 at 3.)  On the basis of that assertion, Mercedes claimed that the class notice should be limited to Tele Aid subscribers whose service was discontinued during the first few months of 2008.  Plaintiffs pointed out that the class defined by the Court's April 24, 2009 ruling included all individuals who "subscribed to Tele Aid service until being informed that such service would be discontinued at the end of 2007," and argued that the list proposed by Mercedes would impermissibly exclude any potential class members whose service was terminated as part of the company's "customer ramp-down" plan in which it terminated service to several thousand subscribers during the last six months of 2007.  (Id. at 2.)

In order to help settle that dispute, the Court on July 14, 2009 entered an Order directing each party to file a brief outlining its arguments as to how, if at all, the class definition should be clarified.  As specified in the Order, the Plaintiffs filed their brief on July 17, 2009, and Mercedes did so ten days later.[5]

While the Motion for Clarification of the Class Definition was pending, the Court of Appeals decided an interlocutory appeal from a decision by another judge on this Court, the Honorable Dennis M. Cavanaugh, certifying a nationwide class of plaintiffs and applying the NJCFA in an action for consumer fraud.  See Nafar v. Hollywood Tanning Sys., Inc., 339 F. App'x 216 (3d Cir. Aug. 5, 2009).  In an unpublished Opinion, the Court of Appeals vacated the Order certifying the class and remanded for further proceedings.  In doing so, it noted that since Judge Cavanaugh's decision certifying the class, the New Jersey Supreme Court had adopted the Restatement's "most significant relationship" test for resolving choice of law disputes, and

---

[5] In light of the fact that the dispute regarding the scope of the class was first raised by Mercedes, the Court will for the sake of simplicity refer throughout this Opinion to those submissions as Mercedes's Motion for Clarification of the Class Definition and the Plaintiffs' opposition to that Motion.

discussed the portion of <u>Agostino</u> in which Judge Chesler held that Restatement § 148(1) created a presumption in favor of applying the law of the home state of each of the plaintiffs in that case. <u>See</u> <u>Id.</u> at *4-5.

Contending that the Court of Appeals had, by discussing <u>Agostino</u>, adopted that case's holding that the presumption contained in Restatement § 148(1) applies to situations where, as here, a defendant allegedly made misrepresentations or omissions in New Jersey that were received by the plaintiffs in other states, Mercedes on August 31, 2009 moved to decertify the class. The Court held combined oral arguments on both the Motion for Clarification of the Class Definition and the Motion to Decertify on October 5, 2009.

## II. DISCUSSION

As discussed above, there are two motions currently before the Court. In the first, Mercedes argues that the class created by the April 24, 2009 Opinion and Order should be decertified because (1) the Court of Appeals in <u>Nafar</u> adopted <u>Agostino</u>'s holding that a presumption in favor of the law of each plaintiff's home state applies in situations where a defendant made misrepresentations or omissions in one state that were received in other states, (2) the Court did not adequately consider the regulatory interests of other states when completing its choice of law analysis, and (3) the prior ruling disregarded differences between the various class Plaintiffs' individual levels of knowledge regarding the FCC rule change and the impending obsolescence of their analog Tele Aid systems. In the second motion, Mercedes requests that the definition of that class be clarified to exclude analog-only Tele Aid subscribers whose service was terminated prior to 2008. Since a decision granting the first motion would render the second moot, the Court will address Mercedes's argument that the class should be decertified before turning to the issue of whether the class definition should be clarified.

**A.  Motion to Decertify the Class – Procedural Issues**

As a preliminary matter, the Court notes that there is no procedural vehicle by which Mercedes can assert the pending Motion to Decertify the Class.  In its papers, the company claims that the decision in Nafar "demonstrates that the choice of law and predominance analysis in this Court's Class Certification Opinion … were incorrect."  (Def.'s Br. Supp. Mot. Decertify Class 1.)  Elsewhere, however, the company claims that Nafar "clarified" the applicable choice of law and class certification standards – an apparent reference to a change in controlling law.

The decision in Nafar was designated as "not precedential" under Rule 5.2 the Internal Operating Procedures ("IOPs") of the Court of Appeals.  Pursuant to Rule 5.7 of the IOPs, the citation of such rulings – commonly referred to as "NPOs" – is discouraged and "[s]uch opinions are not regarded as precedents that bind the court because they do not circulate to the full court before filing."  See, e.g., Jamison v. Klem, 544 F.3d 266, 278 n.11 (3d Cir. 2008) ("We do not accept [unpublished opinions] as binding precedent because, unlike precedential opinions, they do not circulate to the entire court before they are filed."); In re Grand Jury Investigation, 445 F.3d 266, 276 (3d Cir. 2006) (finding that "[t]he District Court erred in relying on a NPO," and stating that such rulings "are not precedents for the district courts of this circuit.").[6] Accordingly, the ruling in Nafar is not binding and cannot constitute a change in controlling law.

The only available means of asserting the pending motion, then, is as a request for reconsideration pursuant to Federal Rule of Civil Procedure 60(b).  "[I]t is well-established in this district that a motion for reconsideration is an extremely limited procedural vehicle."

---

[6] Mercedes argued in its brief that NPOs issued by the Court of Appeals constitute persuasive authority.  (Def.'s Br. Supp. Mot. Decertify Class 4 n.1.)  Despite the fact that its entire argument in the pending Motion to Decertify the Class depends on its ability to convince this Court to follow Nafar, the company cited no authority in support of that proposition beyond an unpublished, non-binding decision of this Court.  In light of the clear statements to the contrary made by the Court of Appeals in the published, precedential, and binding cases cited above, the Court will discount the authority cited by Mercedes.

Resorts Int'l v. Greate Bay Hotel & Casino, 830 F. Supp. 826, 831 (D.N.J. 1992).  As such, a

party seeking reconsideration must satisfy a high burden, and must "rely on one of three major

grounds:  (1) an intervening change in controlling law; (2) the availability of new evidence not

available previously; or (3) the need to correct clear error of law or prevent manifest injustice."

North River Ins. Co. v. CIGNA Reins. Co., 52 F.3d 1194, 1218 (3d Cir. 1995).  Having already

ruled that there has been no intervening change in controlling law, the Court finds that neither of

the other two grounds exists in this case.  Mercedes does not point to any new evidence that was

not available at the time of the Court's April 24, 2009 Opinion.  Although it contends that the

class should be decertified because the Court committed errors of law in that ruling, that

assertion is belied by the fact that the Court of Appeals has already refused the company's

request for interlocutory review under Rule 23(f).  If the April 24, 2009 ruling did, as Mercedes

claims, suffer from clear errors of law or create the danger of manifest injustice, the Court of

Appeals could easily have addressed those deficiencies by granting interlocutory review.  See

Newton, 259 F.3d at 164 (stating that the Court of Appeals will exercise its discretion to grant

interlocutory review in order to address "erroneous rulings" at the class certification stage).

Thus, implicit in the denial of the company's request for interlocutory review was a holding that

this Court's Opinion certifying the class would not justify a grant of reconsideration under Rule

60(b).[7]

---

[7] In addition to correcting erroneous class certification decisions, the Court of Appeals has
repeatedly emphasized that it will grant interlocutory review under Rule 23(f) if the district
court's decision "would effectively … create excessive pressure to settle, or reach a novel or
unsettled question of law."  Hagan v. Rogers, 570 F.3d 146, 157-58 (3d Cir. 2009).  The Court
estimated in its April 24, 2009 Opinion that the class would likely include "significantly more
than 100,000" analog Tele Aid subscribers, and stated that the Plaintiffs' compensatory damages
would include the cost of an upgrade to digital equipment, which Mercedes priced at $1,000.
Mercedes, 257 F.R.D. at 70, 73-74.  Under the NJCFA, any compensatory damages would be
automatically trebled.  N.J. Stat. Ann. § 56:8-19.  Accordingly, Mercedes may be held liable for
over $300 million if Plaintiffs prevail on their consumer fraud claim.  In light of the extreme

After a thorough review of the case law in this and other circuits, the Court has been unable to find a single case in which a district court entertained a motion for reconsideration of an order certifying a class after a request for interlocutory review of that order pursuant to Rule 23(f) was denied.  As an issue of first impression, the Court finds that motions for reconsideration are barred under such circumstances.  To hold otherwise would allow litigants to, at least in theory, receive relief from a district court that has already been denied by a court of appeals.  The hierarchy on which our federal judicial system is based cannot countenance such a result.  Therefore, the Court holds that it is powerless to grant reconsideration of its April 24, 2009 Opinion, and the Motion to Decertify the Class must be denied.

## B.  Motion to Decertify the Class – Merits

Since the Court's holding that it cannot grant reconsideration of its April 24, 2009 ruling arises out of a procedural issue of first impression on which there is no guiding case law, it is only prudent that the merits of the Motion to Decertify the Class be considered as an alternative ground for today's ruling.  In doing so, the Court first notes that, even if it found the company's arguments meritorious, a judgment granting that Motion would not result in the wholesale decertification of the class.  Except for a brief mention of the unjust enrichment claim in connection with its final argument (which will be discussed below), the Motion to Decertify the Class is directed exclusively to the Plaintiffs' consumer fraud claim.  Mercedes has not pointed to any change in law or other development that would lay the basis for a challenge to the portion of the Court's April 24, 2009 ruling relating to the Plaintiffs' unjust enrichment claim.  Nor could it, as the pending Motion is based on <u>Nafar</u>, a case that dealt exclusively with consumer fraud and did not involve an unjust enrichment claim.  Thus, class treatment of the Plaintiffs'

---

pressure to settle that such great potential liability will exert on Mercedes, the fact that the Court of Appeals refused the company's request for interlocutory review strongly implies its approval of this Court's reasoning in the April 24, 2009 ruling.

unjust enrichment claim would be appropriate even if the pending Motion to Decertify were granted.

The fact that Plaintiffs' unjust enrichment claim remains amenable to class treatment is illustrated by the arguments made by Mercedes in challenging the choice of law determination contained in the prior ruling. Mercedes does not contend that the presumption in favor the law of each Plaintiff's home state contained in Restatement § 148(1) would apply to the unjust enrichment claim. Doing so would be absurd, as it is undisputed that Restatement § 148 applies only to consumer fraud claims, and the corresponding choice of law analysis for unjust enrichment is governed by § 221. Nor does the company claim that the Court erred by concluding that New Jersey law applies to the Plaintiffs' unjust enrichment claim because there is no material conflict between the unjust enrichment laws of the various states from which class members would be drawn. To the contrary, Mercedes's assertion that the Court did not complete an individualized choice of law analysis for each class member or fully consider the regulatory interests of states other than New Jersey is based on its argument that certain named Plaintiffs did not receive misrepresentations or omissions emanating from that state prior to purchasing their vehicles, and therefore cannot assert consumer fraud claims under the NJCFA. The two examples used by Mercedes to elucidate its argument focus only on the initial purchase of the vehicles in question, and contain no reference to the subscriber and upgrade fees – which make up the benefit at issue in the unjust enrichment claim – paid by the Plaintiffs and received by Mercedes in New Jersey. See Mercedes, 257 F.R.D. at 59 (noting that "the benefits provided by Plaintiffs which they allege unjustly enriched the company" were "their payments for Tele Aid subscriptions prior to the suspension of analog service and the $1,000 upgrade fee paid by individuals who converted to digital technology," and that those benefits were "accepted by

Mercedes in New Jersey.").  In fact, Mercedes makes reference to the interests of states other

than New Jersey in "deterring fraudulent marketing," (Def.'s Br. Supp. Mot. Decertify Class 16),

applying their law to "non-disclosure claims," (id. at 15), and the "omissions" or

"misrepresentations" at issue, (id. at 12), but does not contend that the Court erred in holding– in

light of the fact that the relationship between the parties was centered in New Jersey and the

benefits at issue were received in that state – that New Jersey had the most significant

relationship to Plaintiffs' unjust enrichment claim and the greatest interest in having its law

applied to that cause of action.

        Mercedes's final argument in support of its Motion to Decertify the Class – in which it

briefly mentioned the unjust enrichment claim – asserts the Court did not consider variations in

the individual class members' knowledge of the impending obsolescence of analog Tele Aid.

That contention, which goes to the question of whether issues common to the class

"predominate" as required by Rule 23(b)(3), appears to be based on one out-of-context quotation

excerpted from the portion of the Court's April 24, 2009 Opinion dealing with the causation

element of the NJCFA.  Moreover, the sections of Nafar that Mercedes claims support its

argument deal only with consumer fraud.  See (Id. at 18 ("Nafar holds that the NJCFA's

requirement of a causal relationship between the defendant's unlawful conduct and the plaintiff's

ascertainable loss 'could be viewed as requiring inquiry into individual class member's

motivations.'") (quoting Nafar, 339 F. App'x at 222).)  Therefore, the Court finds that Mercedes

has not articulated a proper basis for challenging its April 24, 2009 class certification ruling as it

relates to the Plaintiffs' unjust enrichment claim, and only the portion of that judgment dealing

with the consumer fraud claim is at issue in the pending Motion to Decertify the Class.  In order

to fully address the company's arguments in that Motion, it is necessary to revisit the standards that governed the Court's initial class certification decision.

### i.       *Class Certification Standard*

In order to obtain certification as a class, a group of plaintiffs must satisfy the two-pronged inquiry mandated by Federal Rule of Civil Procedure 23 ("Rule 23"). Under that standard, the parties seeking certification must establish that the proposed class meets all four of the requirements outlined in Rule 23(a) and qualifies under at least one of the three sections of Rule 23(b). Baby Neal, 43 F.3d at 55.

Rule 23(a) includes four criteria, which are generally referred to as (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. See Fed. R. Civ. P. 23(a). In order to satisfy those requirements, Plaintiffs must demonstrate that "(1) the class is so numerous that joinder of all members is impracticable [(numerosity)]; (2) there are questions of law or fact common to the class [(commonality)]; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [(typicality)]; and (4) the representative parties will fairly and adequately protect the interests of the class [(adequacy of representation)]." Fed. R. Civ. P. 23(a).

In addition to the four requirements contained in Rule 23(a), a group of plaintiffs seeking certification must also demonstrate that their proposed class falls within one of the three categories enumerated in Rule 23(b). Baby Neal, 43 F.3d at 55. In this case, Plaintiffs sought certification under Rule 23(b)(3). See (Consol. Compl. ¶ 58); (Pls.' Mot. Supp. Class Certification 22-25.) That section, which forms the "customary vehicle for damages [class] actions," is designed to "[e]nsure that a proposed class has sufficient unity so that absent class members can fairly be bound by decisions of class representatives." In re Cmty. Bank of N. Va.,

418 F.3d 277, 302 (3d Cir. 2005) (internal citations and quotations omitted).  In order to do so, it requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  "The twin requirements of Rule 23(b) are known as predominance and superiority."  In re Hydrogen Peroxide, 552 F.3d at 310.  The rule specifically outlines four factors that are especially "pertinent" to the Court's analysis:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

"In deciding whether to certify a class under [Rule] 23, the district court must make whatever factual and legal inquiries are necessary and must consider all relevant evidence and arguments presented by the parties," including expert testimony.  In re Hydrogen Peroxide, 552 F.3d at 309 (citing Newton, 259 F.3d at 166-67).  Certification is appropriate only "if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met."  Id.  That analysis "calls for findings by the court, not merely a threshold showing by a party, that each requirement of Rule 23 is met."  Id. at 306.  "In other words, to certify a class the district court must find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23."  Id. at 320 (citing Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 202 (3d Cir. 2008)).

When determining whether the requirements of Rule 23 are met, "the court may 'consider the substantive elements of the plaintiffs' case in order to envision the form that a trial on those issues would take.'" Id. at 317 (quoting Newton, 259 F.3d at 166). Plaintiffs are not required to conclusively demonstrate the merit of their claims in order to obtain certification as a class, even though doing so will be necessary to ultimately prevail. Rather, they must show that the elements of those claims are "capable of proof at trial through evidence that is common to the class rather than individual to its members." Id. at 311-12. As part of its inquiry into whether the claims asserted are amenable to classwide proof, the court must "resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits – including disputes touching on elements of the cause of action." Id. In doing so, the court need not afford Plaintiffs' factual allegations any deference. Id., n.18 (rejecting a previous statement by the Court of Appeals in Chaing v. Veneman, 385 F.3d 256, 262 (3d Cir. 2004), that "in determining whether a class will be certified, the substantive allegations of the Complaint must be taken as true.").

### ii.     Choice of Law

In order to decide whether the claims on which a group of plaintiffs seek certification are amenable to common proof, and thus to class treatment, the presiding court must examine each cause of action asserted and identify the law that applies to that claim. See, e.g., Elias, 252 F.R.D. at 246; Szczubelek v. Cendant Mortgage Corp., 215 F.R.D. 107, 120-21 (D.N.J. 2003). Although the mere "presence of individual questions … does not mean that the common questions of law and fact do not predominate," Eisenberg v. Gagnon, 766 F.2d 770, 785 (3d Cir. 1985), "class certification is unsuitable" in cases where "proof of the essential elements of the cause of action requires individual treatment." In re Hydrogen Peroxide, 552 F.3d at 311.

*(a) Nafar and Restatement § 148*

Mercedes contends that the Court erred by ruling in its April 24, 2009 Opinion that New Jersey law applies to the Plaintiffs' consumer fraud claim.  The company asserts that, in its ruling in Nafar, the Court of Appeals "adopted Agostino and affirmed that Section 148(1) of the Restatement applies in cases like this one," where the alleged misrepresentations or omissions were made in New Jersey and received in other states.  (Def.'s Br. Supp. Mot. Decertify 4.)  That assertion assigns undue weight to Nafar, which was an NPO and is not binding on this Court.  Moreover, it rests on a misconstruction of the holding in Nafar and urges an interpretation of the Restatement that would be contrary to its plain language and at odds with prior decisions from the four states that utilize the "most significant relationship test" in which named Plaintiffs in this action originally filed their suits.[8]

As discussed above, the ruling in Nafar was designated "not precedential" under IOP 5.2. Therefore, Nafar is not binding on this Court pursuant to IOP 5.7.  See also In re Grand Jury Investigation, 445 F.3d at 276 (NPOs "are not precedents for the district courts of this circuit."). Given the non-precedential value of the ruling in Nafar, the Court of Appeals could not have, as Mercedes contends, "adopted" as the law of this circuit the holding in Agostino that Restatement § 148(1)'s presumption in favor of the law of each plaintiff's home state applies in cases where misrepresentations or omissions are made in one state and received in others.  Nor could it have "clarified" the law of this circuit to that effect or have "unambiguously reject[ed] the bases on

---

[8] As discussed in the April 24, 2009 Opinion, the Court must utilize the choice of law rules from each of the six states that make up this multi-district litigation when determining which state's substantive law applies to Plaintiffs' claims. See Mercedes, 257 F.R.D. at 55-56.  Four of those states use the Restatement's "most significant relationship" test: Illinois, Missouri, New Jersey, and Washington.  The other two – California and New York – use the "government interest" test. The ruling in Nafar did not deal with the latter test, and Mercedes does not challenge the Court's choice of law determination under that test in its Motion to Decertify the Class.  Therefore, the Court's ruling that New Jersey law would apply to the claims asserted by Plaintiffs from California and New York remains the law of the case.

which this Court decided that New Jersey law would apply."  (Def.'s Br. Supp. Mot. Decertify

Class 5.)  In order to do so, the Court of Appeals would have had to issue a precedential opinion.

In the absence of such a ruling, this Court will treat <u>Nafar</u> as what it is – a decision limited to the

facts of that case, and one that has no bearing on the present litigation.  See <u>In re Grand Jury</u>

<u>Investigation</u>, 445 F.3d at 276 ("This court does not prohibit citation to NPOs but the members

of this court regard them for what they are worth – the opinion of three members of the court in a

particular case.").

     Even if the Court were to assign precedential weight to <u>Nafar</u>, the ruling in that case

would not require decertification of the class.  Mercedes claims that "<u>Nafar</u> adopts <u>Agostino</u>'s

approach to conduct that is alleged to 'emanate' from New Jersey," and holds that Restatement

§ 148(1) applies to claims based on such conduct.  (Def.'s Br. Supp. Mot. Decertify Class 6.)

That argument rests on a misunderstanding of the ruling in <u>Nafar</u>, and urges this Court to

impermissibly alter the state law jurisprudence of the states in which the actions that make up

this multi-district litigation were filed.

     The context in which <u>Nafar</u> cited <u>Agostino</u> makes it clear that the latter case was used as

an example of the  two-step choice of law analysis that courts applying the Restatement must

undertake, not for its substantive holding that § 148(1) applies in cases where misrepresentations

were made one state and received in others.  The Court of Appeals began the section of its

decision relating to choice of law by noting that, since the issuance of the district court ruling,

New Jersey had adopted the Restatement's "most significant relationship" test.[9]   <u>Nafar</u>, 339 F.

---

[9] <u>Nafar</u> was an interlocutory appeal undertaken pursuant to Federal Rule of Civil Procedure 23(f)
from an Order by this Court certifying a nationwide class in a consumer fraud action.  Unlike this
case, <u>Nafar</u> involved only one suit, which was filed in this district.  Therefore, the Court of
Appeals applied New Jersey's choice of law rules.  <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313
U.S. 487, 496 (1941) (holding that a federal court exercising jurisdiction pursuant to 28 U.S.C. §
1332 must apply the choice of law rules of the forum state).

App'x at 220 (citing <u>P.V. v. Camp Jaycee</u>, 962 A.2d 453, 455 (N.J. 2008)).  The Court of

Appeals then outlined the process district courts must follow in applying that test, stating:

> New Jersey's most significant relationship test consists of two prongs.  The first
> prong of the analysis requires a court to examine the substance of the potentially
> applicable laws in order to determine if an actual conflict exists….
>
> …
>
> The second prong of the most significant relationship test requires the court to
> weigh the factors enumerated in the Restatement section corresponding to the
> plaintiffs' cause of action.

<u>Id.</u>

In each of the two paragraphs excerpted above, the Court of Appeals cited <u>Agostino</u> as an

example of a case in which the "most significant relationship" test was applied to a consumer

fraud claim.  The first noted <u>Agostino</u>'s conclusion that there are material conflicts between the

consumer fraud laws of the various states, while the second acknowledged that ruling's use of

§ 148 as the Restatement's claim-specific section applicable to consumer fraud actions.  <u>Id.</u> at

*4-5.

After setting forth the two-step framework of the Restatement test, the Court of Appeals

distinguished the extensive choice of law analysis in <u>Agostino</u> from the one undertaken by the

District Court in <u>Nafar</u>.  The entire choice of law ruling in the latter case consisted of the

following statement:

> The NJCFA will apply to all class members because this particular law governs
> Defendant's behavior and uniform policies.  New Jersey has a strong interest in
> this litigation because the case's outcome will likely affect Defendant's
> nationwide behavior.  As stated in <u>Dal Ponte</u>, [2006 WL 2403982 at *6]: "Many
> states can claim members of the proposed class as residents, including New
> Jersey.  These contacts are clearly relevant to the litigation, as each state has an
> interest in applying its consumer fraud laws to ensure that its citizens and
> domiciliaries are protected and compensated.  It is equally apparent, however, that
> the interests of these states would not be frustrated by the application of the
> NJCFA."   Indeed, the NJCFA is one of this nation's strongest consumer

protection laws and its application will not frustrate other states' consumer protection laws.  Hence, common issues of law predominate.

Nafar v. Hollywood Tanning Sys., Inc., 2008 WL 3821776 at *6 (D.N.J. 2008).

In contrast, Judge Chesler's decision in Agostino included a lengthy analysis of the various factors enumerated in the Restatement.  In reviewing those considerations, the Court of Appeals quoted the portion of Agostino in which Judge Chesler stated that Restatement § 148(1) "recognizes that the state in which a prospective plaintiff acted in reliance on a defendant's fraud is presumed to have the predominant relationship to the parties and the issues in the litigation." Id. at *5 (quoting Agostino, 256 F.R.D. at 462).  It then summarized Agostino's application of Restatement § 148(1) to the facts of that case, stating:

> The Court in Agostino concluded that the plaintiffs received the allegedly false bills in their home states and likely paid the amount by making a payment from their respective home states.  Although the purportedly illegal billing practices may have emanated from the defendants' home state of New Jersey, they were directed at each plaintiff's home state.  The Court found that there was a strong presumption under Section 148 that the consumer fraud law of each class plaintiffs' home state should apply to his respective claim, and further that nothing in the analysis of the principles delineated in Section 6 of the Restatement rebuts the presumption that each prospective plaintiff's home state has the most significant interest in litigating its residents' claims.  The Court rejected the plaintiffs' claim that the NJCFA should apply nationwide, instead finding that each state has an overwhelming interest in seeing its own consumer protection statute govern in cases where residents were victims of fraud perpetrated within the state's borders.

Id. (citing Agostino, 256 F.R.D. at 463).

Finally, the Court of Appeals noted that Agostino's consideration of the factors enumerated in § 6 of the Restatement "did not change its conclusion that each plaintiff's home state had the most significant interest in the litigation."  Id. at 221.  After doing so, it stated that "[i]n the first instance, it is for the District Court here to consider the Section 6 factors as they relate to the facts of this claim on remand.  However, we have been referred to no Section 6 considerations

that would appear to rebut the presumption that each prospective plaintiff's home state has the most significant interest in litigating its residents' claims." Id. (citing Agostino, 256 F.R.D. at 463 (enumerating Restatement § 6 factors)). At the conclusion of the portion of its decision dealing with choice of law, the Court of Appeals remanded the case and instructed the District Court to "conduct a choice of law analysis under New Jersey's most significant relationship test, looking to the Restatement and Agostino." Id.

In its Motion to Decertify the Class, Mercedes seizes on the statements excerpted above and argues that "[i]n its adoption of Agostino and the Restatement Section 148(1) presumption, Nafar rejects this Court's choice of law analysis." (Def.'s Br. Supp. Mot. Decertify Class 7.) That contention ignores several important aspects of the decision in Nafar. First, the statement by the Court of Appeals that it was aware of "no Section 6 considerations that would appear to rebut the presumption that each prospective plaintiff's home state has the most significant interest in litigating its residents' claims," Nafar, 339 F. App'x at 221, was unnecessary to its holding that the District Court had not conducted a proper choice of law analysis, and was therefore dicta. Whether Restatement § 148 contains a presumption in favor of applying the law of each plaintiff's home state in a consumer fraud action was not before the Court. Nor was the question of whether proper consideration of the Restatement § 6 factors would rebut that presumption. In fact, the record on appeal did not include any consideration of the Restatement § 6 factors, as the District Court had applied the "government interest" test used by New Jersey at the time of its decision. Accordingly, this Court would not be bound, even if Nafar were precedential, by the statement in that case that none of the Restatement § 6 factors rebut the presumption in favor of applying the law of each plaintiff's home state, and is not required to hold to that effect or apply such a presumption. Kool, Man, Coffee & Co. v. Coffey, 300 F.3d

340, 355 (3d Cir. 2002) ("[C]omments about the merits of [a] case that [are] simply precatory

and [are] not necessary to the actual holding … are properly considered dicta, and are not

binding."); see also Cohens v. Virginia, 6 Wheat. 264, 399-400 (1821) (Marshall, C.J.)

(explaining why dicta is not binding).

 Moreover, the substantive underpinning of Mercedes's reliance on Nafar – its contention

that the Court of Appeals "endorsed and adopted Agostino's approach" to choice of law in

consumer fraud actions, (Def.'s Br. Supp. Mot. Decertify 8) – misinterprets that ruling.  While

the Court of Appeals cited Agostino and quoted the portions of that case in which Judge Chesler

stated that Restatement § 148(1) creates a presumption in favor of applying the law of each

plaintiff's home state in consumer fraud actions where the alleged misrepresentations at issue

were made in one state and received in another, at no point did Nafar explicitly endorse or adopt

that holding.  Rather than a sweeping pronouncement adopting Agostino, the choice of law

holding in Nafar was a narrow one:  "the District Court erred by failing to conduct an adequate

choice of law analysis."  Nafar, 339 F. App'x at 217.  In light of that limited ruling, Nafar's

citations to Agostino are best viewed as using the latter case as an example of the process that a

district court must follow in completing its choice of law analysis under the "most significant

relationship" test rather than an adoption of the latter case's substantive holding.

 The Court's reading of Nafar draws further support from (1) the non-precedential nature

of that decision, (2) the context of the appeal in which it was made, and (3) the fact that, if Nafar

truly had adopted Agostino's ruling, the Court of Appeals would have exceeded its authority by

impermissibly opining on issues of state law best left to the Supreme Court of New Jersey.

Turning to the first of those factors, the Court notes that, as discussed above, the Court of

Appeals chose to issue Nafar as an NPO.  Such rulings are not binding on future panels of the

Court of Appeals or on this Court.  In re Grand Jury Investigation, 445 F.3d at 276.  If the Court of Appeals had, as Mercedes claims, wanted to adopt Agostino's substantive holding that Restatement § 148(1) applies to consumer fraud claims in cases where the alleged misrepresentations were made and received in different states, it would have done so by means of a precedential ruling.

Secondly, the question of which subsection of Restatement § 148 applies to consumer fraud actions in which the misrepresentations at issue were made and received in different states was not posed by the appeal in Nafar.  Nor could it have been, as the District Court in that case applied the "government interest" test rather than the Restatement's choice of law rules.  See Nafar, 339 F. App'x at 220.  The issue before the Court of Appeals involved only the narrow question of "whether the District Court erred by failing to conduct an adequate choice-of-law analysis when the potential class members for this consumer fraud action hail from numerous states."  Id. at 217.  Accordingly, any statement by the Court of Appeals that Restatement § 148(1) rather than § 148(2) applies to consumer fraud claims such as those in Agostino and this case would have decided an issue outside the scope of the appeal in Nafar.  In other words, the ruling that Mercedes claims the Court of Appeals made in Nafar could not have been anything but dicta, and therefore would not be binding on this Court even if the company's reading of that case were supported by its text.  Coffey, 300 F.3d at 355.

Finally, the Court's conclusion that Nafar did not "adopt" Agostino's erroneous holding that Restatement § 148(1) applies in cases such as this one is compelled by the fact that the Court of Appeals would have exceeded its authority by making such a ruling.  The consumer fraud claims asserted by the plaintiffs in Nafar were state, not federal, causes of action.  The District Court in that case had jurisdiction solely due to the fact that the amount in controversy was

greater than $5 million and at least one plaintiff was of diverse citizenship from the defendant as required by the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).[10]  When exercising jurisdiction over such cases, a federal court must apply the choice of law rules of the forum state in which the action was originally filed.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  Thus, as stated by the Court of Appeals when remanding the case, it is the manner in which New Jersey would apply the Restatement's "most significant relationship" test to the plaintiffs' consumer fraud claims in Nafar that will determine whose substantive law will apply in that case.

New Jersey adopted the "most significant relationship" test less than two years ago, see Camp Jaycee, 962 A.2d at 460, and no court in that state has addressed the question of whether Restatement § 148(1) or § 148(2) applies to consumer fraud claims in which the alleged misrepresentations were made in one state and received in another.  Therefore, New Jersey's current choice of law rules in consumer fraud actions are governed by the unmodified plain language of Restatement § 148.  As discussed above, see supra I(D)(i)(b), that section of the Restatement distinguishes between claims in which the alleged misrepresentations were made and received in the same state and those where they were made in one state but received in others.  The first subsection applies "when the plaintiff's actions in reliance took place in the same state where the false representations were made and received."  Restatement § 148(1) (emphasis added).  The second applies "[w]hen the plaintiff's actions in reliance took place in whole or in part in a state other than where the false representations were made."  Restatement § 148(2).

---

[10] The decision in Nafar dealt with an interlocutory appeal of the District Court's order granting class certification pursuant to Federal Rule of Civil Procedure 23(f).  The Court of Appeals has jurisdiction over such actions under 28 U.S.C. § 1292(e).

Mercedes claims that <u>Nafar</u> "adopted" <u>Agostino</u> "and clarified that Restatement Section 148(1) does indeed apply where the defendant's alleged conduct emanates from one state and is directed to and received by plaintiffs in another."  (Def.'s Br. Supp. Mot. Decertify Class 8.) Such a ruling would have amounted to a modification of the plain language of the Restatement – and therefore New Jersey's choice of law rules – which, as discussed above, explicitly states that such cases are governed by § 148(2).  As a federal court exercising jurisdiction under 28 U.S.C. § 1332, the Court of Appeals was not empowered to make such a change.  <u>City of Philadelphia v. Lead Indus. Ass'n, Inc.</u>, 994 F.2d 112, 129 (3d Cir. 1993) ("It is decidedly not the business of the federal courts to alter or augment state law.").  Therefore, <u>Nafar</u>'s citations to <u>Agostino</u> must have been an effort to use that case as an example of the two-step review a district court applying the "most significant relationship" test must undertake rather than an endorsement of the latter case's holding that § 148(1) applies in consumer fraud actions where the misrepresentations at issue were made and received in different states.  In the absence of a clear statement to the contrary, this Court will not assume that the Court of Appeals diverged from the issues posed by the appeal in <u>Nafar</u> and embarked on the slippery slope of making pronouncements on how New Jersey or any other state should apply the Restatement test.[11]

---

[11] Even if the Court of Appeals had adopted <u>Agostino</u>'s ruling in <u>Nafar</u> and the latter case was precedential, this Court would be prohibited from applying Restatement § 148(1) to the consumer fraud claims of the named Plaintiffs who filed their suits in Illinois and Washington. Courts in those states have applied Restatement § 148(2) to consumer fraud claims in which the representations at issue were made and received in different states.  <u>Barbara's Sales, Inc. v. Intel Corp.</u>, 879 N.E.2d 910, 922-23 (Ill. 2007) (applying Restatement § 148(2) to consumer fraud claim in which the representations at issue were made in California and received by plaintiffs in Illinois and Missouri); <u>Schnall v. AT&T Wireless Svcs., Inc.</u>, 161 P.3d 395, 402-03 (Wash. Ct. App. 2007) (applying Restatement § 148(2) to consumer fraud claims where representations were made in Washington and received in other states).  In fact, the Washington Court of Appeals has applied Restatement § 148(2) in almost exactly the same manner as this Court did in its prior decision, holding in a similar factual situation that Washington law applied to a consumer fraud action in which a defendant company located in that state allegedly made false representations to customers in other states.  <u>Schnall</u>, at 402-03 (finding that Washington law

In sum, the Court rejects Mercedes's contention that the choice of law analysis contained in its April 24, 2009 Opinion "cannot stand" in the face of Nafar.  (Def.'s Br. Supp. Mot. Decertify Class 8).  That argument assigns undue weight to Nafar, which was issued as an NPO and has no binding effect.  Moreover, it misreads the decision in Nafar, which did not "adopt" or "endorse" Agostino's substantive holding that Restatement § 148(1) applies in cases such as this one where the alleged misrepresentations at issue were made in one state and received in another, but rather cited that case as an example of the two-step choice of law analysis that courts must undergo when applying the "most significant relationship" test.  This Court's ruling that Nafar did not "adopt" Agostino's holding is supported by the fact that the Court of Appeals chose to issue its ruling in the former case as an NPO, which it would almost certainly not have done had it intended for that ruling to be followed in future cases.  Furthermore, the question of which subsection of Restatement § 148 applies to consumer fraud actions in which the misrepresentations at issue were made and received in different states was not posed by the appeal in Nafar, and any statement on that point would have been unnecessary to the Court's narrow ruling that the District Court did not complete an adequate choice of law analysis.  See Coffey, 300 F.3d at 355 (ruling that such statements, as dicta, are not binding).  Finally, the reading of Nafar urged by Mercedes asks this Court to assume that the Court of Appeals exceeded its authority in that case by modifying the state choice of law rules of New Jersey.  In light of the fact that Nafar never explicitly endorsed Agostino's holding, such an assumption is

---

applied to plaintiffs' claims because (1) the marketing materials at issue, which including alleged false statements, were conceived and produced in Washington, (2) defendant company evidence and witnesses were located in Washington, and (3) Washington has a strong interest in regulating businesses operating in that state).  This Court would be bound by those decisions even if it accepted the reading of Nafar urged by Mercedes.  Lead Indus. Ass'n, 994 F.2d at 123 (The role of a federal court exercising jurisdiction pursuant to 28 U.S.C. § 1332 "is to apply the current law of the appropriate jurisdiction, and leave it undisturbed.").

unwarranted.  Therefore, the Court rejects Mercedes's argument that the choice of law analysis

in its April 24, 2009 ruling was flawed, and reaffirms the reasoning set forth in that decision.

### (b)  Individualized Choice of Law Analysis

In addition to contending that the Court erred in its application of Restatement § 148(2)

to Plaintiffs' claims, Mercedes claims that the class should be decertified because the April 24,

2009 ruling did not include an individualized choice of law analysis for each class Plaintiff's

consumer fraud claim.[12]  See Georgine v. Amchem Prods., Inc., 83 F.3d 610, 627 (3d Cir. 1996)

(A district court ruling on a motion for class certification "must apply an individualized choice of

law analysis to each plaintiff's claims.").  That argument is unavailing.

The company's assertion that the Court did not conduct an individualized choice of law

analysis for each of the named Plaintiffs is simply incorrect.  The April 24, 2009 decision

individually assessed which law should apply to each class Plaintiff's claims by conducting a

choice of law analysis for each of the ten proceedings that make up this multi-district litigation

using the choice of law rules applicable in the state in which each case was originally filed.  That

analysis, which comprised almost a third of the class certification ruling, included an extensive

discussion of the factual circumstances underlying the Plaintiffs' claims and the relevant contacts

of each state to those causes of action.  See Mercedes, 257 F.R.D. at 58-69.

---

[12] As discussed supra II(B), the choice of law arguments contained in Mercedes's Motion to
Decertify the Class are directed only to the Plaintiffs' consumer fraud claims, and do not
challenge the portion of the April 24, 2009 ruling holding that New Jersey law applies to
Plaintiffs' unjust enrichment claims.  Nor could the company properly assert such a challenge, as
the case on which its Motion is purportedly based, Nafar, did not involve unjust enrichment
claims.  Therefore, the Court will limit its discussion of Mercedes's remaining choice of law
arguments – that the April 24, 2009 ruling (1) did not contain an individualized choice of law
analysis and (2) did not adequately consider the regulatory interests of states other than New
Jersey – to the portions of that decision dealing with consumer fraud, and reiterates its holding
that New Jersey law applies to Plaintiffs' unjust enrichment claims under both the "government
interest" and Restatement "most significant relationship" tests.

In its brief, Mercedes cites the circumstances of two named Plaintiffs – Lois Stowers and Karen Marcus – as examples of the Court's purported failure to carry out an individualized choice of law analysis.  In doing so, the company stresses the actions of those individuals prior to purchasing their vehicles and notes that neither had any significant contact with New Jersey in making that purchase, stating:

> Lois Stowers lives in Washington State.  She purchased her vehicle in Washington state, where the vehicle is titled and insured.  Ms. Stowers obtained Tele Aid service by signing a Subscriber Agreement in Washington state.  She did not speak with anyone at Mercedes (in New Jersey) before purchasing her vehicle.  She did not visit Mercedes' website before purchasing her vehicle and did not review any literature from Mercedes before purchasing her vehicle.  Simply put, Ms. Stowers had no contact with anyone or anything from New Jersey in connection with the purchase of her vehicle.

> Karen Marcus lives in Illinois.  She purchased vehicle, titled it, and insures it in Illinois.  Ms. Marcus obtained Tele Aid service by signing a Tele Aid Subscriber Agreement where she bought the car.  Ms. Marcus did not speak with anyone at Mercedes in New Jersey, or visit the Mercedes website, either before or in connection with the purchase of her vehicle.  She received Mercedes' promotional material in Illinois.  She also testified that the promotional material and advertising did <u>not</u> influence her purchase decision.

(Def.'s Br. Supp. Mot. Decertify Class 11-12) (emphasis in original, citations omitted.) Those examples, which represent the circumstances of the two class Plaintiffs who had the least contact with New Jersey in purchasing their vehicles, are inapposite for a number of reasons.

First, the statements excerpted above focus exclusively on the actions of Ms. Stowers and Ms. Marcus, completely ignoring those of Mercedes.  For instance, when Mercedes claims that the class should be decertified because many of the named Plaintiffs "obtained Tele Aid Service by signing a Subscriber Agreement" in their home states, it leaves out the fact that the content of those agreements – which the Plaintiffs claim included material misrepresentations or omissions – was crafted in New Jersey and the agreements were disseminated from that state.  Similarly, Mercedes's argument ignores the fact that class members were required to periodically renew

their Tele Aid subscriptions, thus meaning that the company's allegedly fraudulent omissions in failing to disclose the impending obsolescence of that system were issued on multiple occasions, each time from offices located in New Jersey.  Finally, Mercedes does not acknowledge the fact that communications from AT&T stating that it would "shut down" its analog network as soon as the requirement that it provide such service expired, see (Munroe Decl., Ex. 12 at 3), were received and reviewed by Mercedes personnel in New Jersey prior to the company's decision not to disclose that information to analog Tele Aid subscribers – a decision made in New Jersey. Thus, each class member had contact with a division of Mercedes located in New Jersey, regardless of whether they knew of that office's location when they subscribed to Tele Aid and renewed those subscriptions.  See Mercedes, 257 F.R.D. at 60 (Because "all Mercedes's actions related to Tele Aid" were performed in New Jersey, "the relationship between the parties, at least insofar as it relates to this litigation was centered in New Jersey.") (emphasis added).

More importantly, Mercedes's argument rests on a misapprehension of the harm at issue in this case.  The company focuses exclusively on whether its alleged misrepresentations or omissions affected the class Plaintiffs' decisions to purchase their vehicles.  See (Def.'s Br. Supp. Mot. Decertify Class 12) ("The only omissions that could be at issue in [the Plaintiffs'] individual cases are those that could have affected the purchase decision, since an omission that would not have affected the purchase decision could not be the cause of any legally-recoverable damages.").[13]  The harm at issue in this litigation, however, does not arise out of the Plaintiffs' purchase of their vehicles, but rather their decision to subscribe to Tele Aid service for those vehicles.  As explained in the April 24, 2009 ruling:

---

[13] Mercedes characterizes its argument that the class should be decertified because at least two of the named Plaintiffs had no contact with New Jersey prior to purchasing their vehicles as apropos to the April 24, 2009 ruling's choice of law analysis.  That characterization is imprecise. The Court's choice of law analysis with respect to the consumer fraud claims that were originally

Plaintiffs do not allege that, but for the alleged misrepresentations, they would not have purchased their vehicles.  Nor do they contend that analog Tele Aid service would have been available after 2007 if not for Mercedes's alleged misconduct; AT&T stopped providing analog service because the FCC rule change removed the requirement that it do so, not because of any statement made by Mercedes. Plaintiffs simply claim that they did not get what they paid for – that because of Mercedes's alleged wrongdoing, they did not know that the Tele Aid systems in their automobiles would become useless long before the vehicles aged to such a degree that they were no longer drivable.

Mercedes, 257 F.R.D. at 74.

In other words, the alleged harm in this case is that Plaintiffs were induced to subscribe to and

utilize Tele Aid Service based on their belief that such service would continue throughout the life

of their vehicles – a belief that they claim Mercedes nurtured through misrepresenting or

omitting information on the FCC ruling and the impending discontinuation of analog service.

Accordingly, it is not the information that the class Plaintiffs considered when making the

decision to purchase their vehicles that is relevant to the Court's determination as to which

---

filed in California and New York follows the "government interest" test, while the determination for the other four states in which the actions that make up this multi-district litigation – Illinois, Missouri, New Jersey, and Washington – is governed by the Restatement's "most significant relationship" test.  See Mercedes, 257 F.R.D. at 57-58.  Neither of those tests includes the question of whether the plaintiffs in a consumer fraud action did in fact receive and take into account the misrepresentations or omissions that form the basis of their claims as a factor in deciding which state's law should govern.  Rather, that question is one of causation – an essential element of a consumer fraud claim under any state's law.  In arguing that not all of the class Plaintiffs can demonstrate that they received and relied on the misrepresentations or omissions made by the company's "Telematics Team" prior to purchasing their vehicles, Mercedes essentially claims that the Plaintiffs cannot demonstrate common causation, and thus cannot satisfy the commonality and predominance requirements contained in Rule 23.  In light of the fact that Mercedes mischaracterizes the harm in this case – the question is not whether the Plaintiffs took the company's alleged misrepresentations or omissions into account when purchasing their vehicles, but rather whether those misrepresentations or omissions affected their decisions to subscribe to Tele Aid – and the fact that the Plaintiffs can prove through evidence common to all members of the class that a disclosure of the impending obsolescence of analog-only Tele Aid service prior to the purchase and renewal of their subscriptions would have been sufficient to warn them that the fact that their service would expire at the end of 2007, see Mercedes, 257 F.R.D. at 74-75, the Court reiterates its April 24, 2009 holding that common questions of law and fact predominate as required by Rule 23(b)(3).

state's law applies to their respective claims, but rather the information that affected their choices to subscribe to Tele Aid and subsequent decisions to renew that subscription.

That information – all Tele Aid Subscriber Agreements, advertisements related to the system, and other promotional materials – was conceived, drafted, and disseminated from New Jersey.  Mercedes could have warned the Plaintiffs that analog-only Tele Aid service would expire at the end of 2007 by including a statement to that effect in their Subscriber Agreements.[14] The company's decision not to do so was made in New Jersey, as was the choice to charge analog-only Tele Aid subscribers $1,000 for an equipment upgrade that would allow them to continue using that service.  Therefore, the Court reiterates its April 24, 2009 holding that New Jersey has the most significant relationship of any state to Plaintiffs' consumer fraud claim, and that claim is therefore governed by the NJCFA.

### (c) State Regulatory Interests

In a similar argument, Mercedes contends that the Court's April 24, 2009 Opinion did not adequately consider the interests of states other than New Jersey in having their respective consumer fraud laws applied to Plaintiffs' claim.  That argument, much like the company's assertion that the Court did not conduct an individualized choice of law analysis, misrepresents the prior ruling.  As required by the choice of law rules of the states from which the actions that make up this multi-district litigation were filed, that decision analyzed the Plaintiffs' consumer

---

[14] Mercedes noted in connection with its arguments relating to the Motion for Class Certification that the Subscriber Agreements signed by some of the Plaintiffs included statements to the effect that their Tele Aid service depended on analog telephone networks and would be unavailable in the event that AT&T stopped providing analog service.  Those statements were phrased, however, in the hypothetical:  they informed customers that Tele Aid would be unavailable "if" AT&T stopped providing analog service, not "when" it did so at the end of 2007, as outlined by the August 22, 2002 letter sent by AT&T to Mercedes.  (Munroe Decl., Ex. 12 at 3.)  The company did not individually disclose the existence of the FCC rule change to the Plaintiffs or affirmatively inform them that analog-only Tele Aid service would not be available after 2007 prior to the notice letters sent in 2006 and 2007 as part of its "customer ramp-down" plan.

fraud claims under both the "government interest" test used by California and New York and the Restatement's "most significant relationship" used by Illinois, Missouri, and Washington.  Under each test, the Court discussed at length the relevant interests of each state in having its own law applied.

In determining that New Jersey law applies to the consumer fraud claims originally filed in California and New York pursuant to the "government interest" test, the Court in its April 24, 2009 Opinion highlighted the dual purpose of consumer fraud statutes:  (1) compensating individuals who have suffered pecuniary loss due to a defendant's material misrepresentations or omissions, and (2) punishing such wrongdoing.[15]  It then used those purposes as a framework for assessing the interests of each state in which one of the actions that make up this multi-district litigation was filed in having its law applied.

With respect to the first, the Court noted that each state from which class members will be drawn has an interest in having its law applied to the Plaintiffs' claims – namely, the interest in seeing that class members who reside in that state are compensated for any losses suffered due to the company's alleged wrongful behavior.  Id. at 64 ("[E]ach of the various jurisdictions from which class members will be drawn have an equal interest in compensating their citizens.").  Those interests are not, as characterized by Mercedes, "competing," see (Def.'s Br. Supp. Mot. Decertify Class 15), but rather aligned.  In a case in which the recovery by any individual

_____

[15] The decision in Nafar dealt only with the Restatement's "most significant relationship" choice of law test, which is used by Illinois, Missouri, New Jersey, and Washington.  See supra n.8.  Mercedes's Motion to Decertify the Class, which is based on that decision, does not challenge the Court's choice of law analysis under the "government interest" test used by California and New York.  To the contrary, Mercedes made no reference whatsoever to that test in its briefs or oral arguments.  Therefore, the April 24, 2009 ruling that New Jersey law applies to the consumer fraud claims of the named Plaintiffs who originally filed their suits in California and New York remains the law of the case.  The Court's discussion in this ruling of its previous "government interest" analysis is offered solely in an effort to elucidate the dual purpose of consumer fraud actions.  As discussed below, those purposes – and the state law interests they implicate – are significant in assessing which state's law applies under the Restatement test.

plaintiff would be sufficiently large to justify litigating the claims at issue, the interest of each

state in compensating its citizens could be served by applying the law of each plaintiff's home

state to his or her claims, but this is not such a case.  Each of the Plaintiffs suffered damages of

no more than $1,000 – the amount charged by Mercedes for an upgrade to digital equipment –

plus compensation for the time period that they have been forced to go without Tele Aid during

the pendency of this litigation.  See Id. at 73-74 (If they prevail at trial, each Plaintiff will be

entitled to "the cost of such an upgrade plus compensation for the time period between the end of

2007 and any eventual judgment, during which service was unavailable.").  Therefore, the Court

found in its April 24, 2009 Opinion that the interest of each jurisdiction in compensating its

citizens was best served by the certification of a class, stating:

> In light of the relatively small amount of damages claimed by each class member,
> however, the Plaintiffs would likely find it impossible to achieve recovery if the
> Court applied the law of each individual's home state to his or her claim and
> refused to certify a class based on differences between the [laws of] the various
> jurisdictions.   Such a scenario would have the undesirable result of leaving
> potential class members with no practical means of vindicating their expectations
> regarding the continued functionality of their Tele Aid systems.

Id. at 62 (citing Windsor, 521 U.S. at 617 ("The policy at the very core of the class action

mechanism is to overcome the problem that small recoveries do not provide the incentive for any

individual to bring a solo action prosecuting his or her rights.  A class action solves this problem

by aggregating the relatively paltry potential recoveries into something worth someone's (usually

an attorney's) labor.") (internal quotations omitted)).

  After determining that the class members' home jurisdictions share the same interest in

seeing their citizens compensated, the Court turned to the states' competing interests in

punishing Mercedes's alleged misconduct through the application of their own consumer fraud

statutes.  In doing so, it noted that the areas from which class members will be drawn –

presumably every jurisdiction in the United States – have made varying policy choices with respect to the punitive function of their consumer fraud statutes.  Id. at 63-64 (discussing differences in (1) the type of goods on which a consumer fraud claim may be based, (2) the requisite scienter of the defendant, and (3) the availability of punitive damages).  Although that portion of the Court's April 24, 2009 Opinion cited laws of jurisdictions other than the six states in which the actions that comprise this litigation were originally filed, the differences highlighted are typical of the variations between those six states.  Those differences, and the varying policy choices they represent, are best divided into three categories:  (1) the type of goods on which a consumer fraud class action may be based, (2) the availability of punitive damages, and (3) the requisite culpability of the defendant required before such damages may be awarded.  An examination of the policy considerations reflected in those aspects of the consumer fraud laws of the states from which this litigation's constituent actions were transferred supports the Court's April 24, 2009 ruling that New Jersey has the greatest interest in applying its law to Mercedes's alleged wrongdoing, and its law should therefore govern.

Missouri limits the availability of consumer fraud class actions to goods purchased for "personal family or household purposes," which would include the automobiles at issue in this case.  Mo. Ann. Stat. § 407.025.1.  The other five states in which the cases comprising this action were originally filed do not impose such limitations.  Cf., Int'l Union of Operating Eng'rs, 894 A.2d at 1146-47 ("[S]ome states confine their consumer fraud statute remedies to items purchased primarily for personal, family or household purposes.") (citing Miss. Code Ann. § 75-24-15(4); S.C. Code Ann. § 39-5-140(a); Ala. Code § 8-19-10(f)).  Therefore, no state has an interest based on the type of property at issue in this suit in applying its own law to the claims of its citizens in order to prohibit them from participating in the class.

Each of the six states in which the named Plaintiffs reside attempts to deter fraudulent activity on the part of businesses by allowing punitive damages in consumer fraud actions, but the amount of such damages and level of culpability that must be shown before they can be awarded varies.  Under California law, a prevailing plaintiff is automatically entitled to punitive damages in an amount to be determined by the jury.  Cal. Civil Code § 3294 (providing for the award of punitive damages in cases where "the defendant has been guilty of oppression, fraud, or malice" and defining "fraud" as "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant.").  New Jersey mandates automatic treble damages, N.J. Stat. Ann. § 56:8-19, while Washington allows the award of treble damages in the discretion of the court, up to a maximum of $25,000.  Wash. Rev. Code § 19.86.090.  The other three states require plaintiffs to prove some form of heightened culpability on the part of the defendant.  See, e.g., Kleczek v. Jorgensen, 767 N.E.2d 913, 923 (Ill. App. Ct. 2002) (A plaintiff in a consumer fraud action may recover punitive damages "for conduct that is outrageous, either because the defendant's motive was evil or the acts showed a reckless disregard of others' rights."); Williams v. Finance Plaza, Inc., 78 S.W.3d 175, 183 (Mo. Ct. App. 2002) (same); Walker v. Sheldon, 179 N.E.2d 497, 499 (N.Y. 1961) ("[T]here may be recovery of exemplary damages in fraud and deceit actions where the fraud, aimed at the public generally, is gross and involves high moral culpability.").  Thus, the states in which the suits that make up this multi-district litigation were originally filed have competing interests in applying the portions of their consumer fraud laws dealing with the amount of punitive damages and the level of defendant culpability required for such awards to the Plaintiffs' claims.

The competing interests of California, Illinois, Missouri, New York, and Washington are essentially equal.  Each of those states has an interest in deterring future violations by imposing

punitive damages on Mercedes as called for under its respective consumer fraud law, but only to the extent that Mercedes actually operates in that state.  The company's operations in California, Illinois, Missouri, New York, and Washington are limited to the marketing and sales of vehicles.  In contrast, its operations in New Jersey involve additional functions beyond marketing and selling cars.  Mercedes is headquartered in New Jersey and received the Plaintiffs' Tele Aid subscription payments in that state.  The conduct at issue – the company's alleged decision to conceal the impending obsolescence of analog Tele Aid – was performed in New Jersey, and the Subscriber Agreements signed by the Plaintiffs in order to obtain Tele Aid service were conceived, drafted, and disseminated from that state.  Accordingly, New Jersey has the greatest interest in controlling the punishment Mercedes may face for its alleged misrepresentations or omissions through the application of its own law to the Plaintiffs consumer fraud claims.

For similar reasons, New Jersey has a unique economic interest in applying its punitive damages provision to the Plaintiffs' claims.  Because Mercedes has its principal place of business in New Jersey, it pays corporate income taxes to that state.  As discussed above, Mercedes may be liable for over $300 million if the Plaintiffs prevail on their consumer fraud claims.  See supra n.7.  That calculation of the company's potential liability reflects the fact that New Jersey law limits punitive damages to "threefold the actual damages suffered by the victim of any practice declared unlawful … plus an award of reasonable attorney's fees and costs of suit to the successful plaintiff."  Fink, 839 A.2d at 979.  Were the Court to apply the law of California, Illinois, Missouri, or New York, the jury would be allowed to award unlimited punitive damages, which might substantially increase Mercedes's total liability.  Such an increase would, in turn, deplete the company's assets and the amount of its New Jersey taxes.  Therefore, New Jersey has the additional interest – which is not shared by any other state – of

applying its law to the Plaintiffs' consumer fraud claims in order to ensure that the company's liability is limited to the amount deemed proper by the New Jersey legislature in promulgating the NJCFA.  See Pasquantino v. United States, 544 U.S. 349, 357 (2005) (characterizing "entitlement to tax revenue" as "a straightforward 'economic' interest").

In short, the Court ruled that New Jersey has a greater interest in having its law applied to the Plaintiffs' consumer fraud claim than the other five states in which the constituent cases in this litigation were filed.  Each of those states has an equal stake in seeing its citizens compensated for any losses they suffered due to Mercedes's alleged misrepresentations or omissions.  However, New Jersey's interest in controlling the punitive aspect of the litigation is greater than that of any of the other states because Mercedes is headquartered in New Jersey, the conduct at issue took place there, and any eventual damages award will have implications for New Jersey's tax revenue.  See Mercedes, 257 F.R.D. at 58-59, 62, 64.

After determining that New Jersey has the greatest interest in having its law applied to the Plaintiffs' consumer fraud claims, the Court engaged in a second choice of law analysis using the Restatement's "most significant relationship" test.  In doing so, it found that the claim-specific factors enumerated in § 148(2)[16] and general considerations set forth in § 6 of the Restatement – both of which take into account the competing interests of the states in having their laws applied – require that Plaintiffs' consumer fraud claim be governed by the NJCFA.

The Court's ruling that the claim-specific factors contained in Restatement § 148(2) weigh in favor of applying New Jersey law was based heavily on its assessment, completed when applying the "government interest" test, of the competing regulatory interests of the states in

---

[16] As discussed at length above, the Court rejected Agostino's holding that Restatement § 148(1) applies in cases such as this one where the misrepresentations or omissions at issue were made and received in different states and conducted its choice of law analysis using Restatement § 148(2).

which the cases that make up this litigation were originally filed.  Although it found as part of that assessment that four of the six Restatement § 148(2) factors supported applying the law of each Plaintiff's home state, the Court held that the third factor articulated by Restatement § 148(2) – the "the place where the defendant made the representations" – outweighs those considerations.  Id. at 67-68 (citing Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 467 (3d Cir. 2006) (discounting certain factors due to their "minor importance to the issue."); David B. Lilly Co., Inc. v. Fisher, 18 F.3d 1112, 1119 (3d Cir. 1994) ("The factors enumerated in [the Restatement] should be evaluated on a qualitative rather than a quantitative basis.").  That finding relied on two provisions contained in the comments to Restatement § 148(2), which require that a court attempting to determine which state has the "most significant relationship" to a consumer fraud claim take into account the policies underlying the different states' laws.  The first – Comment (h) – incorporates a comment to another section of the Restatement, which states that:

> [A]n important factor in determining which is the state of most significant relationship is the purpose sought to be achieved by the rule of tort law involved.  If this purpose is to punish the tortfeasor and thus to deter others from following his example, there is better reason to say that the state where the conduct occurred is the state of dominant interest and that its local law should control than if the tort rule is designed primarily to compensate the victim for his injuries.

Restatement (Second) of Conflict of Laws § 146, Comment (e) (emphasis added).

The second provision contains a similar instruction, stating that courts must take into account "the choice-of-law principles stated in [Restatement] § 6 with emphasis upon the purpose sought to be achieved by the relevant tort rules of the potentially interested states, the particular issue and the tort involved" when balancing the choice of law factors applicable to fraud claims.  Id. § 148, Comment (e) (emphasis added).  In light of those provisions – and its earlier holding that,

while each of the named Plaintiffs' home states has an equal interest in applying the compensatory portion of their consumer fraud statutes, New Jersey has a greater interest than the other five in having the punitive provisions of the NJCFA control the litigation due to the fact that Mercedes is headquartered there and the misrepresentations or omissions at issue were made in that state – the Court found that "New Jersey is 'the state of dominant interest and … its local law should control'" pursuant to the Restatement test.  Mercedes, 257 F.R.D. at 68 (quoting Restatement (Second) of Conflict of Laws § 146, Comment (e)).

The Court also considered the competing interests of the states when applying the factors enumerated in Restatement § 6.  In doing so, it once again noted that the named Plaintiffs' home states have an equal, and aligned, interest in compensating their citizens, but New Jersey has a greater interest than any of the other five states in having its consumer fraud law control the punitive aspect of the case, stating:

> The considerations articulated in Restatement § 6(a), (b), and (c) overlap in this case.  The first, "the needs of the interstate and international systems," requires that the Court take into account "the needs and policies of other states and of the community of states" when determining which jurisdiction's law should apply to Plaintiffs' consumer fraud claim.  Restatement (Second) of Conflict of Laws § 6, Comment (d).  The second and third, respectively, require the Court to consider "the relevant policies of the forum" and "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue."  Id. § 6(b),(c).  Having already ruled that conflicts exist between the various states' consumer fraud statutes and that New Jersey has a greater interest than any other jurisdiction in having its law applied, the Court finds that applying the NJCFA to Plaintiffs' consumer fraud claims will not result in an unacceptable conflict between states.  As mentioned above, each of the states from which class members will be drawn has an interest in assuring that its citizens will be compensated for any harm they may have suffered.  Only New Jersey, however, possesses the additional interest in regulating a corporation headquartered within its borders – the interest implicated by the availability, or lack thereof, of punitive damages.  Therefore, the interests of jurisdictions whose consumer fraud statutes differ with respect to punitive damages will not be implicated by the application of the NJCFA to Plaintiffs' claim, and that application will not give rise to any conflict between the various states.

Mercedes, 257 F.R.D. at 68.

In another portion of its analysis under Restatement § 6, the Court ruled that the

relationship between the parties is centered in New Jersey.  Based on that ruling, it found that

New Jersey's interest in applying the punitive portion of its consumer fraud statute outweighs the

interests of the other five states in having the compensatory portions of their laws control.  In

doing so, the Court noted the fortuitous nature of the other states' connections to the litigation,

stating:

> [T]he actions taken by Plaintiffs in reliance on Mercedes alleged
> misrepresentations – the payment of Tele Aid subscription fees or the $1,000
> upgrade charge – occurred throughout the United States, and may or may not have
> taken place in each Plaintiff's home state.  As discussed above, it is entirely
> possible that a given class member may have submitted payment to Mercedes
> from a location, such as an office or vacation-spot, outside his or her home state.
> In the absence of any evidence to the contrary, the Court finds that the ongoing
> relationship between Mercedes and the Tele Aid subscribers from which class
> members will be drawn was centered at the place where the alleged misconduct
> underlying Plaintiffs' consumer fraud claim took place: the headquarters of the
> "Telematics team" in Montvale, New Jersey.

Id. at 69.

Finally, the Court ruled that consideration of "the basic policies underlying the particular

field of law" – another factor enumerated in Restatement § 6 – strongly supports the application

of the NJCFA to Plaintiffs' consumer fraud claim:

> Although the consumer fraud statutes of the various states from which class
> members will be drawn vary in many respects, every jurisdiction seeks to assure
> that plaintiffs can recover compensatory damages for any pecuniary loss suffered
> as the result of foreseeable reliance on a defendant's misrepresentations.  That
> shared policy would be frustrated if the Court applied the law of each Plaintiff's
> home state to his or her claims and refused on that basis to certify a class.  Given
> the relatively paltry amount of damages suffered by each potential class member –
> the Tele Aid subscription fees paid in anticipation of that system's continuing
> functionality and the upgrade charge for those individuals who purchased digital
> equipment – the requirement that potential class members individually pursue
> their claims would effectively bar suits by creating a situation where the costs to

each Plaintiff of pursuing his or her proceeding would dwarf any potential recovery.

Id. at 69.

The Court's April 24, 2009 holding that the policies of the six states in which the actions that make up this litigation were filed will be best served by certifying a class applying New Jersey law to the Plaintiffs' consumer fraud claim is equally applicable at this stage of the case. Granting the relief sought by Mercedes in its pending Motion – decertification of the class based on a determination that the law of each Plaintiff's home state should apply to his or her claim – would infringe the compensatory interests of all six of the states in which this litigation's constituent actions were filed by winnowing the size of any potential group of plaintiffs to such a small number that it would be irrational for them to pursue their suits. Such a ruling would be incompatible with the important federal policies that led Congress to vest consumers with a weapon to protect themselves from illegal practices on the part of companies like Mercedes by banding together as a class. Indeed, acceptance of Mercedes's argument would result in a situation in which corporations that operate in multiple jurisdictions could escape the effect of state consumer fraud laws they view as unfavorable to their interests by delegating to nameless, faceless offices the task of preparing deceptive materials, distributing the materials throughout the country, and then claiming that the law of each jurisdiction in which those materials were disseminated should apply to claims brought by residents of that jurisdiction, all while knowing that the relatively small amount of losses suffered by those residents would make it irrational to pursue such claims individually. See Id. at 60 ("[I]t would be absurd to apply the laws of all 50 states and the District of Columbia to the claims of potential class members from those jurisdictions simply because Mercedes's alleged wrongdoing – which emanated from New Jersey – was so widespread as to affect individuals throughout the United States."). The policies

behind our federal class action mechanism weigh heavily against such a result.  Windsor, 521

U.S. at 617.  Therefore, the Court reiterates its April 24, 2009 holding that New Jersey law

applies to the Plaintiffs' consumer fraud claims under the Restatement's "most significant

relationship" test.[17]

### iii.    Consideration of Class Members' Individual Knowledge

The company's final argument in support of its Motion to Decertify the Class is totally

disconnected from both the content of the April 24, 2009 Opinion and the applicable case law.

Mercedes contends that the Court "failed to consider how individual class members' knowledge

and motivation might affect causation" and "failed to consider Mercedes'[s] arguments and

evidence on the issue of class members' knowledge and motivation."  (Def.'s Br. Supp. Mot.

Decertify Class 18.)  In doing so, it claims that:

> Nafar relies on and adopts the reasoning of International Union of Op[erating]
> Eng[ineer]s Local #68 v. Merck & Co., in which the New Jersey Supreme Court
> found that potential class member's [sic] "individualized decisions" were
> necessarily part of the NJCFA causation analysis, such that "defendant's behavior
> is but a small piece of the required proofs" and "the common fact questions
> surrounding what defendant knew and what it did not would predominate."

(Id.) (quoting Int'l Union of Op. Eng'rs, 929 A.2d at 1087.)

---

[17] The Court's ruling that New Jersey has the "most significant relationship" to the Plaintiffs'
consumer fraud claim draws strong support from analogous rulings by courts in two of the four
relevant states that use the Restatement's choice of law test.  See, e.g., Armstrong Bus. Servs.,
Inc. v. H & R Block, 96 S.W.2d 867, 873 (Mo. Ct. App. 2002) (holding that Missouri law
applied in a contract suit between a defendant located in that state and its franchisees, who were
located elsewhere, because Missouri was the state in which the defendant was headquartered and
incorporated, and the defendant company's conduct was performed at least partially in that
state); Ernst v. Ford Motor Co., 813 S.W.2d 910, 921-22 (Mo. Ct. App. 1991) (same); Singh v.
Edwards Lifesciences Corp., 210 P.3d 337, 342 (Wash. Ct. App. 2007) (ruling that California
law applied in a case in which citizens of Washington were injured due to a California
company's failure to disclose defects in medical equipment because "the conduct which resulted
in the injury occurred in California," and the defendant's "headquarters" – where the defect was
discovered and the decision to conceal it made – were located in that state, while "the only
Washington contact was the plaintiff's residency.").  It does not appear that Illinois and New
Jersey, the latter of which only adopted the Restatement test in 2008, have ever addressed a
situation similar.

Both of those assertions – the factual claim that the Court did not consider how variations in the Plaintiffs' individual levels of knowledge might affect causation and the legal claim that Nafar requires consideration the "individualized decisions" of class members in all consumer fraud cases – are demonstrably wrong.

As a preliminary matter, the Court rejects Mercedes's interpretation of Nafar.[18]  That decision cited International Union of Operating Engineers for the proposition that:

> [E]vidence of plaintiffs' conduct relevant to the causation issue cannot be ignored without comment in a predominance analysis.  This is because the Supreme Court of New Jersey has held that individual issues regarding plaintiff's behavior may, in certain cases, defeat predominance in a NJCFA class action, despite the uniformity of a defendant's misrepresentations or omissions.

Nafar, 339 F. App'x at 223 (emphasis added).

Thus, Nafar did not hold, as Mercedes contends, that "[c]lass members' knowledge and motivations are relevant and must be considered as part of the Court's predominance analysis." (Def.'s Br. Supp. Mot. Decertify Class 19.)  It held that plaintiffs' conduct may be relevant, and if so, differences in the plaintiffs' actions may defeat predominance.

In International Union of Operating Engineers, the Supreme Court of New Jersey addressed the circumstances under which potential class members' individual conduct are relevant to the Court's predominance analysis.  Before doing so, it explicitly reiterated that the predominance inquiry under Rule 23(b)(3) does not require "that individual issues be absent, or that common issues dispose of the entire dispute.  Nor does predominance require that all issues

---

[18] As discussed above, the decision in Nafar cannot serve as a proper procedural basis for Mercedes's request that the Court reconsider its April 24, 2009 Opinion.  Nafar was issued as an NPO, and therefore did not affect the governing case law.  See supra II(A).  Moreover, this Court cited the Supreme Court of New Jersey's decision in International Union of Operating Engineers in its causation analysis – the exact portion of its prior decision which Mercedes now contends ignored that precedent.  See Mercedes, 257 F.R.D. at 74; see also at 66 n.9.  Accordingly, the April 24, 2009 Opinion makes it clear that the Court considered International Union of Operating Engineers, and there has been no change in law or oversight that would justify a grant of reconsideration.

be identical among the class members or that each class member be affected in precisely the same manner." Int'l Union of Op. Eng'rs, 929 A.2d at 1083. The Court then discussed the unique factual circumstances of that case, which involved a suit by funds that acted as third-party payors who reimbursed individuals covered by their benefit plans for the purchase of Vioxx, a prescription drug marketed by the defendant in that case as a safer and more effective alternative to traditional arthritis medications, but later revealed to cause severe cardiovascular side-effects.

In ruling that common issues of fact and law did not predominate as required by Rule 23(b)(3), the Supreme Court of New Jersey focused on the method by which the third-party payor plaintiffs selected the drugs that would be reimbursable under their respective plans. The determination as to which drugs to cover, which was referred to by the plaintiffs as a "formulary," was made by separate committees hired by each third-party payor. As noted by the Court, those committees selected the drugs that would be reimbursed by each plan by "conducting their own evaluation of the effectiveness, safety, and cost of each medication." Id. at 1080 (describing in detail variations the review processes of the various committees). "The decision to include a medication" in one plan did "not necessarily result in uniform treatment of that drug in every forumulary, as each operate[d] differently." Id. at 1081. Rather, the various committees used different methods to evaluate prospective drugs, and thus had varying degrees of knowledge of the benefits and side-effects of any given drug. Therefore, the Supreme Court of New Jersey ruled that, "as a factual matter, there [we]re such divergences among the class members as to how they analyzed the [alleged misrepresentations] received from [the] defendant that class certification [wa]s inappropriate." Id.; see also Id. at 1087 ("[P]laintiff does not suggest that each of these proposed class members, receiving the same information from

defendant, reacted in a uniform or even similar manner…. [E]ach third-party payor … made individualized decisions concerning the benefits that would be available to its members.").

In contrast, the Plaintiffs in this case reacted in a uniform manner to the information they received from Mercedes:  each subscribed to Tele Aid and maintained that subscription until being informed that their service would be discontinued at the end of 2007.  Unlike the third-party payors in International Union of Operating Engineers – who employed armies of consultants and physicians to undertake independent research in an attempt to verify the claims at issue in that case – the Plaintiffs here were not sophisticated enough to individually test the statements made by Mercedes.  Nor could they have.  Even if the class consisted only of experienced communications lawyers with in-depth knowledge of the FCC regulatory process, obtaining such verification would have been impossible, as it is undisputed that the August 22, 2002 communication in which AT&T informed Mercedes that it would discontinue analog service as soon as the FCC rule took effect was confidential and could not have been obtained by consumers, no matter how sophisticated.  See (Munroe Decl., Ex. 12 at 3.)

The nature of the statements at issue in this case creates a second, and important, distinction between the Plaintiffs' consumer fraud claims and those at issue in International Union of Operating Engineers.  That litigation involved affirmative misrepresentations, whereas the Plaintiffs in this matter complain of omissions.  The conduct of plaintiffs in omissions actions is less relevant than in cases based on affirmative misrepresentations.  In misrepresentation cases, the plaintiffs receive false information and may, as was the case in International Union of Operating Engineers, react to that information differently.  See 929 A.2d at 1087 ("The evidence about separately created formularies, different types of tier systems, and individualized requirements for approval or reimbursement imposed on various plans' members and, to some

74

extent, their prescribing physicians … convinces us that the commonality of defendant's behavior is but a small piece of the required proofs.").  With omissions, however, the plaintiffs cannot react differently to the defendant's wrongdoing – they do not receive any sort of statement to which they can react at all.

Based on the fact that the consumer fraud claim in this case is premised on omissions rather than misrepresentations, the Court held in its April 24, 2009 Opinion that Plaintiffs will be able to establish causation by common proof; they must simply show that Mercedes knew that analog Tele Aid service would not be available after 2007, but did not inform the class members of that development until after they had purchased vehicles that contained analog-only systems and subscribed to Tele Aid.  See Mercedes, 257 F.R.D. at 74-75 ("[I]f Plaintiffs demonstrate at trial that Mercedes failed to disclose the impending obsolescence of analog Tele Aid, that omission will be presumed to have caused Plaintiffs' loss and there will be no need for individualized evidence regarding causation.").  The Court cited two cases in support of that ruling.  In the first, Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153 (1972), the Supreme Court of the United States acknowledged that the conduct of individual plaintiffs is of less relevance in a fraud action based on omissions rather than misrepresentations, and held that causation is established in such actions if the plaintiffs demonstrate that the defendant withheld material information, stating:

> Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable [purchaser] might have considered them important in the making of [his or her] decision.  This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact.

The Appellate Division of the New Jersey Superior Court applied that holding to class action litigations such as this one in Varacallo, 752 A.2d at 817-18, when it stated that "[t]he

presumption or inference of reliance and causation, where omissions of material fact are common to the class, has been extended in the context of both common law and statutory fraud…. Where the omission of fact is common to the entire class, class certification is favored."[19]

Mercedes's failure to grasp those precedents and the corresponding distinction between cases involving affirmative misrepresentations (where variations in the plaintiffs' conduct are relevant) from cases involving omissions (where they generally are not) explains its meritless factual assertion that the Court "failed to consider how individual class members' knowledge and motivation might affect causation" and "failed to consider Mercedes'[s] arguments and evidence on the issue of class members' knowledge and motivation." (Def.'s Br. Supp. Mot. Decertify Class 18). The Court considered Mercedes's arguments relating to variations in the class members' levels of knowledge, but found that they were not relevant because "Plaintiffs will not need to prove at trial that each individual class member relied on Mercedes statements relating to Tele Aid when purchasing their vehicles." Mercedes, 257 F.R.D. at 74. Indeed, because the Plaintiffs will be required to show only a "causal nexus" rather than actual reliance on Mercedes's alleged misrepresentations or omissions, see N.J. Stat. Ann. § 56:8-2, the Court held that their consumer fraud claims will "turn on the knowledge and actions of the company rather

---

[19] Mercedes claims in a baffling contortion of the applicable case law that Nafar, by relying on International Union of Operating Engineers, rejected the reasoning contained in Varacallo. (Def.'s Br. Supp. Mot. Decertify Class 18-19.) That contention is puzzling in light of the fact that the Supreme Court of New Jersey cited Varacallo on two separate occasions in its decision in International Union of Operating Engineers. See 929 A.2d at 1083. Thus, Nafar's reliance on International Union of Operating Engineers has no effect on validity of Varacallo (if anything, it would strengthen that precedent). As discussed above, the latter two cases are not conflicting, but complementary: the first deals with consumer fraud claims involving affirmative misrepresentations, while the second deals with cases involving omissions. Tellingly, Mercedes's briefs make no reference whatsoever to the Supreme Court's ruling Affiliated Ute Citizens of Utah – a binding precedent from the highest possible authority, and one that could not possibly have been altered by Nafar.

than those of the individual class members," and therefore disregarded Mercedes's arguments on that point. Id. at 73.

Even if the Court had considered the company's evidence and arguments relating to variations in the Plaintiffs' knowledge of the impending obsolescence of analog Tele Aid, doing so would not have changed its April 24, 2009 ruling that common issues of law and fact – including those relating to causation – predominate. Mercedes submits three main pieces of evidence in support of its assertion to the contrary. First, it points to disclosures contained in the Subscriber Agreements signed by the Plaintiffs, which the company contends "informed [them] of the FCC rule change and the impending obsolescence of analog-only Tele Aid." (Def.'s Br. Supp. Mot. Decertify Class 20). Second, Mercedes claims that class members who purchased pre-owned vehicles containing analog Tele Aid systems after December 2006 were informed that their systems would not function after 2007 by disclosure stickers affixed to the windows of vehicles. Finally, the company notes an expert report submitted by Dr. Thomas C. O'Guinn, a Professor of Marketing at the University of Wisconsin, who "opined that thousands of class members would have had independent knowledge of the discontinuation of analog service." (Id. at 23.)

The company's argument that the disclosures contained in its Subscriber Agreements were sufficient to inform the Plaintiffs of the impending obsolescence of Tele Aid borders is meritless. The three disclosures cited by Mercedes were all phrased in the hypothetical. The first, which was included in Subscriber Agreements distributed in 2003 and 2004, stated that "[y]our Tele Aid system uses analog wireless signals. If the wireless carrier terminates or restricts analog services, the Tele Aid systems will not be available." (Id. at 20-21) (emphasis

added.)  The second, which was included in Subscriber Agreements signed by two of the named

Plaintiffs in April and July 2004, used similarly conditional language:

> Your Tele Aid system uses analog wireless signals.  <u>If</u> the wireless carrier terminates or restricts analog services, the Tele Aid systems <u>may</u> not be available.  UNDER THIS CIRCUMSTANCE, SOME OR ALL OF THE TELE AID SERVICES MAY BE SUSPENDED OR TERMINATED WITHOUT NOTICE TO YOU AND WITHOUT LIABILITY.[20]

(<u>Id.</u> at 21) (emphasis added.)

Despite knowing about the FCC rule change, which was proposed on May 17, 2001 and finalized

on August 8, 2002, Mercedes included no reference to that development in either of the first two

disclosures.  Its failure to do so is especially telling in light of the fact that its submissions to the

FCC opposing that change vociferously argued that it would "prematurely render the hardware

[contained in analog-only Tele Aid systems] obsolete," (Munroe Decl., Ex. 4 at 3), and would

endanger subscribers' safety by making it impossible to provide crash notification and

emergency response services through the use of Tele Aid.  (<u>Id.</u>, Exs. 3, 5.); <u>see also</u> <u>Mercedes</u>,

257 F.R.D. at 51 (discussing the company's submissions to the FCC).

Only the third disclosure cited by Mercedes contained a reference to the FCC rule

change.  Like the others, that disclosure was phrased in the hypothetical and informed the

Plaintiffs only that their service <u>might</u> become unavailable:

> Your Tele Aid system uses analog cellular telephone signals which the FCC will no longer require to be provided after early 2008.  Additionally, cellular carriers have been permitted to reduce their analog networks which may result in some

---

[20] Mercedes has not argued that the "without liability" language in that disclosure resulted in a knowing and voluntary waiver of the consumer fraud claims at issue in this case.  Therefore, Mercedes has waived its right to appeal the Court's class certification ruling based on such an assertion.  <u>See, e.g.</u>, <u>Bagot v. Ashcroft</u>, 398 F.3d 252, 256 (3d Cir. 2005) ("[I]t is well established that failure to raise an issue in the district court constitutes a waiver of the argument.") (quotations and citations omitted); <u>Shell Petroleum, Inc. v. United States</u>, 182 F.3d 212, 218 (3d Cir. 1999) ("[A] party … must unequivocally put its position before the trial court at a point and in a manner that permits the court to consider its merits.").

degraded services in some areas.  <u>If</u> the wireless carrier terminates or restricts analog services, the Tele Aid services will not be available.

(Def.'s Br. Supp. Mot. Decertify Class 21) (emphasis added.)

In asserting that the hypothetical language contained in the aforementioned disclosures was sufficient to inform analog Tele Aid subscribers that their service would be discontinued at the end of 2007, Mercedes fundamentally misconstrues the nature of the Plaintiffs' consumer fraud claim.  Plaintiffs contend that Mercedes knew as early as August 8, 2002 – when the FCC finalized its rule change – that analog Tele Aid service would not be available after 2007.  In support of that contention, they submitted documentary evidence that AT&T informed Mercedes that it would – not <u>might</u>, but <u>would</u> – "shut down" its analog network as soon as soon as the requirement that it provide such service expired.  (Munroe Decl., Ex. 12 at 3.)  Based on that document, which was dated August 22, 2002, and the various statements made by Mercedes in promoting Tele Aid, the Plaintiffs claim that Mercedes committed consumer fraud by failing to inform customers who purchased vehicles and subscribed to Tele Aid after August 8, 2002 that their service would not be available for the entire life of their cars.  (Consol. Compl. ¶ 66) ("Mercedes knew that analog-only Tele Aid systems would become obsolete during the useful life/lease terms of the vehicles in which they were installed, but failed … to disclose this material fact to Plaintiffs and class members.")  It was not the <u>possibility</u> that analog Tele Aid would become obsolete that constitutes the "material fact" Plaintiffs claim Mercedes concealed, but rather the <u>certainty</u> that it would do so.  <u>See</u> N.J. Stat. Ann. § 56:8-2 (Prohibiting "the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment.").  Therefore, Mercedes's reliance on the disclosures contained in its Subscriber Agreements, which stated only that Tele Aid <u>might</u> not be available, is inapposite.

In contrast, the disclosure stickers affixed to the windows of pre-owned Mercedes vehicles sold after December 2006[21] used language that informed purchasers in no uncertain terms that their Tele Aid systems would soon be obsolete, stating:

> This vehicle is equipped with a Tele Aid unit which was designed to provide services over the analog wireless network.   Consistent with a Federal Communications Commission ruling allowing carriers to shut down the analog wireless network, this device employs analog wireless technology which is no longer supported by the wireless carrier.   In order to continue the availability of the security and convenience benefits of Tele Aid on this vehicle, Mercedes-Benz USA is offering for purchase through and installation by its authorized dealerships analog-to-digital upgrade equipment that will permit the Tele Aid system to operate on the digital wireless network.

(Def.'s Br. Supp. Mot. Decertify Class 22.)

Mercedes is correct in its assertion that the Court did not consider those disclosures in its April 24, 2009 Opinion.  The reason for that oversight is simple:  Mercedes did not raise the issue of the disclosure stickers prior to that ruling.  Despite its indignant assertion in connection with the pending Motion that the Court erred by ignoring the disclosure stickers, the company made no reference whatsoever to those stickers in any of its submissions or oral arguments relating to the Motion for Class Certification.  In fact, the first mention of those disclosure stickers came in the company's brief in support of its pending Motion to Decertify the Class, which was filed on August 31, 2009, almost five months after the Court issued its prior ruling.

Normally, the Court would be prohibited from reconsidering its April 24, 2009 judgment based on evidence, such as the disclosure stickers, that a party could have presented during the earlier proceeding but did not.  North River, 52 F.3d at 1218 (A party seeking reconsideration

---

[21] It is not entirely clear whether such stickers were actually placed on all pre-owned Mercedes vehicles sold after December 2006.  The company claims only that it "instructed its dealers" to do so.  However, Plaintiffs have not disputed Mercedes's claim or produced any evidence that such disclosure stickers were not used.  Therefore, the Court will accept the implication of Mercedes's argument and will assume that such stickers were affixed to all pre-owned vehicles sold after December 2006.

must "rely on one of three major grounds: (1) an intervening change in controlling law; (2) the availability of new evidence not available previously; or (3) the need to correct clear error of law or prevent manifest injustice.") (emphasis added).  Allowing a party to achieve reconsideration by doing what Mercedes has done here – essentially, making up new arguments after a judgment has already been made in an effort to challenge a result with which it disagrees – would fundamentally undermine the finality of this Court's rulings and lead to endless relitigation of settled issues.  See, e.g., Yureko v. Port Auth. Trans-Hudson Corp., 279 F. Supp.2d 606, 609 (D.N.J. 2003) ("[M]ere disagreement with a court's decision normally should be raised through the appellate process and is inappropriate on a motion for [reconsideration].… Thus, the motion may address only dispositive factual matters or controlling decisions of law that were presented to, but not considered by, the court in the course of making the decision at issue.") (internal quotations omitted); Resorts Int'l, 830 F. Supp. at 831 n.3 ("We are in fact bound not to consider such new materials, lest the strictures of our reconsideration rule erode entirely.") (emphasis in original).

In this case, however, the Court is faced with two Motions:  one for reconsideration – in the form of Mercedes's Motion to Decertify the Class – and another for clarification of the class definition.   The latter Motion, which will be discussed at length below, provides an appropriate opportunity for addressing the company's argument that it disclosed the impending obsolescence of analog Tele Aid to at least some class members by affixing stickers to the windows of pre-owned vehicles starting in December 2006.  Plaintiffs' consumer fraud claim is premised on Mercedes's alleged failure to inform Tele Aid subscribers that their service would expire at the end of 2007.  Individuals who had actual knowledge of the impending obsolescence of analog Tele Aid could not have been harmed by that failure – the omission would not have been the

cause in fact of their "ascertainable loss."  See Fink, 839 A.2d at 959 (Because the NJCFA

requires that "a plaintiff must allege that he was, in some manner, deceived," individuals who

"knew the truth" cannot claim that a given misrepresentation or omission was the cause of their

injury.).  In light of the fact that persons who purchased pre-owned vehicles to which the

disclosure stickers discussed above were affixed will not be able to demonstrate causation – an

essential element of their claim under the NJCFA – the Court will clarify its class definition to

exclude such individuals.[22]  In doing so, the Court does not wish to reward Mercedes's behavior

in failing to present evidence of the disclosure stickers during the prior proceedings relating to

class certification, but finds that the goal of narrowly tailoring the class to ensure that only

individuals with cognizable claims are included outweighs the company's litigation tactics.

As a final piece of evidence in support of its argument that the Court erred in its April 24,

2009 Opinion by failing to consider how variations in the Plaintiffs' individual knowledge of the

discontinuation of analog Tele Aid service might affect causation, Mercedes relies on the expert

report of Dr. Thomas C. O'Guinn.  (Def.'s Br. Opp'n Mot. Class Certification, Dec. 23, 2008

Decl. of Thomas C. O'Guinn ("O'Guinn Decl.").)  Dr. O'Guinn testified in his report that,

regardless of whether Mercedes withheld information about the impending obsolescence of

analog Tele Aid, "thousands" of potential class members would have had independent

knowledge that their service would expire at the beginning of 2008.  (Id. at 9.)  That conclusion

was based on the fact that various media outlets reported on the FCC rule change that allowed

cellular providers to discontinue analog service.  Dr. O'Guinn's asserted that many Mercedes

owners would have seen those reports because the "demographic characteristics of Mercedes-

---

[22] It is unlikely that this clarification will eliminate many class members, as Mercedes did not
begin affixing such disclosure stickers to its pre-owned vehicles until December 2006, and the
prior class definition included only those individuals who bought or leased a Mercedes vehicle
and subscribed to analog Tele Aid prior to being informed of that system's impending
obsolescence via the disclosure letters sent by the company beginning in early 2007.

Benz owners match those of the greatest media users and those who learn the most from media."

(Id.)

Dr. O'Guinn's findings are both unreliable and irrelevant, and therefore were not considered by the Court in its April 24, 2009 Opinion.  His conclusion that class members would have known that their analog Tele Aid service would no longer be available after 2007 is belied by the nature of the data on which he based that opinion.  Specifically, Dr. O'Guinn stated that a search of media reports published in the United States revealed 3,274 articles that "specifically discussed the FCC [rule] change."  (Id. at 8.)  His report does not include citations to those articles that would allow the Court to conduct an independent review of their relevance to the Plaintiffs' consumer fraud claims.  Nor does it give important information on the media sources in which the articles appeared – i.e., the circulation and availability of each source.  Without such information, it is impossible to tell whether the articles appeared in high-circulation newspapers such as The New York Times or Washington Post (in which case it would be more likely that at least some of the class members would have read the articles), in more obscure sources whose coverage is limited to technological developments such as Wired magazine, or even in trade publications aimed exclusively at individuals in the wireless communications industry.  In the absence of reliable evidence to the contrary, the Court finds it highly unlikely that the rule change was so widely-reported as to be common knowledge outside of the small circle of communications lawyers whose practices focus on FCC administrative actions and their clients, companies such as AT&T and Mercedes, who have a direct stake in those developments.[23]

_____

[23] Other portions of Dr. O'Guinn's expert opinion appear to contradict his assertion that thousands of class members would have been aware of the FCC rule change.  For example, he contended throughout his report that Mercedes would have simply confused its customers by disclosing the existence of the FCC action, stating that "if Mercedes-Benz dealers had provided detailed information about the [rule change] as part of the car shopping/buying experience, this would have violated the consumers' car buying script, causing consumer confusion."  (Id. at 5.)

The Court's holding that Dr. O'Guinn's expert report is unreliable draws further support from flaws in his research methods.  The media sources on which Dr. O'Guinn bases his conclusions include stories from 2007, many of which may have been published after Mercedes posted information relating to the impending obsolescence of analog Tele Aid on its website and/or began distributing letters to Tele Aid subscribers informing them that their service would not be renewed.  See (Id.) ("An analysis of media coverage from 2002-2007 demonstrates a significant number of stories … about the FCC's elimination of the analog rule for cellular transmission.")  In fact, Dr. O'Guinn's own data demonstrates that, while "[a] significant number of articles began appearing in late 2002," the "media coverage [of the FCC rule change] continued to increase up through the end of 2007."  (Id.)  Although Dr. O'Guinn did not categorize the media reports on which he relied according to the year in which they were published, thus making it impossible to tell exactly how many of his sources post-dated Mercedes's disclosure of the FCC rule and impending obsolescence of analog Tele Aid, a graph contained in his expert report reveals that more of those articles – over 300 – were attributable to 2007 than any other year.  In fact, more of the reports on which Dr. O'Guinn based his conclusion were published in 2007 than the years 2002, 2003, and 2004 combined.  (Id. at 9.)  In light of the fact that those articles may have been reported after Mercedes disclosed that analog Tele Aid service would be discontinued at the end of 2007 – the very "material fact" that forms the basis of Plaintiffs' consumer fraud claims – Dr. O'Guinn's conclusion that thousands of class

---

Elsewhere, he stated that "[i]f manufacturers were required to disclose" information such as the existence of the rule change, "it would overwhelm consumers and ultimately harm them by obscuring other important information that was more important for them."  (Id. at 21.)  Plaintiffs obviously disagree, as demonstrated by their assertion of a consumer fraud claim based on Mercedes's alleged omissions.  So does the New Jersey legislature, which passed the NJCFA to prohibit "the the knowing concealment, suppression, or omission of any material fact … in connection with the sale of merchandise."  N.J. Stat. Ann. § 56:8-2.

members would have been aware of that information prior to the company's disclosure must be rejected.

Finally, and most importantly, Dr. O'Guinn's conclusions are simply not relevant to the Plaintiffs' consumer fraud claim.  In his expert report, Dr. O'Guinn addressed only the question of whether class members would have known of the FCC rule change – which allowed cellular providers to discontinue analog service in February 2008, but did not require that they do so. See (Id. at 8-9) (discussing the "number of stories … about the FCC's elimination of the analog rule for cellular transmission.")  He did not opine on whether the Plaintiffs knew that AT&T, the telecommunications company responsible for providing the analog signals on which their Tele Aid systems depended, would take advantage of that rule and discontinue analog service at the end of 2007.  Plaintiffs allege that AT&T informed Mercedes of its intention to do just that in confidential communications between the two companies as early as August 22, 2002.  See (Munroe Decl., Ex. 12 at 3.)  It is Mercedes's failure to disclose that AT&T would discontinue analog service at the end of 2007, thus rendering the Plaintiffs' Tele Aid systems useless, that constitutes the concealment of a "material fact" on which Plaintiffs base their consumer fraud claim.[24]  See (Consol. Compl. ¶ 66) ("Mercedes knew that analog-only Tele Aid systems would become obsolete during the useful life/lease terms of the vehicles in which they were installed, but failed … to disclose this material fact to Plaintiffs and class members.") (emphasis added). Whether the Plaintiffs knew about the FCC rule change itself is immaterial; such knowledge would have informed them only that their Tele Aid systems might become obsolete, whereas the Plaintiffs contend that Mercedes knew those systems would, in fact, become useless at the end of 2007.

---

[24] As discussed below, the class will be modified to reflect the date, August 22, 2002, on which AT&T informed Mercedes of its intent to discontinue analog service.

For the same reason, the Court rejects Mercedes's contention that many "class members would have received information from General Motors … that disclosed the impact of analog termination on [their] telematics service." (Def.'s Br. Supp. Mot. Decertify Class 23.) Dr. O'Guinn included no statement to that effect in his expert report. Rather, the company's argument appears to be premised wholly on the fact that two of the named Plaintiffs – Colleen Sen and Karen Marcus – also owned vehicles manufactured by General Motors Company ("GM"), which were equipped with another analog-only emergency response system known as "OnStar." Following the FCC rule change, GM sent OnStart subscribers the following disclosure:

> FCC ruling 02-229 eliminates the requirement that wireless carriers support the analog network after February 16, 2008. As a result of this ruling, if the carriers for OnStar elect to provide only digital service commencing on 2/16/08, the system in the vehicle will not operate.

(Def.'s Br. Opp'n Mot. Class Certification, Decl. of Kathleen N. Fennelly ("Fennelly Decl."), Ex. 39 at 3) (emphasis added.)

As was the case with the disclosures sent to class members by Mercedes as part of its Tele Aid Subscriber Agreements, the GM statement was phrased in the hypothetical, stating that OnStar would become unavailable "if" the wireless carrier discontinued analog service. (Id.) Moreover, that disclosure referred only to the telecommunications company that provided analog service for GM's "OnStar" system, which may or may not have intended to discontinue service, and whose actions are not at issue in this case. It included no information on the "material fact" that Plaintiffs contend Mercedes concealed in this case: AT&T's stated intention to discontinue the analog service on which Tele Aid depended at the end of 2007. Therefore, the Court finds that the disclosures sent by GM to OnStar subscribers are not relevant to the Plaintiffs' consumer fraud action, and cannot serve as a basis for decertifying the class.

**C.  Motion for Clarification of the Class Definition**

Having rejected Mercedes's Motion to Decertify the Class, the Court now turns to the

company's Motion for Clarification of the Class Definition.  As discussed above, the class

certified by the Court's April 24, 2009 ruling includes:

> All persons or entities in the United States who purchased or
> leased a Mercedes-Benz vehicle equipped with an analog-only
> Tele Aid system after August 8, 2002, and
>
>> (1) subscribed to Tele Aid service until being informed that
>> such service would be discontinued at the end of 2007, or
>>
>> (2) purchased an upgrade to digital equipment.

Despite the inclusion of the words "until being informed" in the first subsection of that

definition – a reference to the letters Mercedes sent in late 2006 and early 2007 to Tele Aid

subscribers informing those who were scheduled to renew their service between June 2007 and

the end of that year that they would not be allowed to do so – Mercedes claims that "the Court

must have intended to limit class membership to those whose analog Tele Aid Service terminated

at the end of 2007."  (Def.'s Br. Supp. Mot. Clarification 3.)  In other words, Mercedes seeks to

exclude all members of the class as it is currently defined who had their service terminated on a

rolling basis from June through December of 2007 as part of the company's "customer ramp-

down" plan.

In support of its contention that such individuals should be excluded from the class,

Mercedes erroneously asserts that they lack standing, and therefore any interpretation of the class

that includes Tele Aid subscribers whose service was terminated prior to the end of 2007 would

be unconstitutionally overbroad.  (Def.'s Br. Supp. Mot. Clarification 4-7.)  As part of that

argument, Mercedes notes several categories of individuals included in the current class that it

claims did not suffer a cognizable harm:  (1) individuals who were included on the mailing list

used to distribute letters informing Tele Aid subscribers that their service would not be renewed, but "who sold or otherwise disposed of their vehicles before" receiving such letters, (2) "individuals who sold or otherwise disposed of their vehicles after receiving one or more of the Analog Termination Letters for reasons unrelated to the loss of Tele Aid service," (3) "those who chose voluntarily not to renew Tele Aid service for reasons of cost, dissatisfaction, or disinterest" after receiving a letter informing them that their service would not be renewed, and (4) individuals who no longer own the vehicle on which their claims are based.  (Id. at 3.)  Those in the first category lack standing, but are not included in the current class definition.  Those in the other three categories suffered an "ascertainable loss" cognizable under the NJCFA.  Therefore, the Court will not modify the class to exclude individuals who subscribed to Tele Aid until receiving a letter informing them that their service would not be renewed simply because their service was terminated prior to December 31, 2007.[25]

The precise nature of the harm at issue in Plaintiffs' consumer fraud claims is the key to assessing whether the various categories cited by Mercedes have standing.  Under the NJCFA, Plaintiffs do not need to demonstrate that they actually relied on the company's misrepresentations or omissions.  N.J. Stat. Ann. § 56:8-2 (allowing recovery "whether or not any person has in fact been misled, deceived or damaged" by the defendant's misrepresentation or omission); Int'l Union of Operating Eng'rs, 929 A.2d at 1087 ("Our CFA does not require proof that a consumer has actually relied on a prohibited act in order to recover.").  Rather, they must show an "ascertainable loss," meaning that they "paid for a product and got something less

---

[25] The modification urged by Mercedes would impermissibly condition the standing of any given class member on whether the company had the foresight to involuntarily terminate his or her Tele Aid subscription prior to the time that AT&T actually stopped providing analog service. Doing so would allow the company to escape liability to some class members – who suffered the same harm as those who had their service terminated after 2007 – on the basis of actions it took only after it allegedly omitted the material fact of Tele Aid's impending obsolescence.

than what had been promised."  Elias, 252 F.R.D. at 249 (internal quotations omitted); see also

Thiedemann v. Mercedes-Benz U.S.A., LLC, 872 A.2d 783, 792-93 (N.J. 2005) (defining

"ascertainable loss" as "either an out-of-pocket loss or a demonstration of loss in value" that is

"quantifiable and measurable.").  As discussed in the April 24, 2009 Opinion, it is the fact that

each class member subscribed to Tele Aid service until being informed that such service would

be discontinued – not the Plaintiffs' purchase of their vehicles or the discontinuation of analog

Tele Aid service – that gives rise to an "ascertainable loss" in this case:

> Plaintiffs do not allege that, but for the alleged misrepresentations, they would not
> have purchased their vehicles.  Nor do they contend that analog Tele Aid service
> would have been available after 2007 if not for Mercedes's alleged misconduct;
> AT&T stopped providing analog service because the FCC rule change removed
> the requirement that it do so, not because of any statement made by Mercedes.
> Plaintiffs simply claim that they did not get what they paid for – that because of
> Mercedes's alleged wrongdoing, they did not know that the Tele Aid systems in
> their automobiles would become useless long before the vehicles aged to such a
> degree that they were no longer drivable.

Mercedes, 257 F.R.D. at 74.

In other words, the harm at issue in Plaintiffs' consumer fraud claims is not that they were

induced to purchase their vehicles by Mercedes's alleged misrepresentations or omissions.

Rather, it is that they were induced, based on their expectation that the systems imbedded in their

vehicles would continue to function throughout the life of the car, to subscribe to Tele Aid

service during the period between their initial purchase and the time at which they were informed

– by means of the aforementioned letters sent by the company in 2006 and 2007 – that such

service would be terminated.[26]  Accordingly, individuals who owned their vehicles and

---

[26] As discussed in the April 24, 2009 ruling, the amount of that "ascertainable loss" is easily
quantified:

> Simply put, the sum of each class member's loss is the amount necessary to fulfill
> his or her expectation of a functioning Tele Aid system.  For those class members
> who did not purchase a digital upgrade, the ascertainable loss will be the cost of

continued to subscribe at the time they received the letter from Mercedes informing them that

their service would not be renewed have suffered an "ascertainable loss" and have standing,

while those who sold their automobiles or voluntarily discontinued their service before receiving

such a letter do not.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (In order

to have standing, "the plaintiff must have suffered an injury in fact – an invasion of a legally-

protected interest which is (a) concrete and particularized, and (b) actual or imminent, not

conjectural or hypothetical" which is likely to be "redressed by a favorable decision.") (internal

quotations and citations omitted).

Viewed in light of that analysis, the first category of persons pointed to by Mercedes –

those who were included on the mailing list used to distribute letters informing Tele Aid

subscribers that their service would not be renewed, but "who sold or otherwise disposed of their

vehicles before" receiving such letters – lack standing.  In disposing of their vehicles before

being informed that the analog Tele Aid systems imbedded in them would become obsolete at

the end of 2007, such individuals demonstrated that they did not intend to subscribe to Tele Aid

for the duration of their car's useful life.  In the absence of such intent, they suffered no damage

from the early termination of analog Tele Aid service.  To the contrary, the service to which they

subscribed was available during the entire period during which they owned the vehicle.

In order to ensure that all members of the class certified by its April 24, 2009 Opinion

had standing, the Court excluded individuals who sold or otherwise disposed of their vehicles

prior to being informed that their Tele Aid service would expire at the end of 2007.  That ruling

---

such an upgrade plus compensation for the time period between the end of 2007
and any eventual judgment, during which service was unavailable.  With respect
to Plaintiffs who purchased an upgrade to digital equipment, the amount paid for
that modification represents the total ascertainable loss.

Id. at 73-74.

stated repeatedly that the class would be limited "to vehicle owners who subscribed to analog

Tele Aid service until being told that service would be discontinued at the end of 2007 or

purchased a digital upgrade." Mercedes, 257 F.R.D. at 72, 73, 75.  The company's argument that

such individuals lack standing in its pending Motion for Clarification of the Class Definition

appears to be motivated not by a dispute with the Court's previous ruling, but rather a

disagreement with the Plaintiffs over the best method of sending notice of this suit to potential

class members.  Plaintiffs argue that notice should be sent to all individuals who were sent letters

in 2006 and 2007 disclosing the impending obsolescence of analog Tele Aid.  See (Pls.' Br.

Opp'n Mot. Clarification 3.)  Having already ruled that some of those individuals – the ones that

were included on Mercedes's mailing list but had already disposed of their vehicles at the time

they received the letters – lack standing, the Court finds that sending notice to every person who

received a letter relating to the termination of analog Tele Aid would be inappropriate.  The

problem of who should receive class notice, however, can be easily solved:  Mercedes must

simply cross-reference the list of individuals to whom it sent such disclosure letters with its Tele

Aid subscription records in order to determine which individuals on the mailing list were no

longer paying subscription fees at the time the letters were sent.  Doing so will limit the class

notice to those individuals who still owned their vehicles and continued to subscribe to analog

Tele Aid when the company disclosed that program's impending termination, and will therefore

narrow the class so that its "members can be identified through objective criteria," Chaing, 385

F.3d at 271 (citations omitted), while providing "the best notice that is practicable under the

circumstances."  Fed. R. Civ. P. 23(c)(2)(B).

    In contrast, the second category of individuals that Mercedes contends lack standing –

those who "sold or otherwise disposed of their vehicles after receiving one or more Analog

Termination Letters for reasons unrelated to the loss of Tele Aid service" – clearly fall within the class certified by the Court's April 24, 2009 Opinion. Contrary to Mercedes's arguments, such individuals suffered a legally-cognizable harm: they were induced by the company's alleged misrepresentations and/or omissions to subscribe to analog Tele Aid until being informed that their service would be terminated at the end of 2007. Whether they disposed of their vehicles and allowed their subscriptions to lapse during the few months between being informed that Tele Aid service would be terminated and the actual date of that termination does not alter the fact that they "paid for a product" – a vehicle with an embedded Tele Aid system that would function throughout the life of the car – "and got something less than what had been promised" – a Tele Aid system that was obsolete after 2007. See Elias, 252 F.R.D. at 249. Those who disposed of their vehicles after being informed of the impending termination of analog Tele Aid service, regardless of their reasons for doing so, were selling cars that they had thought would have a functioning emergency response system throughout their useful lives, but which was now useless. Therefore, the Court finds that individuals who sold or otherwise disposed of their vehicles after being informed that their Tele Aid service would expire at the end of 2007 but prior to the actual termination of that service have standing, and were correctly included in the class certified by its April 24, 2009 Opinion.

For the similar reasons, the Court rejects Mercedes's contention that a third category of individuals – "those who chose voluntarily not to renew Tele Aid service for reasons of cost, dissatisfaction, or disinterest" after receiving a letter informing them that their service would be terminated – have not suffered a cognizable harm and therefore must be excluded from the class. Such a category does not exist; there is simply no way a person could have "voluntarily" discontinued his or her service after being informed that it was being involuntarily terminated.

Mercedes's contentions to the contrary are purely speculative, as there is no way to prove that any given class member would have discontinued his or her Tele Aid subscription if that service had not been shut down. The relevant temporal inquiry in determining whether an individual is included in the class hinges on whether that individual continued to subscribe to analog Tele Aid at the time her or she was informed that service would be terminated. If so, the individual suffered an "ascertainable loss" – paying for a vehicle with an embedded emergency response system that he or she expected to function throughout the car's life and subscribing to that system until being informed that it would soon become useless – and must be included in the class.

In light of that analysis, the fourth category of individuals that Mercedes argues must be excluded from the class – those who no longer own the vehicles on which their claims are based – also have standing. Such individuals are similarly situated to those in Mercedes's second category, who sold or otherwise disposed of their vehicles after being informed that their Tele Aid service would be terminated but before that termination took place. Both groups suffered a legally-cognizable "ascertainable loss" – purchasing or leasing a Mercedes vehicle and subscribing to Tele Aid based on the belief that their service would continue throughout the vehicle's useful life, until being informed that analog service was actually scheduled to expire at the end of 2007. The fact that some class members disposed of their vehicles after being informed that Tele Aid service would be terminated is irrelevant; the vehicles they later sold did not include a functioning Tele Aid system, and thus were "something less than had been promised." Elias, 252 F.R.D. at 249. Therefore, the Court rejects Mercedes's argument that individuals who no longer own the vehicles on which their claims are based must be excluded from the class.

## III.  CONCLUSION

For the reasons set forth above, Mercedes's Motion to Decertify the Class will be denied. The class will be clarified in two ways.  First, the date after which a Plaintiff must have purchased or leased the vehicle on which his or her suit is based will be changed from August 8, 2002 to August 22, 2002.  While the FCC rule change became final on the former, the Plaintiffs have not produced evidence that AT&T informed Mercedes of its intent to take advantage of that change by discontinuing analog service until the latter date.  See (Munroe Decl., Ex. 12 at 3.) Therefore, the company could not have known with certainty that the analog Tele Aid systems imbedded in its vehicles would become obsolete until August 22, 2002.  As discussed above, the class must also be clarified in order to exclude individuals who, in December 2006 or thereafter, purchased pre-owned vehicles to which the company affixed stickers informing them of the FCC rule and the impending obsolescence of analog Tele Aid.  Therefore, the Court will modify the class definition contained in its April 24, 2009 Opinion to include:

> All persons or entities in the United States who purchased or leased a Mercedes-Benz vehicle equipped with an analog-only Tele Aid system after August 22, 2002, except those who purchased or leased a pre-owned Mercedes-Benz vehicle in December 2006 or thereafter, and
>
> > (1) subscribed to Tele Aid service until being informed that such service would be discontinued at the end of 2007, or
>
> > (2) purchased an upgrade to digital equipment.

Finally, the Court finds that today's ruling rests on two "controlling question[s] of law as to which there is a substantial ground for difference of opinion and that an immediate appeal … may materially advance the termination of the litigation."  28 U.S.C. § 1292(b).  Therefore, the Court will certify the matter for interlocutory appeal on the narrow questions of (1) whether a district court may entertain a motion for reconsideration of an order certifying a class after a

request for interlocutory review of that order pursuant to Rule 23(f) has been denied, and (2) whether this Court was correct in its April 24, 2009 holding that <u>Agostino</u> was wrongly decided insofar as that case ruled that Restatement § 148(1) applied to a consumer fraud action in which the misrepresentations or omissions at issue were made in one state but received by at least some plaintiffs in other states, while the choice of law analysis in such actions is governed by Restatement § 148(2).

      The Court will enter an Order implementing this Opinion.

                                   **_s/ Dickinson R. Debevoise_____**
                                   DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: March 15, 2010